No. 24-1608

## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

E.D., a minor by and through her parents and next friends MICHAEL DU-ELL and LISA DUELL; NOBLESVILLE STUDENTS FOR LIFE,

*Plaintiffs-Appellants,*

v.

NOBLESVILLE SCHOOL DISTRICT, et al.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Southern District of Indiana
Case No. 1:21-cv-03075-SEB-TAB

## OPENING BRIEF OF APPELLANTS

John J. Bursch
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@adflegal.org

Zachary S. Kester
L. Katie Buckner
Spencer E. Rehn
CHARITABLE ALLIES, INC.
3500 Depauw Blvd., Suite 3090
Indianapolis, IN 46268
(463) 229-0229
zkester@charitableallies.org
kbuckner@charitableallies.org
srehn@charitableallies.org

Tyson C. Langhofer
Mathew W. Hoffmann
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
tlanghofer@adflegal.org
mhoffmann@adflegal.org

*Counsel for Appellants*

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>24-1608</u>

Short Caption: <u>E.D., et al. v. Noblesville School District, et al.</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

      [ ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    <u>E.D., a minor by and through her parents and next friends Michael Duell and Lisa Duell;</u>

    <u>Noblesville Students for Life</u>

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    <u>Alliance Defending Freedom; Charitable Allies, Inc.</u>

(3)     If the party, amicus or intervenor is a corporation:

    i)     Identify all its parent corporations, if any; and

        <u>N/A</u>

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>N/A</u>

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    <u>N/A</u>

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    <u>N/A</u>

Attorney's Signature: <u>s/ Mathew W. Hoffmann</u>     Date: <u>June 3, 2024</u>

Attorney's Printed Name: <u>Mathew W. Hoffmann</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes [ ]   No [✓]

Address: <u>44180 Riverside Pkwy</u>

    <u>Lansdowne, VA 20176</u>

Phone Number: <u>571-707-4655</u>     Fax Number: _____

E-Mail Address: <u>mhoffmann@adflegal.org</u>

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 24-1608

Short Caption: E.D., et al. v. Noblesville School District, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐        **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)        The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

E.D., a minor by and through her parents and next friends Michael Duell and Lisa Duell;

Noblesville Students for Life

(2)        The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Alliance Defending Freedom; Charitable Allies, Inc.

(3)        If the party, amicus or intervenor is a corporation:

i)        Identify all its parent corporations, if any; and

N/A

ii)        list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)        Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)        Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: s/ Tyson C. Langhofer        Date: June 3, 2024

Attorney's Printed Name: Tyson C. Langhofer

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).        **Yes** ☐        **No** ☑

Address: 44180 Riverside Pkwy

Lansdowne, VA 20176

Phone Number: 571-707-4655        Fax Number:

E-Mail Address: tlanghofer@adflegal.org

rev. 12/19 AK

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>24-1608</u>

Short Caption: <u>E.D., et al. v. Noblesville School District, et al.</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
    <u>E.D., a minor by and through her parents and next friends Michael Duell and Lisa Duell;</u>

    <u>Noblesville Students for Life</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
    <u>Alliance Defending Freedom; Charitable Allies, Inc.</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        <u>N/A</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>N/A</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    <u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    <u>N/A</u>

Attorney's Signature: <u>s/ John J. Bursch</u>      Date: <u>June 3, 2024</u>

Attorney's Printed Name: <u>John J. Bursch</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☐   **No** ☑

Address: <u>440 First Street NW, Suite 600</u>

    <u>Washington, DC 20001</u>

Phone Number: <u>616-450-4235</u>      Fax Number: _____

E-Mail Address: <u>jbursch@adflegal.org</u>

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>24-1608</u>

Short Caption: <u>E.D., et al. v. Noblesville School District, et al.</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
<u>E.D., a minor by and through her parents and next friends Michael Duell and Lisa Duell;</u>

<u>Noblesville Students for Life</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
<u>Alliance Defending Freedom; Charitable Allies, Inc.</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        <u>N/A</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>N/A</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

<u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

<u>N/A</u>

Attorney's Signature: <u>s/ Zachary S. Kester</u>    Date: <u>June 3, 2024</u>

Attorney's Printed Name: <u>Zachary S. Kester</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes ☐ No ☑

Address: <u>3500 Depauw Blvd., Suite 3090</u>

<u>Indianapolis, IN 46268</u>

Phone Number: <u>463-229-0229</u>    Fax Number: _____

E-Mail Address: <u>zkester@charitableallies.org</u>

| Save As | Clear Form |
|---------|------------|

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 24-1608

Short Caption: E.D., et al. v. Noblesville School District, et al.

　　To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

　　The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

　　　　☐　　**PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)　　The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

　　　　E.D., a minor by and through her parents and next friends Michael Duell and Lisa Duell;

　　　　Noblesville Students for Life

(2)　　The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

　　　　Alliance Defending Freedom; Charitable Allies, Inc.

(3)　　If the party, amicus or intervenor is a corporation:

　　　　i)　　Identify all its parent corporations, if any; and

　　　　　　N/A

　　　　ii)　　list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

　　　　　　N/A

(4)　　Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

　　N/A

(5)　　Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

　　N/A

Attorney's Signature: s/ Spencer E. Rehn　　　　　　　Date: June 3, 2024

Attorney's Printed Name:  Spencer E. Rehn

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).　**Yes** ☐　**No** ☑

Address:  3500 Depauw Blvd., Suite 3090

　　　　Indianapolis, IN 46268

Phone Number: 463-229-0229　　　　　　　Fax Number: 

E-Mail Address: srehn@charitableallies.org

rev. 12/19 AK

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 24-1608

Short Caption: E.D., et al. v. Noblesville School District, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

E.D., a minor by and through her parents and next friends Michael Duell and Lisa Duell;

Noblesville Students for Life

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Alliance Defending Freedom; Charitable Allies, Inc.

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

N/A

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: s/ L. Katie Buckner    Date: June 3, 2024

Attorney's Printed Name:  L. Katie Buckner

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☑    **No** ☐

Address:  3500 Depauw Blvd., Suite 3090

Indianapolis, IN 46268

Phone Number:  463-229-0229    Fax Number:

E-Mail Address:  kbuckner@charitableallies.org

rev. 12/19 AK

# TABLE OF CONTENTS

Corporate Disclosure Statement................................................i

Table of Authorities...............................................................v

Statement Regarding Oral Argument .....................................1

Statement of Jurisdiction.......................................................2

Statement of Issues ...............................................................3

Introduction............................................................................5

Statement of the Case ...........................................................7

    A.    E.D. founded Noblesville Students for Life to bring a
        life-affirming message to campus. ..........................7

    B.    E.D. sought guidance from staff about her proposed
        pro-life flyers. ............................................................8

    C.    Principal McCaffrey revoked the chapter's status
        because of the "political" "content" of the flyers. .................10

    D.    Principal McCaffrey publicly accused E.D. of "multiple
        instances of disregard for school protocols."..........................11

    E.    Noblesville Schools required student group flyers to
        receive prior approval under its *Prior Restraint Policy*
        and maintained an unwritten *Censorship Custom* that
        banned "political" and "inappropriate" flyers......................12

    F.    Noblesville High School had no written policy on club
        recognition or revocation......................................14

    G.    Principal McCaffrey serves as the chief administrative
        officer of Noblesville High....................................14

    H.    The district court denied Plaintiffs summary judgment
        but granted Defendants summary judgment. ......................15

Summary of the Argument ..................................................18

Argument....................................................................21

I.  Defendants violated the First Amendment by censoring
    E.D.'s pro-life flyers and revoking recognition. .............21

    A.  Defendants' enforcement of their *Prior Restraint Policy*
        and *Censorship Custom* and revocation violated the
        Free Speech Clause (Count II).............................21

        1.  Neither *Tinker* nor *Hazelwood* permits
            Defendants to enforce their *Prior Restraint Policy*
            and *Censorship Custom* to ban "political" or
            inappropriate speech....................................22

            a.  *Hazelwood* doesn't apply.....................23

            b.  Defendants' enforcement of their *Prior
                Restraint Policy* and *Censorship Custom*
                fails *Tinker* because they had no evidence of
                disruption and because they discriminated
                based on viewpoint.............................26

            c.  Defendants' enforcement of their *Censorship
                Custom* fails under *Hazelwood*. ..........32

        2.  Defendants' revocation fails limited public forum
            scrutiny.......................................................34

    B.  Defendants retaliated against E.D.'s pro-life flyers by
        revoking registration (Counts V and VI). .............36

        1.  Defendants' revocation of club recognition and
            censorship of posters deters future speech.................37

        2.  E.D.'s "political" flyers motivated Principal
            McCaffrey's revocation decision...................38

        3.  Superintendent Niedermeyer acquiesced in
            Principal McCaffrey's retaliation. ...............44

    C.    Principal McCaffrey's revocation violated Plaintiffs'
associational rights (Count I).................................................45

II.   Defendants violated the Equal Access Act (Count VII). ...............46

III.  Noblesville Schools cannot escape liability under *Monell*............47

    A.    Noblesville Schools had a policy and custom and
practice prohibiting E.D. from displaying "political"
posters (Counts II and VII)....................................................49

    B.    Indiana law and the record establish Principal
McCaffrey as a final policymaker (Counts I, II, V, and
VII)......................................................................................50

Conclusion ........................................................................................54

Certificate of Compliance..................................................................56

Certificate of Service ........................................................................57

Circuit Rule 30(d) Statement.............................................................58

Required Short Appendix....................................................................59

# TABLE OF AUTHORITIES

**Cases**

*American Freedom Defense Initiative v. Suburban Mobility
   Authority for Regional Transportation,*
   978 F.3d 481 (6th Cir. 2020) .......................................................... 32

*Bart v. Telford,*
   677 F.2d 622 (7th Cir. 1982) .......................................................... 39

*Bridges v. Gilbert,*
   557 F.3d 541 (7th Cir. 2009) .......................................................... 37

*Burch v. Barker,*
   861 F.2d 1149 (9th Cir. 1988) ........................................................ 28

*Burrage v. United States,*
   571 U.S. 204 (2014) ........................................................................ 42

*Child Evangelism Fellowship of New Jersey, Inc. v. Stafford
   Township School District,*
   386 F.3d 514 (3d Cir. 2004) ........................................................... 27

*Christian Legal Society v. Walker,*
   453 F.3d 853 (7th Cir. 2006) .......................................................... 46

*Cohen v. California,*
   403 U.S. 15 (1971) .......................................................................... 34

*Comcast Corporation v. National Association of African American-
   Owned Media,*
   589 U.S. 327 (2020) ........................................................................ 47

*Dodge v. Evergreen School District #114,*
   56 F.4th 767 (9th Cir. 2022) ........................................................... 31

*Fayetteville Public Library v. Crawford County,*
   684 F. Supp. 3d 879 (W.D. Ark. 2023) ......................................... 32

*Fujishima v. Board of Education,*
   460 F.2d 1355 (7th Cir. 1972) ................................................. 28–29

v

*Gold v. Wilson County School Board of Education,*
632 F. Supp. 2d 771 (M.D. Tenn. 2009) ........................................ 33

*Greene v. Doruff,*
660 F.3d 975 (7th Cir. 2011) ........................................................ 45

*Gschwind v. Heiden,*
692 F.3d 844 (7th Cir. 2012) ........................................................ 51

*Harless by Harless v. Darr,*
937 F. Supp. 1339 (S.D. Ind. 1996) .............................................. 53

*Hazelwood School District v. Kuhlmeier,*
484 U.S. 260 (1988) ................................................................. 1, 24

*Healy v. James,*
408 U.S. 169 (1972) ...................................................................... 46

*Hedges v. Wauconda Community Unit School District No. 118,*
9 F.3d 1295 (7th Cir. 1993) .............................................. 25–27, 55

*Jones v. City of Chicago,*
856 F.2d 985 (7th Cir. 1988) ........................................................ 45

*Kujawski v. Board of Commissioners,*
183 F.3d 734 (7th Cir. 1999) .................................................. 50–52

*Mahanoy Area School District v. B.L. ex rel. Levy,*
594 U.S. 180 (2021) .................................................. 22–23, 28, 34

*McIntyre v. Ohio Elections Commission,*
514 U.S. 334 (1995) ...................................................................... 34

*Minnesota Voters Alliance v. Mansky,*
585 U.S. 1 (2018) ................................................................... 32, 37

*Mitchum v. Foster,*
407 U.S. 225 (1972) ...................................................................... 49

*Monell v. Department of Social Services,*
436 U.S. 658 (1978) ................................................................. 1, 49

*Muller by Muller v. Jefferson Lighthouse School,*
    98 F.3d 1530 (7th Cir. 1996) ................................................ 25, 26

*N.J. by Jacob v. Sonnabend,*
    37 F.4th 412 (7th Cir. 2022) .................... 1, 19, 22, 24–25, 28–29, 33

*Nuxoll ex rel. Nuxoll v. Indian Prairie School District #204,*
    523 F.3d 668 (7th Cir. 2008) ............................................ 28–29, 31

*Oliver by Hines v. McClung,*
    919 F. Supp. 1206 (N.D. Ind. 1995) ............................................ 53

*Peck ex rel. Peck v. Baldwinsville Central School District,*
    426 F.3d 617 (2d Cir. 2005) ........................................................ 33

*Pembaur v. City of Cincinnati,*
    475 U.S. 469 (1986) .................................................................... 54

*Prince v. Jacoby,*
    303 F.3d 1074 (9th Cir 2002) ..................................................... 35

*Rosenberger v. Rector & Visitors of University of Virginia,*
    515 U.S. 819 (1995) ............................................................. 30, 35

*Rudin v. Lincoln Land Community College,*
    420 F.3d 712 (7th Cir. 2005) ....................................................... 39

*Saxe v. State College Area School District,*
    240 F.3d 200 (3d Cir. 2001) ........................................................ 25

*Searcey v. Harris,*
    888 F.2d 1314 (11th Cir. 1989) ................................................... 34

*Shuttlesworth v. City of Birmingham,*
    394 U.S. 147 (1969) .................................................................... 29

*Southworth v. Board of Regents,*
    307 F.3d 566 (7th Cir. 2002) ....................................................... 30

*Spiegla v. Hull,*
    371 F.3d 928 (7th Cir. 2004) ....................................................... 40

*Surita v. Hyde,*
    665 F.3d 860 (7th Cir. 2011) .................................................... 37–39

*Tinker v. Des Moines Independent Community School District,*
    393 U.S. 503 (1969) .................................................. 1, 28, 37, 41, 55

*Tyler v. City of Kingston,*
    74 F.4th 57 (2d Cir. 2023) ............................................................ 35

*United States v. Playboy Entertainment Group, Inc.,*
    529 U.S. 803 (2000) ...................................................................... 36

*Valentino v. Village of South Chicago Heights,*
    575 F.3d 664 (7th Cir. 2009) ..................... 38, 40–42, 44, 51–52, 55

*Whitfield v. Spiller,*
    76 F.4th 698 (7th Cir. 2023) ......................................................... 41

## Statutes

20 U.S.C. § 4071 ........................................ 2, 4, 19–20, 26, 47

20 U.S.C. § 4072 .................................................... 4, 20, 48

28 U.S.C. § 1291 .................................................................. 2

28 U.S.C. § 1331 .................................................................. 2

28 U.S.C. § 1367 .................................................................. 2

28 U.S.C. § 2107 .................................................................. 2

Ind. Code § 20-18-2-14 .................................................... 15, 52

Ind. Code § 20-33-8-10 ............................................ 15, 21, 52–54

Ind. Code § 20-8.1-5-3 ..................................................... 53

## Other Authorities

1995 Ind. Legis. Serv. P.L. 131-1995, § 12 (H.E.A. 1279) (West) ........... 53

Cong. Globe App., 42d Cong., 1st Sess. (1871) ....................... 49

Feminist Majority Found., *Abortion* ........................................................ 31

Kelsy Burke, *Feminists have long supported trans rights*, Wash.
    Post (July 27, 2023) ........................................................................ 31

## <u>Rules</u>

Federal Rule of Appellate Procedure 4(a)(1)(A) ........................................ 2

Federal Rule of Civil Procedure 56(a) ..................................................... 22

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs request oral argument. The district court's decision applies the incorrect school-speech rule and exculpates a school district from the unlawful actions of one of its principals, who oversees a million-square-foot school with 3,200 students and 200 staff.

Doctrinal confusion abounds in school-speech cases. *E.g.*, *N.J. by Jacob v. Sonnabend*, 37 F.4th 412, 424 (7th Cir. 2022) (reversing district court decision that applied *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988) instead of *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969)). And this Court has not resolved whether an Indiana principal qualifies as a final policymaker under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Oral argument will help the Court decide these important issues and provide clarity to the district courts in this Circuit.

# STATEMENT OF JURISDICTION

This action raises federal questions under the United States Constitution and the Equal Access Act, 20 U.S.C. § 4071, giving the district court subject matter jurisdiction under 28 U.S.C. § 1331. The district court had supplemental jurisdiction over the Indiana law claims under 28 U.S.C. § 1367(a).

In September and October 2022, the district court dismissed all of the official capacity claims against the individual defendants and also sua sponte granted Defendants summary judgment on the Indiana tort law claims. Doc. 98; Doc. 108. On September 28, 2023, and on Plaintiffs' motion, the district court reinstated the official capacity Indiana tort law claims. Doc. 107; Doc. 168. On March 15, 2024, the district court granted Defendants summary judgment on all remaining claims and entered its final judgment. Doc. 189 at 1–2; Doc. 190. On April 15, 2024, Plaintiffs filed their notice of appeal within the 30-day period set by 28 U.S.C. § 2107(a) and Federal Rule of Appellate Procedure 4(a)(1)(A). Doc. 192. This appeal is from a judgment disposing of all parties' claims. This Court thus has jurisdiction under 28 U.S.C. § 1291.

# STATEMENT OF ISSUES

(1)    The First Amendment prohibits schools from censoring student speech based on viewpoint. It also prohibits schools from suppressing any student speech unless the school can show material and substantial disruption from the speech. Defendant Noblesville Schools' *Prior Restraint Policy* and *Censorship Custom* required advance administrative approval for any student flyer and prohibited any flyer Defendants deemed to be "political" or "not appropriate." Defendants applied that *Policy* and *Custom* to censor E.D.'s pro-life flyers, then revoked her student group's status because of the flyers. Did the district court err in granting Defendants summary judgment on Plaintiffs' First Amendment speech and association claims (Counts I and II)?

(2)    To reach trial on a First Amendment retaliation claim, the plaintiff need only show protected speech in part caused the retaliation. Defendant Principal Craig McCaffrey's revocation email condemned E.D.'s "political" and "not appropriate" flyers. He later publicly accused E.D. of violating the ban on "political" flyers, which led to the revocation. Did the district court err in granting Defendants summary judgment on Plaintiffs' retaliation claims (Counts V and VI)?

(3)    The Equal Access Act prohibits schools like Noblesville High from "discriminat[ing] against" the "political" content of student speech at student group "meetings," which it defines as "activities of student

groups" permitted by the school. 20 U.S.C. §§ 4071(a), 4072(3). Noblesville High allowed student groups to post flyers, yet Defendants told E.D. she couldn't post pro-life flyers because they were "political," then revoked her group's recognition because of those flyers. Did the district court err by granting Defendants summary judgment on Plaintiffs' equal-access claim (Count VII)?

(4)     Section 1983 imposes liability on municipalities when their policy or custom or final policymaker violates civil rights. Defendant Noblesville Schools admitted it imposed (1) an administrative approval requirement for student posters, and (2) a custom prohibiting "political" and inappropriate speech in student flyers. Defendant Principal McCaffrey—who supervises 3,200 students and 200 staff and who Indiana law gives the power to draft policy for his school—applied that policy and custom against E.D. and revoked her group's recognition because of her pro-life flyers. Did the district court err in exempting Noblesville Schools from liability (Counts I, II, V, and VII)?[1]

---

[1] Plaintiffs do not challenge the district court's grant of summary judgment on or dismissal of Counts III, IV, and VIII–XIX. Plaintiffs also do not challenge the district court's grant of summary judgment to Defendants Mobley and Luna on Count VI.

## INTRODUCTION

The summer before her freshman year of high school, E.D. resolved to bring a pro-life club, Plaintiff Noblesville Students for Life, to her future campus. She worked to raise money to fund the club's activities. She secured a faculty advisor. She also scheduled a meeting with Principal McCaffrey to have the club recognized, which would allow the group to post flyers and have meetings at school. E.D. and Noblesville Students for Life planned to spread a life-affirming message.

But Principal McCaffrey revoked the club's status shortly after granting it. Why? E.D. sought administrative approval to post two flyers she created advertising a club meeting, one of which contained the phrase "Defund Planned Parenthood." According to Defendant McCaffrey, those flyers were "political" and "not appropriate" under Noblesville Schools' *Prior Restraint Policy* and *Censorship Custom*.

The revocation and censorship forced E.D. to file suit, bringing First Amendment free speech, retaliation, and free association claims and an Equal Access Act claim. The district court granted Defendants summary judgment on these claims, making four erroneous rulings. First, according to the district court, E.D. had no right to post her pro-life flyers advertising a student club meeting because some may have viewed those flyers as the school district's speech. Second, it saw no evidence that Principal McCaffrey revoked status because of the flyers. Third, the court bypassed the Equal Access Act's definition of "meeting"

to hold E.D.'s speech unprotected by the Act. Fourth, the district court held that Noblesville Schools did not have an unlawful policy and relied on case law discussing a repealed statute to conclude that Principal McCaffrey was not a final policymaker for the district.

Both the law and the record evidence show the district court erred. This Court has held that *Tinker*, not *Hazelwood*, applies to student-created flyers. But E.D. never posted her flyers, Defendants had *zero* evidence to expect disruption, and their enforcement of their *Policy* and *Custom* discriminated based on viewpoint. Principal McCaffrey revoked status because of E.D.'s flyers. His revocation email condemned E.D.'s "political" and "not appropriate" flyers. He later publicly accused E.D. of violating protocol by asking to post "political" flyers. The Equal Access Act's definition of "meetings" applies to all activities in the school's forum, which includes posting flyers. So by discriminating against "political" flyers, Defendants violated the Act, which protects students' "political" speech. Finally, Noblesville Schools admitted its *Policy* and *Custom* represented the district's official policy. And Indiana law currently (unlike in the decades-old cases relied upon by the district court) gives Principal McCaffrey the power—independent of the school board—to write regulations governing student conduct.

This Court should reverse and remand with instructions to enter summary judgment for Plaintiffs as to liability, set a trial for damages,

and award other appropriate relief. At minimum, this Court should reverse and remand for trial.

## STATEMENT OF THE CASE

### A.  E.D. founded Noblesville Students for Life to bring a life-affirming message to campus.

The summer before starting high school, E.D. worked at an ice cream shop with a goal. Doc. 43 ¶ 150. She wanted to bring a chapter of Students for Life of America (SFLA) to Noblesville High School. *Id.* ¶¶ 14, 95. SFLA is a pro-life, life-affirming organization that seeks to mobilize the pro-life generation. *Id.* ¶ 15. The chapter, Noblesville Students for Life, assisted by the money E.D. earned over the summer, would spread that pro-life message at Noblesville High. Doc. 158-2; Doc. 152-2 at 545.

E.D. sought "to raise awareness and generate discussion" about abortion "while also doing something about it." Doc. 158-2. The club planned to complete "a lot of activities on and off campus," including "flyering, tabling, chalking, volunteering at a local pregnancy resource center," and hosting pro-life speakers. *Id.* Before her freshman year even started, E.D. found a faculty sponsor and scheduled a meeting with Principal McCaffrey to present her club idea. Doc. 152-2 at 5, 8. On August 3, 2021, E.D. met with Principal McCaffrey; he approved the club shortly thereafter. *Id.* at 6, 15.

Noblesville High operated a limited open forum for over 70 approved noncurricular student groups to bring their ideas to campus. Doc. 101 ¶¶ 344, 349; Doc. 158-30 at 1–3. According to Principal McCaffrey, student groups "connect[ed]" students "with a school activity" and allowed them to "talk about their common interests." Doc. 152-2 at 106; Doc. 158-3. Groups included Noblesville's Young Democrats, Young Republicans, Gender and Sexuality Alliance, Black Student Union, CRU, and Fellowship of Christian Athletes. Doc. 158-30 at 1–3. Approved clubs could hold meetings during the school day, hang flyers and posters at school, and attend the student activity fair. Doc. 152-2 at 58, 339; Doc. 101 ¶ 10. Students "initiated" and led these clubs with no sponsorship from Noblesville Schools. Doc. 158-25 ¶ 10.

## B. E.D. sought guidance from staff about her proposed pro-life flyers.

On August 27, E.D. met with Defendant Assistant Principal Janae Mobley to discuss scheduling an initial meeting and posting flyers advertising that meeting. Doc. 158-5 at 5. Assistant Principal Mobley told E.D. that any administrator could approve a flyer and that Defendant Dean Jeremey Luna (and not her) approved meeting dates. Doc. 152-2 at 44. That day, Assistant Principal Mobley emailed Dean Luna to schedule the meeting. *Id.* at 24. E.D.'s faculty sponsor had also emailed Dean Luna about scheduling a meeting. *Id.* at 26–27. And E.D. herself

emailed Dean Luna for a meeting date. *Id.* at 27. Dean Luna saw those emails but didn't respond. *Id.* at 27–28, 30.

Assistant Principal Mobley and E.D. didn't discuss the specific flyers E.D. wanted to use, so a few days later, E.D. emailed the below two flyers to Mobley for approval. Doc. 158-22 at 19; Doc. 158-5 at 1. E.D. used a template from the SFLA website. Doc. 158-5 at 5.



Assistant Principal Mobley responded that she did not "need the pictures of the signage." Doc. 158-5 at 4. Instead, she "need[ed] flyers advertising that this is a 'Noblesville Students for Life' Club meeting lo-

cation, date, and time." *Id.* Mobley's email made no reference to the flyers as "political." *Id.* E.D. thought that Mobley "provided a very complicated reason that didn't make sense" about what was permitted on the flyers. Doc. 158-18 at 17. She found it "unclear whether there was an issue with the specific picture on [the] flyer, an issue that there was a picture at all, or whether" the flyer simply "lack[ed] call out meeting information." *Id.*

On September 3, still not having received a response from Dean Luna, E.D. met with him to finally get a date for the meeting and resolve the ambiguity with the posters. Doc. 152-2 at 28. E.D. showed Dean Luna the flyers and asked "why" the flyers "had been vetoed previously." *Id.* at 33–34. Luna "[i]nitially" told E.D. that the flyers had a "picture" which was "not allowed." *Id.* at 34–35. When E.D. pointed out that other clubs had "approved flyers with pictures," Luna "changed his mind" and said the problem was with the "Defund Planned Parenthood" image. *Id.* at 35. Luna relayed that the school was "dancing on eggshells," referring to ongoing controversies about "political ideology." *Id.* And Luna told her he "might" have time "over th[e] weekend" to schedule a meeting date. *Id.* at 30.

### C. Principal McCaffrey revoked the chapter's status because of the "political" "content" of the flyers.

Immediately after talking with E.D., Dean Luna went to Principal McCaffrey's office to discuss scheduling the meeting. Doc. 158-23 at 5–6.

Principal McCaffrey, Dean Luna, and Assistant Principal Mobley discussed the meeting Luna had just had with E.D., and Luna returned to his office. *Id.* at 6.

Later that morning, Principal McCaffrey emailed E.D.'s mother, Mrs. Duell—but not E.D.—informing her he had revoked the chapter's status. Doc. 158-3; Doc. 152-2 at 75. Principal McCaffrey claimed that Assistant Principal Mobley had told E.D. the flyers were "not appropriate for school due to the content." Doc. 158-3. Principal McCaffrey wrote: "A poster cannot contain any content that is political …." *Id.* He also was "not sure" why E.D. took the flyers to Dean Luna after Assistant Principal Mobley had given her feedback, and he expressed doubts the club was student-driven because Mrs. Duell participated in two meetings with school administrators. *Id.* Principal McCaffrey had never before revoked a student club's recognition. Doc. 158-20 at 20. After revoking the group's status, Principal McCaffrey called Defendant Superintendent Beth Niedermeyer to inform her about his decision. Doc. 164-1 at 5. She "felt he had justification." *Id.*

### D. Principal McCaffrey publicly accused E.D. of "multiple instances of disregard for school protocols."

In December, Principal McCaffrey wrote in *The Times of Noblesville* to defend his revocation. Doc. 152-2 at 85. He discussed "a student's request to start a pro-life club" and informed the public that he "recently suspended" the group "due to multiple instances of disregard

for school protocols." *Id.* Those "protocol[ ]" violations referred to (1) the "Defund Planned Parenthood" image; (2) seeking approval from Dean Luna for the flyer; and (3) E.D.'s mother attending two meetings with administrators. *Id.* at 70, 76–79. Principal McCaffrey "invite[d] and encourage[d] community members to contact" him "directly" with "questions about Noblesville High School." *Id.* at 85. A week later, he blasted out the same defense in the high school's newsletter, which all parents, students, and staff receive. *Id.* at 80, 90, 350.

E.  **Noblesville Schools required student group flyers to receive prior approval under its *Prior Restraint Policy* and maintained an unwritten *Censorship Custom* that banned "political" and "inappropriate" flyers.**

The Noblesville High School *Student Handbook* contained the policies of Noblesville Schools. Doc. 158 at 12–13. In Fall 2021, the *Handbook* included the *Prior Restraint Policy*, which required posters to either "promote a school-sponsored event or have administrative approval to be posted." Doc. 152-2 at 173. Besides requiring a "local" "not-for-profit organization" to sponsor non-school events, the *Handbook* had no criteria guiding administrative approval. *Id.*

Noblesville Schools also maintained an unwritten *Censorship Custom* created by Principal McCaffrey that prohibited "political" and "inappropriate" content on posters. *Id.* at 53; Doc. 158 at 28–29; Doc. 158-3. But it did not define those terms. Assistant Principal Mobley understood "political" to implement a "really broad and vague" standard. Doc.

158-22 at 6. It barred not only "anything political in nature" but also specific "political stance[s]." *Id.* at 20. To Principal McCaffrey, what qualified as a "political organization" was "very much in turbulent flux at the moment." Doc. 152-2 at 67. He didn't know if "feminism" was "a political ideology." *Id.* at 68. He "hope[d]" feminism wouldn't be "deemed political" because—to him— "feminism" is "important." *Id.* He simply "call[ed] it 'girl power.'" *Id.* And Assistant Principal Mobley offered a circular definition of "political": a "political topic … would be political in nature." Doc. 158-22 at 17.

The "appropriate" criterion had similar breadth. Principal McCaffrey had "no steadfast" way of determining appropriateness. Doc. 152-2 at 103. He would look to the school's "general standard" and "rules." *Id.* He would also make "appropriate" determinations by examining "the current hot topic" in "culture." *Id.* Students had to "talk to an administrator" who could tell them "what would be appropriate and what would be not appropriate." *Id.* at 321.

The unwritten requirements for administrative approval required significant "guessing" by students and allowed substantial discretion to administrators. *Id.* at 56, 104. No written or publicly available policy notified students which administrator could approve posters. *Id.* at 41–42, 317. Principal McCaffrey didn't "know" how students would know which administrator to go to for approval. *Id.* at 51. Under the *Handbook*, any administrator could approve posters. *Id.* at 322.

Enforcement of Noblesville Schools' unwritten *Censorship Custom* also varied from administrator to administrator. Assistant Principal Mobley applied her "rule of thumb" to prohibit posters from containing pictures. *Id.* at 335. That "rule" allowed—on a case-by-case basis—certain graphics. *Id.* But Principal McCaffrey permitted posters to have pictures so long as they were "appropriate." *Id.* at 53.

## F.  Noblesville High School had no written policy on club recognition or revocation.

As far back as 2013, Principal McCaffrey knew the high school had "no clean processes" for club and poster approval. *Id.* at 110–11. In 2017, he developed the club approval form. Doc. 158-20 at 4. Since 2019, Principal McCaffrey had worked on policy revisions. Doc. 152-2 at 56. But those revisions took "longer than [he] wanted to"; none were effective in 2021. *Id.* Besides the club approval form, no policy or written rule, including in the *Student Handbook*, governed club approval or revocation. *Id.* at 56, 111–12; *accord* Doc. 158-21 at 4. Principal McCaffrey alone had the power to revoke recognition from student groups. Doc. 158 at 20; Doc. 158-21 at 8.

## G.  Principal McCaffrey serves as the chief administrative officer of Noblesville High.

Principal McCaffrey sits at the top of the "hierarchy" at Noblesville High School—a one million square foot building with 3,200 students and 200 staff. Doc. 158-20 at 14; Doc. 158-21 at 5; Doc. 152-2 at

323. Indiana law defines the principal alone as "the chief administrative officer of a school." Ind. Code § 20-18-2-14. The "principal may take action concerning the principal's school or a school activity within the principal's jurisdiction that is reasonably necessary to carry out or prevent interference with an educational function or school purposes." Ind. Code § 20-33-8-10(a). Principal McCaffrey may also "write regulations that govern student conduct." Ind. Code § 20-33-8-10(b).

Neither Noblesville School's board nor Superintendent Neidermeyer oversaw Principal McCaffrey's creation and implementation of student club policies. The superintendent has "[n]o" involvement with student clubs. Doc. 164-1 at 3. A board member testified that the board was "not involved with the clubs." *Id.* at 7. The board chair understood that principals would likely write policy "regarding clubs." *Id.* at 15. The board wouldn't "even see" that policy from the school level and would have no "involvement" with it. *Id.*

## H. The district court denied Plaintiffs summary judgment but granted Defendants summary judgment.

As relevant to this appeal, Plaintiffs brought four claims. First, Defendant Noblesville Schools violated the First Amendment associational right by revoking that chapter's status (Count I). Doc. 43 ¶ 242. Second, Defendant Noblesville Schools violated the First Amendment's Free Speech Clause by revoking the club's status and denying permis-

sion to hang the "political" poster (Count II). *Id.* ¶¶ 264, 285. Third, Defendants Noblesville Schools, McCaffrey, Niedermeyer, Mobley, and Luna retaliated against Plaintiffs for their protected speech, including starting the pro-life club and their "political" poster (Counts V and VI). *Id.* ¶¶ 317–18, 330–31. Fourth, Defendants Noblesville Schools, McCaffrey, Niedermeyer, Mobley, and Luna violated the Equal Access Act by revoking recognition and censoring Plaintiffs' pro-life speech (Count VII). *Id.* ¶¶ 343, 350.

The parties cross-moved for summary judgment. Doc. 152; Doc. 158. The district court denied Plaintiffs' motion but granted Defendants'. Doc. 189.

The district court rejected as "a non-starter" E.D.'s First Amendment right "to post a flyer containing political speech" at school. *Id.* at 34. The court applied *Hazelwood*: "Hanging flyers on school walls advertising clubs that meet during school hours and on school grounds with a faculty advisor is expressive activity that could reasonably be perceived to bear the imprimatur of the school." *Id.* at 36. The district court feared the school would "become a facilitator of warring political messages," so it refused to "hold, for obvious reasons," that a ban on political speech "has no valid educational purpose." *Id.* at 37.

For "the same reasons," the court rejected Plaintiffs' Equal Access Act claim. *Id.* at 43. Without citing the Act's definition of "meeting," it

ruled that Principal McCaffrey did not revoke status "because of the content of Plaintiffs' speech at their meetings." *Id.*

On the retaliation claims, the district court acknowledged that "revocation" of recognized "club status is the kind of deprivation that would likely deter future First Amendment activity." *Id.* at 29. It ruled there could "be no dispute" that forming "a pro-life club" and advertising that "club in the same manner afforded to all other student interest clubs" was protected speech. *Id.* But that protected speech, according to the court, did not motivate Principal McCaffrey's revocation. *Id.* It considered the suspicious timing of the revocation—immediately after E.D. met with Dean Luna regarding the posters—in fact to support Defendants' argument that E.D. and her mother attempted to evade the ban on "political" posters. *Id.* at 30–33. Along the way, it found "undisputed evidence" that E.D. received "clear and consistent direction from each administrator." *Id.* at 31.

The district court also granted Noblesville Schools summary judgment on all claims against it based on *Monell. Id.* at 25. Relying on other district court cases, the court held that the "board of school trustees" serves as the "final policymaker" for the district and that the district itself had no unlawful policy leading to the revocation. *Id.* at 20. It also concluded that the board had not delegated Principal McCaffrey the power to make policy regarding student clubs, even if he had "discretionary authority over *decisions* affecting student clubs." *Id.* at 23.

## SUMMARY OF THE ARGUMENT

The district court made four key errors. First, it wrongly applied the *Hazelwood* rule for curricular speech to a student-created flyer for a student club meeting when the correct test is *Tinker*. Second, it overlooked the record evidence showing Principal McCaffrey retaliated by revoking Noblesville Students for Life's status because of E.D.'s pro-life flyers. Third, even though Noblesville Schools prohibited "political" flyers, according to the district court, it didn't violate the Equal Access Act's protection of "political" speech. 20 U.S.C. § 4071(a). Fourth, the court relied on outdated cases based on repealed Indiana law and ignored current Indiana law to rule that Principal McCaffrey—the top of the hierarchy over 3,200 students and 200 staff—was not a final policymaker for Noblesville Schools.

This Court has held that *Hazelwood* doesn't apply to student-created flyers. *N.J.*, 37 F.4th at 425. *Hazelwood* governs speech controlled by the school, but no reasonable observer would think the school spoke through student-created flyers advertising the meeting of a student club. Instead, the *Tinker* rule applies. Defendants violated *Tinker* because zero evidence supports any reasonable forecast that E.D.'s pro-life flyers would cause substantial disruption and because Defendants discriminated against the viewpoint of those flyers by censoring them. Similarly, Defendants discriminated based on viewpoint by revoking the chapter's status.

Direct and indirect evidence abound showing E.D.'s protected speech motivated Principal McCaffrey to revoke club status. His revocation email condemns E.D.'s proposed flyers as "political" and "not appropriate." Doc. 158-3. After revoking status, Principal McCaffrey publicly accused E.D. of "multiple" protocol violations, which included proposing "political" and "not appropriate" flyers. He revoked status immediately after E.D. had met with Dean Luna to discuss the pro-life flyers. In that meeting, Dean Luna told E.D. Noblesville High was "dancing on eggshells" regarding controversial issues and so could not allow E.D.'s flyers.

The district court failed to apply the Equal Access Act's broad definition of "meetings." The statutory definition includes any student group "activities … permitted under a school's limited open forum." 20 U.S.C. § 4072(3). Noblesville Schools admitted that it allowed student groups to post flyers. So by discriminating against E.D.'s "political" flyers and revoking club status because of them, Defendants unlawfully "discriminate[d] against" Plaintiffs "on the basis of the … political" speech at their "meetings." *Id.* § 4071. In other words, the flyers were either "political" and therefore protected by the Equal Access Act, or they were not "political," rendering the school's censorship a First Amendment violation. Noblesville Schools can't have it both ways.

Noblesville Schools has liability both because of its official policy and custom and because Principal McCaffrey is a final policy maker.

The school district admitted that its *Prior Restraint Policy* and *Censorship Custom*—under which Defendants censored E.D.'s pro-life flyers—were official policy. And Principal McCaffrey acted as a final policy-maker for Noblesville Schools when he censored the flyers and revoked club status. Indiana law currently gives school principals the authority—independent of the school board—to write regulations governing student conduct. Ind. Code § 20-33-8-10(b). The school board chair and Superintendent Niedermeyer both testified they had no involvement with student clubs.

The law and record evidence show that this Court should reverse and remand with instructions to enter summary judgment in favor of Plaintiffs on Counts I, II, V, VI, and VII, set trial for damages, and award other appropriate relief. At minimum, this Court should reverse and remand for trial on those Counts.

## ARGUMENT

This Court reviews "the district court's summary-judgment order de novo." *N.J.*, 37 F.4th at 420. Summary judgment is appropriate only where the moving party "shows that there is no genuine dispute as to any material fact" and it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On appeal "from a decision on cross-motions for summary judgment," this Court "review[s] the evidence and draw[s] all reasonable inferences in favor of the party against whom the motion under consideration was made." *N.J.*, 37 F.4th at 420 (cleaned up).

## I.  Defendants violated the First Amendment by censoring E.D.'s pro-life flyers and revoking recognition.

Students don't "shed" their First Amendment rights "at the school house gate." *Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180, 187 (2021). Those First Amendment rights include free expression, freedom from retaliation based on speech, and free association. But Defendants violated all three.

### A.  Defendants' enforcement of their *Prior Restraint Policy* and *Censorship Custom* and revocation violated the Free Speech Clause (Count II).

Plaintiffs brought free-speech claims against the censorship of E.D.'s pro-life posters and the revocation of Noblesville Students for Life's status (Count II). Doc. 43 ¶¶ 260, 285. Defendants McCaffrey, Luna, and Mobley enforced Noblesville Schools' *Prior Restraint Policy* and *Censorship Custom* to prohibit E.D. from posting her pro-life flyers.

They censored these posters, labeling them "political" and not appropriate. Principal McCaffrey then revoked Noblesville Students for Life's status because of those posters. Defendants' censorship violates the First Amendment because Defendants cannot meet the *Tinker* standard and because they discriminated based on viewpoint. Principal McCaffrey's revocation similarly violates the First Amendment because he discriminated based on viewpoint and acted unreasonably in the forum Noblesville High created for student groups.

> 1. **Neither *Tinker* nor *Hazelwood* permits Defendants to enforce their *Prior Restraint Policy* and *Censorship Custom* to ban "political" or inappropriate speech.**

The district court green-lighted Defendants' censorship by ruling that E.D.'s self-created posters for a student club constituted the curricular speech *of the school*. That was error. Under this Court's precedent, student-generated flyers are not curricular speech. Instead, "*Tinker*'s demanding" standard governs any school interference with their message. *See B.L.*, 594 U.S. at 193. That rule doesn't allow viewpoint discrimination. E.D. never posted the flyers, so Defendants had no basis to claim a substantial disruption—or even the reasonable forecast of a substantial disruption. And their censorship discriminated based on E.D.'s pro-life view.

### a. *Hazelwood* doesn't apply.

The district court applied the *Hazelwood* rule to flyers created by E.D. for her student club. Doc. 189 at 35. But *Hazelwood* "is plainly limited to speech that others may reasonably perceive as bearing the imprimatur of the school, such as that appearing in a school-sponsored newspaper." *N.J.*, 37 F.4th at 425 (cleaned up). The *Hazelwood* Court applied a different school-speech rule because activities that have the school's "imprimatur" "may fairly be characterized as part of the school curriculum." 484 U.S. at 271. To qualify for the *Hazelwood* rule, speech must be "supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences." *Id.*

*Hazelwood* involved a school-sponsored newspaper—"part of the educational curriculum" and a "regular classroom activity." *Id.* at 268 (cleaned up). School officials "selected the editors of the newspaper, scheduled publication dates, decided the number of pages for each issue, assigned story ideas to class members, advised students on the development of their stories, reviewed the use of quotations, edited stories, selected and edited the letters to the editor, and dealt with the printing company"—largely "without consultation" with the students. *Id.* And the principal had to review the entire issue "prior to publication." *Id.* at 269. Under those facts, reasonable observers may have thought the newspaper to be the school's speech, so educators could regulate it in line with the "lessons the activity is designed to teach." *Id.* at 271.

*Hazelwood* doesn't apply to student-group flyers. This Court has held that flyers "inviting classmates to attend a Bible study at [the student's] church" did *not* bear the "imprimatur of the school." *N.J.*, 37 F.4th at 424–25 (citing *Muller by Muller v. Jefferson Lighthouse Sch.*, 98 F.3d 1530 (7th Cir. 1996)). The *N.J.* Court concluded that Judge Rovner's *Muller* opinion "was right" under "clear" Supreme Court caselaw. *Id.* at 425. Judge Rovner rejected the application of *Hazelwood* to the flyers—even though the principal or superintendent had to approve them in advance of distribution—because they "originate[d] with the students themselves, outside the purview of any school-sponsored activity." *Muller*, 98 F.3d at 1546 (Rovner, J., concurring in part).

Similarly, this Court has rejected the argument that "the school endorses whatever it permits." *Hedges v. Wauconda Cmty. Unit Sch. Dist. No. 118*, 9 F.3d 1295, 1298 (7th Cir. 1993); *accord Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 214 (3d Cir. 2001) (Alito, J.) (discussing *Hedges*'s rejection of *Hazelwood* because "school 'sponsorship' of student speech is not lightly to be presumed"). The *Hedges* Court held that the school did not sponsor a student's distribution of a publication from her church and flyers about an event at the church, even though the school required the student to obtain advance approval from the principal who would review the content of the materials. *Hedges*, 9 F.3d at 1297. The school thought that "the best defense against misunderstanding" of who sponsored the materials was "censorship." *Id.* at 1299.

But that logic turns the First Amendment on its head. Instead of "squelch[ing] the speaker" the "school's proper response," according to this Court, must "teach [students] about the first amendment, about the difference between private and public action, about why we tolerate divergent views." *Id.* With that "education," "the school need not worry that providing a central place for distribution will 'endorse' any speaker, any more than providing a Speaker's Corner in Hyde Park endorses each of the many users." *Id.* at 1300.

E.D.'s posters originated with her, outside of any school-sponsored activity. *See Muller*, 98 F.3d at 1546 (Rovner, J., concurring in part). She took them from an SFLA template and submitted them to Assistant Principal Mobley for approval. Doc. 158-5 at 1, 5. Defendants have consistently maintained that the forum for non-curricular clubs, like Noblesville Students for Life, operates independently of the school. Principal McCaffrey: "clubs are student-led and initiated. They are not school sponsored." Doc. 158-25 ¶ 10. Again from Principal McCaffrey: "even the teacher [sponsor] cannot have anything to do with the club other than advising on school rules and policy and making sure everyone is safe." Doc. 158-3. And again, student clubs are "non-curriculum based." Doc. 101 ¶ 348. Further, under the Equal Access Act, which Defendants have admitted governs their forum, "there is no sponsorship of the [student] meeting by the school." 20 U.S.C. § 4071(c)(2).

The evidence invalidates the district court's unsupported conclusion that "parents and other members of the public" would "reasonabl[y]" "attribute any political messaging" on flyers "to the school district." Doc. 189 at 36. Defendants' rule for posters required them to have the student group name, meeting location, date, and time. Doc. 152-2 at 334; Doc. 158-3. And only recognized, student-led groups could post flyers. Doc. 152-2 at 58, 339.

The district court's reasoning gets it "backwards." *Hedges*, 9 F.3d at 1300. The "students' speech will *itself* dissipate any perception of endorsement—for students will disagree among themselves." *Id.* Young Democrats, Young Republicans, Fellowship for Christian Athletes, and the Gender and Sexuality Alliance all post flyers on Noblesville's walls. Doc. 158-30 at 1–3. Naturally, "the audience will understand that the school does not endorse incompatible positions." *Hedges*, 9 F.3d at 1300. If the public does "not comprehend so simple a lesson, then one wonders whether the [Noblesville] schools can teach anything at all." *Id.*

> **b.** **Defendants' enforcement of their *Prior Restraint Policy* and *Censorship Custom* fails *Tinker* because they had no evidence of disruption and because they discriminated based on viewpoint.**

School walls may become public fora, *e.g.*, *Child Evangelism Fellowship of N.J., Inc. v. Stafford Twp. Sch. Dist.*, 386 F.3d 514, 526 (3d Cir. 2004) (Alito, J.), but here the default school-speech rule from *Tinker*

provides the appropriate standard. Under "*Tinker*'s demanding standard," *B.L.*, 594 U.S. at 193, Defendants have "the burden of justifying student-speech restrictions," *N.J.*, 37 F.4th at 426. Defendants must show "that the speech in question would materially and substantially disrupt the work and discipline of the school or invade the rights of others." *Id.* (cleaned up).

*Tinker* also prohibits viewpoint discrimination: schools cannot resort to censorship "to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." 393 U.S. at 509; *accord, e.g.*, *Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist. #204*, 523 F.3d 668, 673 (7th Cir. 2008). (*Tinker* prohibits "a rule that forbade negative comments just about heterosexuality or just about homosexuality."). Defendants have zero evidence of actual or forecasted disruption to justify the enforcement of their *Prior Restraint Policy* and *Censorship Custom* and viewpoint discrimination against E.D.'s pro-life flyers, all in violation of *Tinker*.

Noblesville Schools' *Prior Restraint Policy* requires "administrative approval" before posting flyers. It thus imposes a "prior restraint"— "long a constitutionally prohibited power." *Fujishima v. Bd. of Educ.*, 460 F.2d 1355, 1358–59 (7th Cir. 1972). Even in the school setting, prior restraints come with a "heavy presumption" of unconstitutionality. *Burch v. Barker*, 861 F.2d 1149, 1154 (9th Cir. 1988). Defendants' *Policy* can't overcome that "heavy presumption." Just like the policy this Court

invalidated in *Fujishima*, it imposes a blanket prior approval require-ment without *any* criteria governing that approval. *See* 460 F.2d at 1356. But prior restraints cannot grant unbridled discretion; they must have "narrow, objective, and definite standards to guide the licensing authority." *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–51 (1969). Lacking any such standards, Noblesville Schools has made "the peaceful enjoyment of freedoms which the Constitution guarantees con-tingent upon the uncontrolled will of an official." *Id.* at 151. As a long line of precedent affirms, that's "unconstitutional." *Id.*; *Fujishima*, 460 F.2d at 1357.

Because Defendants never allowed E.D. to post her pro-life flyers, they have no evidence of actual disruption, so they must rely on a fore-cast of substantial disruption. But "mere speculation won't do." *N.J.*, 37 F.4th at 426. Defendants "must present facts that might reasonably have led" them to "forecast substantial disruption"—such as a "decline in students' test scores" or "an upsurge in truancy." *Id.*; *Nuxoll*, 523 F.3d at 674.

As with actual disruption, Defendants have no facts that would have allowed them to reasonably forecast a substantial disruption. De-fendants below merely offered the unsupported assertion that "Defund Planned Parenthood" "reflect[s] a specific stance on a political contro-versy that *could* cause unnecessary disruption within the school." Doc. 158 at 32 (emphasis added). But Defendants' mere speculation can't

meet their burden. Far from forecasts of potential *disruption*, the record shows Defendants nixed E.D.'s poster because of the mere *controversy* over a potentially unpopular view. Dean Luna said the school was "dancing on eggshells" regarding potentially controversial issues. Doc. 152-2 at 35. And Principal McCaffrey would review flyers for "appropriateness" based "on what the current hot topic is in our culture." *Id.* at 103.

The "political" and "appropriateness" criteria in Defendants' *Censorship Custom* discriminate based on viewpoint. Viewpoint discrimination is "an egregious form" of content discrimination that targets "particular views taken by speakers on a subject." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Schools have no role in regulating speech when the "specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.* That "viewpoint-neutrality requirement" also prohibits policies that grant school officials "unbridled discretion." *Southworth v. Bd. of Regents*, 307 F.3d 566, 579 (7th Cir. 2002). The "political" ban discriminates based on viewpoint facially and both the "political" and "appropriate" criteria grant Defendants unbridled discretion to discriminate based on viewpoint.

Noblesville Schools' *Censorship Custom* bans not only "political" speech but also "political stance[s]." Doc. 158-22 at 20. *Tinker* squarely invalidates attempts to silence certain political stances: the school there

unconstitutionally "discriminat[ed] against a particular point of view, namely opposition to the Vietnam war expressed by the wearing of black armbands." *Nuxoll*, 523 F.3d at 673. It discriminated against the political stance of war opposition. But it's "clearly establish[ed] that disagreement with a disfavored political stance or controversial viewpoint, by itself, is not a valid reason to curtail expression of that viewpoint at a public school." *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 786 (9th Cir. 2022).

The school's ban on "political" speech also discriminates based on viewpoint. Principal McCaffrey shows how. He didn't "deem[ ]" "feminism" political because—to him—it was just "girl power." Doc. 152-2 at 68. But some feminists demand abortion.[2] Other feminists maintain that males who identify as females are women.[3] By withdrawing "feminism" from the list of forbidden "political" topics, Principal McCaffrey favored certain feminists' pro-choice views ahead of E.D.'s pro-woman and pro-life message. But to allow "all discussion" of feminism while banning critiques of certain aspects of the feminist movement "in reality" takes "sides" because it privileges proponents of "feminism" while disadvantaging those with opposing views. *Nuxoll*, 523 F.3d at 675.

---

[2] *E.g.*, Feminist Majority Found., *Abortion*, https://feminist.org/our-work/abortion/ (last accessed May 31, 2024).

[3] *See, e.g.*, Kelsy Burke, *Feminists have long supported trans rights*, WASH. POST (July 27, 2023).

Both "political" and "appropriate" censorship license unbridled discretion. Defendants do not define the "expansive" term "political." *Minn. Voters All. v. Mansky*, 585 U.S. 1, 17 (2018). "It can encompass anything 'of or relating to government, a government, or the conduct of governmental affairs,' or anything 'of, relating to, or dealing with the structure or affairs of government, politics, or the state.'" *Id.* (cleaned up). "On its face, the word 'political' has no clear meaning." *Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.*, 978 F.3d 481, 494 (6th Cir. 2020). The Defendants who enforced the *Policy* and *Custom* agree. Assistant Principal Mobley testified that "political" implements a "really broad and vague" standard. Doc. 158-22 at 6. Neither Assistant Principal Mobley nor Principal McCaffrey could define "political," with Principal McCaffrey admitting the definition was "very much in turbulent flux." Doc. 152-2 at 67; Doc. 158-22 at 17. "Political" doesn't provide an "objective, workable standard[ ]," *Mansky*, 585 U.S. at 21; it licenses viewpoint discrimination.

"Appropriate" has similarly limitless breadth. *The American Heritage Dictionary* defines "appropriateness" as "the state of being suitable for a particular person, condition, occasion or place." *Fayetteville Pub. Libr. v. Crawford Cnty.*, 684 F. Supp. 3d 879, 906 (W.D. Ark. 2023). This open-ended definition makes it "difficult, if not impossible, to assess a challenged [poster's] 'appropriateness' without considering its content, message, and/or viewpoint." *Id.* Indeed, "appropriate" leaves

"the decision to approve or disapprove of speech … to the sole judgment and discretion of a school principal." *Gold v. Wilson Cnty. Sch. Bd. of Educ.*, 632 F. Supp. 2d 771, 793 (M.D. Tenn. 2009). "It leaves the door of invidious discrimination wide open." *Id.*

Principal McCaffrey, Assistant Principal Mobley, and Dean Luna applied the *Prior Restraint Policy* and *Censorship Custom* against E.D. They labeled her pro-life flyers "political" and inappropriate. Principal McCaffrey favored feminism over E.D.'s pro-life message. They thereby impermissibly discriminated against E.D.'s views.

### c. Defendants' enforcement of their *Censorship Custom* fails under *Hazelwood*.

*Hazelwood* doesn't apply, but Defendants' application of their *Censorship Custom* violates even that standard. Schools may regulate speech that bears the imprimatur of the school if "their actions are reasonably related to legitimate pedagogical concerns." *N.J.*, 37 F.4th at 424. Viewpoint discrimination remains anathema. "[A] manifestly viewpoint discriminatory restriction on school-sponsored speech is, prima facie, unconstitutional, *even if* reasonably related to legitimate pedagogical interests." *Peck ex rel. Peck v. Baldwinsville Cent. Sch. Dist.*, 426 F.3d 617, 633 (2d Cir. 2005). *Hazelwood* involved only a content-based speech restriction and "never distinguished the powerful holdings of [past] cases with respect to viewpoint neutrality." *Id.*; *accord Searcey v.*

*Harris*, 888 F.2d 1314, 1324–25 (11th Cir. 1989). The viewpoint neutrality requirement "put[s] the decision as to what views shall be voiced" where it should be—"into the hands of each of us." *Cohen v. California*, 403 U.S. 15, 24 (1971). Indeed, "no other approach would comport with the premise of individual dignity and choice upon which our political system rests." *Id.* But Defendants' *Custom* both discriminates based on viewpoint and has no reasonable relation to legitimate pedagogical goals.

As discussed, Defendants' enforcement of their *Custom* discriminates based on viewpoint both by its terms and by its grant of unbridled discretion. *Supra* Section I.A.1.b. Principal McCaffrey labeled E.D.'s pro-life poster "political" and "inappropriate," banned her from posting it, and derecognized her group because of it. Yet "advocacy of a politically controversial viewpoint … is the essence of First Amendment expression." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995). *Hazelwood* does not allow Defendants to close the doors to the marketplace of ideas.

Defendants have no legitimate pedagogical reason to ban "political" speech from non-curricular, student-led clubs. Our "public schools are the nurseries of democracy." *B.L.*, 594 U.S. at 190. But that democracy "only works if we protect the 'marketplace of ideas.'" *Id.* "[F]ree exchange facilitates an informed public opinion, which, when transmitted to lawmakers, helps produce laws that reflect the People's will." *Id.* By

imposing a prior restraint on all "political" posters, Noblesville Schools undermined students' efforts to develop an informed public opinion on important topics. The school district has no need to fear disruption from allowing students to post "political" flyers outside of class and then discuss those topics amongst themselves. The ensuing dialogue is exactly what public schools are for.

### 2. Defendants' revocation fails limited public forum scrutiny.

Because Noblesville Schools has a "policy of accommodating [student-group] meetings," it "created a forum generally open for use by student groups." *Prince v. Jacoby*, 303 F.3d 1074, 1090 (9th Cir 2002). It thus "assumed an obligation to justify its discriminations and exclusions under applicable constitutional norms." *Id.* at 1090–91. Student group fora are at least limited public fora because the school has reserved it "for certain groups." *Rosenberger*, 515 U.S. at 829. Within a limited public forum, the government must meet strict scrutiny for "restrictions on speech that falls within the designated category for which the forum has been opened." *Tyler v. City of Kingston*, 74 F.4th 57, 62 (2d Cir. 2023). And in such a forum, a school cannot discriminate based on viewpoint or regulate unreasonably "in light of the purpose served by the forum." *Rosenberger*, 515 U.S. at 829. Principal McCaffrey had no compelling interest to revoke the group's status for proposing to post a

flyer; nor was revocation the least restrictive means. He also discriminated based on viewpoint and acted unreasonably towards E.D.'s posters.

Because posting flyers constituted a main benefit of Noblesville Schools' forum, Doc. 101 ¶ 10, Principal McCaffrey's revocation triggers strict scrutiny. But he cannot meet his high burden of showing he used the least restrictive means to achieve a compelling government interest. *See United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000). Revoking status for merely proposing a flyer cannot be the least restrictive means to any government interest. Principal McCaffrey instead could have informed E.D. about Noblesville Schools' policies (especially because he admitted following them required significant guesswork). Or he could have told E.D. which administrators had approval authority for posters. Instead, he reached for the saw when a scalpel was needed and booted the group from the forum entirely. Nor does any compelling interest exist. Noblesville Schools' forum aimed to "connect[ ]" students "with a school activity" and allow them to "talk about their common interests." Doc. 152-2 at 106; Doc. 158-3. By derecognizing Students for Life because of its "political" speech, Defendants abridged E.D. and her peers' ability to connect and discuss the pro-life issues they care most about.

Principal McCaffrey discriminated based on viewpoint by revoking status because of E.D.'s "political" and "not appropriate" posters. Doc.

158-3; *accord infra* Section I.B.2. He thus targeted the group because of its views. *Supra* Section I.A.1.b. Noblesville Schools—walking on "eggshells"—sought to "avoid the discomfort and unpleasantness" from potentially "unpopular viewpoint[s]." *Tinker*, 393 U.S. at 509. But the revocation deprived E.D., her over 3,000 peers, and the rest of the school community of the important dialogue the First Amendment protects.

Principal McCaffrey also acted unreasonably by revoking recognition because the group wanted to participate in speech on campus. Banning "political" speech in a forum meant for students to come together over common interests is unreasonable. *See Mansky*, 585 U.S. at 21–22 (holding that an "indeterminate" ban on "political" speech in a limited public forum was unreasonable).

## B. Defendants retaliated against E.D.'s pro-life flyers by revoking registration (Counts V and VI).

A First Amendment retaliation claim has three elements: (1) the plaintiff "engaged in activity protected by the First Amendment"; (2) she suffered "a deprivation that would likely deter First Amendment activity in the future"; and (3) "the First Amendment activity was at least a motivating factor in the Defendants' decision to take the retaliatory action." *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009) (cleaned up). Prima facie causation requires "only" that the plaintiff "show" a "motivating factor" *i.e.*, "when something present makes something else bound to happen." *Surita v. Hyde*, 665 F.3d 860, 874 (7th Cir. 2011).

The burden then shifts to Defendants who can "rebut that showing, but only by establishing that" Defendants were "not a but-for" cause of the harm. *Id.* Evidence that allows "a reasonable jury" to "find but-for causation" "overcome[s] a defendant's summary judgment motion." *Id.* Should Defendants carry their burden, "the plaintiff may still reach trial by producing sufficient evidence to allow a reasonable fact finder to determine that the employer's reasons were merely a pretext for firing the employee, at least in part, for exercising her First Amendment rights." *Valentino v. Vill. of S. Chi. Heights*, 575 F.3d 664, 670 (7th Cir. 2009).

E.D. more than meets the prima facie case for her retaliation claim against Principal McCaffrey and Superintendent Niedermeyer. Principal McCaffrey would not have revoked club status but for E.D.'s "political" speech. Defendants' arguments to the contrary are pretextual. And Superintendent Niedermeyer approved of the constitutional violation.

> ### 1. Defendants' revocation of club recognition and censorship of posters deters future speech.

Contrary to the district court's conclusion, E.D. had the First Amendment right to post "political" flyers at school. *Supra* Section I.A.1. But the district court correctly ruled that it's "undisputed that the revocation" of the chapter's recognized status "would likely deter future First Amendment activity." Doc. 189 at 29. Telling E.D. she couldn't

hang "political" or "inappropriate" posters also deters First Amendment activity, especially when coupled with Principal McCaffrey's public broadcast accusing E.D. of "multiple instances of disregard for school protocols." Doc. 152-2 at 85; *see Surita*, 665 F.3d at 878 ("The First Amendment prohibits threats of punishment designed to discourage future protected speech."); *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982) ("harassment and ridicule through selective enforcement of" policies deter protected speech).

### 2. E.D.'s "political" flyers motivated Principal McCaffrey's revocation decision.

The district court overlooked the abundant direct and circumstantial evidence of speech discrimination. Direct evidence, "if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720 (7th Cir. 2005). It is what the school official "said or did in the specific" instance "in question." *Id.* Circumstantial evidence "allows the trier of fact to infer intentional discrimination by the decisionmaker." *Id.* (cleaned up). It includes "suspicious timing" and "ambiguous statements oral or written." *Id.*

For direct evidence:

- Principal McCaffrey wrote in his revocation email that E.D.'s posters were "political" and "not appropriate for school due

to the content"—in violation of Noblesville Schools' *Censorship Custom*. Doc. 158-3.

- Principal McCaffrey publicly wrote that he revoked status "due to multiple instances of disregard for school protocols," *including* E.D.'s request to hang her pro-life posters. Doc. 152-2 at 70, 76, 78–79, 85.

For circumstantial evidence:

- Principal McCaffrey revoked the group's status immediately after E.D. met with Dean Luna and discussed the posters. Doc. 152-2 at 75; Doc. 158-5 at 4; *see Spiegla v. Hull*, 371 F.3d 928, 943 (7th Cir. 2004) ("It is settled in this Circuit that, a plaintiff may establish a causal link between protected expression and adverse action through evidence that the adverse action took place on the heels of protected activity.") (cleaned up) (four days constitutes suspicious timing).

- Dean Luna informed E.D. the school was "dancing on eggshells" regarding political issues and she couldn't post her pro-life posters; immediately after meeting with E.D., Dean Luna discussed that meeting with Principal McCaffrey. Doc. 152-2 at 35; Doc. 158-23 at 5–6; *see Valentino*, 575 F.3d at 673 (supervisor's statement that the plaintiff "is going to get her butt canned" is circumstantial evidence).

- Defendants McCaffrey, Mobley, and Luna all knew E.D.
  wanted to post her pro-life flyers when they met and when
  McCaffrey made the decision to revoke status. *See Valentino*,
  575 F.3d at 672 (circumstantial evidence that Defendants
  knew of protected speech when they retaliated).

The record establishes that—contrary to the district court's view—
Defendants' personal pro-life views "are irrelevant" here. *Contra* Doc.
189 at 30 n.6. Their personal views do not change the evidence showing
that they banned E.D.'s "political" flyers and then revoked group status
because of viewpoint expressed in those flyers. *See supra* Section
I.A.1.b. As the district court's cited case holds, any evidence of intent
"must shed light on causation, not on subjective intent." *Whitfield v.
Spiller*, 76 F.4th 698, 712 (7th Cir. 2023). And the record shows, inde-
pendent of subjective intent, that Defendants wanted to avoid the "dis-
comfort and unpleasantness that always accompany" a potentially "un-
popular viewpoint." *Tinker*, 393 U.S. at 509.

The district court and Defendants relied on two reasons for the re-
taliation: (1) Mrs. Duell's involvement in two meetings with E.D. and
administrators; and (2) E.D.'s meeting with Dean Luna about the flyers
after discussing them with Assistant Principal Mobley. Doc. 189 at 33;
Doc. 158 at 35. But Principal McCaffrey would not have revoked the
group's status but for E.D.'s pro-life posters. But-for causation allows
for multiple causes "to produce the result, so long as the other factors

alone would not have done so." *Burrage v. United States*, 571 U.S. 204, 211 (2014). So "retaliatory animus need not be the sole motive" for retaliation "for a plaintiff to have an actionable claim." *Valentino*, 575 F.3d at 674. Principal McCaffrey's revocation email condemns the "political" and "not appropriate" "content" of E.D.'s pro-life posters. Doc. 158-3. He testified he revoked status for "multiple" protocol violations, including the "political" flyers. Doc. 152-2 at 70, 76, 78–79, 85. The evidence shows that without the flyers, Principal McCaffrey wouldn't have revoked status.

The district court and Defendants' two reasons are also pretextual. The record belies legitimate concerns about Mrs. Duell's involvement:

- Mrs. Duell only participated in two meetings with her minor daughter and administrators. *See* Doc. 158-3.

- For one of those meetings, Principal McCaffrey conceded that E.D. "did all of the talking and did a good job of representing what she wanted to do." *Id.*

- Principal McCaffrey didn't observe the second meeting. Doc. 158-23 at 6.

- Principal McCaffrey knew that:

  o E.D. had met alone with Assistant Principal Mobley to discuss the club. Doc. 158-3.

- o E.D. had sought approval from Assistant Principal Mobley for "posters *she* wanted to hang up." *Id.* (emphasis added).

- o For the past eight years, the high school had had "no clean processes" pertaining to clubs. Doc. 152-2 at 110–11.

- Principal McCaffrey had been working on developing policies for clubs, but he had not implemented them. Doc. 152-2 at 56.

- Noblesville Schools had no written policy regarding parental involvement in student clubs. Doc. 152-2 at 77.

Similarly, the evidence shows Defendants could not have any legitimate concerns about E.D. seeking approval from Dean Luna:

- Principal McCaffrey didn't "know" how students would know which administrator to go to for approval. Doc. 152-2 at 51.

- Assistant Principal Mobley told E.D. that any administrator could approve a poster. *Id.* at 44.

- The unwritten requirements for administrative approval required significant "guessing" by students. *Id.* at 104.

- Assistant Principal Mobley's initial email to E.D. made no reference to the flyers as "political"; she merely told E.D. she didn't "need the pictures." Doc. 158-5 at 4.

- E.D. didn't understand Assistant Principal Mobley's ambiguous reason for suggesting changes to the flyers. Doc. 158-5 at 4; Doc. 158-18 at 17.

- E.D. met with Dean Luna because he alone had responsibility for scheduling meeting dates, yet he hadn't responded to previous emails; in that meeting she inquired "why" the flyers "had been vetoed previously." Doc. 152-2 at 28, 32–34, 44.

- No evidence supports the district court's assumption against E.D. that Principal McCaffrey knew E.D. had discussed the posters with her faculty advisor. *Contra* Doc. 189 at 30–31. Tellingly, the district court offered no record citation for its assertion.

All that evidence makes it "too fishy" and "too convenient to allow summary judgment in Defendants' favor," and in fact shows Plaintiffs merit summary judgment. *See Valentino*, 575 F.3d at 674 (cleaned up). The record reflects Noblesville Schools had no written policies governing the criteria for approving posters, leaving students to "guess[ ]" at the appropriate procedure. Doc. 152-2 at 104. E.D. did not attempt an end-run around Assistant Principal Mobley's restrictions. She didn't know what Mobley meant and had no written policies to review, so she naturally asked another administrator—who she knew could also approve posters—why her poster violated policy. Thus, the district court

had no basis to also assume against E.D. that she received "clear and consistent direction from each administrator." *Contra* Doc. 189 at 31. Defendants themselves testified to the contrary. Similarly, no written policy informed E.D. about parental involvement in clubs. And Mrs. Duell participated in only two meetings with E.D. admittedly doing "all of the talking" in one of those meetings. Doc. 158-3. The "rather threadbare nature" of Defendants' purported justifications for revocation warrant summary judgment for Plaintiffs and at least "create a triable issue." *See Greene v. Doruff*, 660 F.3d 975, 980 (7th Cir. 2011).

### 3. Superintendent Niedermeyer acquiesced in Principal McCaffrey's retaliation.

To meet Section 1983's personal involvement requirement, Superintendent Niedermeyer need only "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what [she] might see." *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988). The record invalidates the district court's ruling that Superintendent Niedermeyer was not "personally involved, consulted, or otherwise acquiesced in the decision to revoke" club status. *Contra* Doc. 189 at 26. Principal McCaffrey notified Superintendent Niedermeyer that he revoked the group's recognition. Doc. 164-1 at 4. She concluded that Principal McCaffrey "had justification" for the revocation and "appreciated him making [her] aware." *Id.* at 5. That knowledge and approval show

Defendant Niedermeyer had personal involvement in Principal McCaffrey's revocation.

### C. Principal McCaffrey's revocation violated Plaintiffs' associational rights (Count I).

The First Amendment protects "the freedom to gather together to express ideas—the freedom to associate." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 861 (7th Cir. 2006). When schools deny "official recognition, without justification" to student groups, they "abridge[ ] that associational right." *Healy v. James*, 408 U.S. 169, 181 (1972). "Infringements on expressive association" require schools to satisfy strict scrutiny by showing a "compelling" interest "that cannot be achieved through means significantly less restrictive of associational freedoms." *Walker*, 453 F.3d at 861–62. The *Healy* "Court drew a distinction between rules directed at a student organization's actions and rules directed at its advocacy or philosophy; the former might provide permissible justification for nonrecognition, but the latter do not." *Id.* at 864.

"This case is legally indistinguishable from *Healy*" and *Walker*. *Id.* The groups in those cases and Noblesville Students for Life "were frozen out of channels of communication" and use of "facilities for meetings." *Id.*; Doc. 101 ¶ 10. Both those cases establish that denying recognized status because of the group's "advocacy"—like "Defund Planned Parenthood"—violates associational rights. *See Walker*, 453 F.3d at 864.

The district court avoided the associational issue because of its erroneous *Monell* holding. *See infra* Part III. But the record here shows Noblesville Schools violated Plaintiffs' associational rights, so the district court should have granted Plaintiffs summary judgment on their free-association claim.

## II. Defendants violated the Equal Access Act (Count VII).

The Equal Access Act prohibits Defendants' censorship of E.D.'s pro-life flyers and revocation of group status. The Act makes it "unlawful" for schools like Noblesville High to "discriminate against" students "on the basis of" the "political" content of speech at their "meetings." 20 U.S.C. § 4071; Doc. 101 ¶ 349 (Defendants admitting the Act applies to Noblesville High). Yet Defendants admittedly did just that. Defendants McCaffrey, Mobley, and Luna prohibited E.D. from displaying "political" flyers. Defendant McCaffrey revoked and Defendant Niedermeyer acquiesced in revoking group recognition based on those "political" flyers. *Supra* Section I.B; *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 589 U.S. 327, 335 (2020) ("on the basis of" indicates "a but-for causation standard").

The district court had an incorrect understanding of "meeting." Doc. 189 at 43 & n.9. The Act expansively defines "meeting" to include "activities of student groups which are permitted under a school's limited open forum and are not directly related to the school curriculum."

46

20 U.S.C. § 4072(3). Noblesville Schools admitted that recognized student groups could hang flyers and posters at school. Doc. 101 ¶ 10. So the Act's definition of "meeting" protected E.D.'s posters. As the district court recognized, Plaintiffs raised and argued an equal-access claim based on "Defendants' failure to allow Plaintiffs 'to conduct meetings due to the content of their speech.'" Doc. 189 at 43 n.9 (quoting Doc. 140); *accord* Doc. 152-1 at 40. And Plaintiffs also raised an equal-access claim based on Principal McCaffrey's revocation. Doc. 189 at 43.

Given that the flyers and the holding of meetings both qualify under the Act's "meeting" definition, Defendants' liability is straightforward. The Act's plain text and the record show Defendants McCaffrey, Mobley, Luna, and Niedermeyer discriminated based on E.D.'s "political" speech. Accordingly, Plaintiffs are entitled to summary judgment on their equal-access claim (Count VII).

## III.  Noblesville Schools cannot escape liability under *Monell*.

Despite Principal McCaffrey's constitutional and statutory violations and Noblesville Schools' unconstitutional and unlawful policy and custom, the district court exculpated Noblesville Schools from liability. Relying on decades-old district court decisions discussing repealed law, the district court held Principal McCaffrey did not have "responsib[ility] for establishing final government *policy* covering" student clubs. Doc. 189 at 23. And the district court upheld Noblesville Schools' ability to

censor "political" student group flyers. *Id.* at 34. Both the law and the facts show the district court erred.

Congress enacted section 1983 to "throw[ ] open the doors of the United States courts to those whose rights under the Constitution are denied or impaired." Cong. Globe, 42d Cong., 1st Sess. 376 (1871) (Rep. Lowe). This broad, remedial statute "interpose[d] the federal courts between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action under color of state law, whether that action be executive, legislative, or judicial." *Mitchum v. Foster*, 407 U.S. 225, 242 (1972) (cleaned up).

Section 1983 didn't exempt local government units, like school districts, from its remedial scheme. Any such exemption would defy logic: "it beggars reason to suppose that Congress would have exempted municipalities from suit, insisting instead that compensation … come from an officer in his individual capacity rather than from the" responsible government entity. *Monell*, 436 U.S. at 687. If victims of unconstitutional action could only hold individuals responsible, doctrines like qualified immunity would prevent "REDRESS FOR THE wrong." *See id.* (quoting Cong. Globe App., 42d Cong., 1st Sess. 84 (1871) (Rep. Bingham)). Thus, school districts incur liability under Section 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id.* at 694.

A school district can have *Monell* liability in three ways: (1) an express policy caused the rights violation; (2) "a widespread practice constituting custom or usage" caused the rights violation; or (3) a violation by "a person with final policymaking authority." *Kujawski v. Bd. of Comm'rs*, 183 F.3d 734, 737 (7th Cir. 1999). Here, the law and facts show Noblesville Schools' *Prior Restraint Policy* and *Censorship Custom* caused Principal McCaffrey to censor E.D.'s "political" posters and Principal McCaffrey had final policymaking authority.

### A. Noblesville Schools had a policy and custom and practice prohibiting E.D. from displaying "political" posters (Counts II and VII).

The district court concluded and Defendants conceded that the *Student Handbook* is the official policy of Noblesville Schools. Doc. 189 at 23; Doc. 158 at 13. The 2021 *Handbook* contained the *Prior Restraint Policy* that all flyers require advance "administrative approval" with *zero* standards to govern administrators' censorship decisions. *See* Doc. 152-2 at 173. And Defendants also admitted that "Noblesville Schools had a practice and custom of not permitting flyers advertising club meetings to contain political speech." Doc. 158 at 28–29. Both the *Policy* and the *Censorship Custom* caused the censorship of E.D.'s flyers. Doc. 158 at 12–13 (Defendants admitting *Policy* and *Custom* applied to E.D.'s posters).

The *Policy* and *Custom* are unlawful. The *Policy* imposes a prior restraint that licenses unbridled discretion. *Supra* Section I.A.1.b. And it's completely divorced from "*Tinker*'s demanding standard." *Supra id.* That shows Noblesville Schools "condon[ed] unconstitutional" actions because "principals and assistant principals might 'see fit'" to censor flyers "on unconstitutional grounds." *See Gschwind v. Heiden*, 692 F.3d 844, 848 (7th Cir. 2012). The *Custom* also has no justification under *Tinker* or the Equal Access Act and discriminates based on viewpoint. *Supra* Section I.A.1.b, Part II. The district court erroneously exempted Noblesville Schools from *Monell* liability for E.D.'s free-speech and equal-access claims regarding her pro-life posters (Counts II and VII).

## B. Indiana law and the record establish Principal McCaffrey as a final policymaker (Counts I, II, V, and VII).

School districts have liability when "an individual with final policy-making authority for the municipality (on the subject in question) caused the constitutional deprivation." *Valentino*, 575 F.3d at 674. The final policymaker inquiry is granular. It doesn't matter "whether an official is a policymaker on all matters for the municipality." *Id.* at 676. Instead, the official need only make policy "in a particular area, or on a particular issue." *Id.*

State and local law determine a "person's status as a final policy-maker." *Kujawski*, 183 F.3d at 737. That means "not only positive law,

including ordinances, rules and regulations, but also the relevant customs and practices having the force of law." *Valentino*, 575 F.3d at 676 (cleaned up). Final policymaking comes either "directly by statute" or by a "delegat[ion]" from "an official having policymaking authority." *Kujawski*, 183 F.3d at 737. Factors "[h]elpful in determining whether an official is a final decisionmaker" include whether policies of other officials or legislative bodies constrain the official, whether the official's decision is subject to meaningful review, and whether the policy decision resides "within the realm of the official's grant of authority." *Valentino*, 575 F.3d at 676.

Indiana law establishes Principal McCaffrey as a final policymaker for Noblesville Schools. It defines the principal alone as "the chief administrative officer of a school." Ind. Code § 20-18-2-14. The "principal may take action concerning the principal's school or a school activity within the principal's jurisdiction that is reasonably necessary to carry out or prevent interference with an educational function or school purposes." Ind. Code § 20-33-8-10(a). His power includes "writ[ing] regulations that govern student conduct." Ind. Code § 20-33-8-10(b).

The district court cases to the contrary relied on repealed—and materially different—Indiana law. Those cases conceded that Indiana law "grant[ed] principals much discretion and authority in the operation of their schools." *Oliver by Hines v. McClung*, 919 F. Supp. 1206,

1216 (N.D. Ind. 1995); *see Harless by Harless v. Darr*, 937 F. Supp. 1339, 1349 (S.D. Ind. 1996). But they found dispositive a now-repealed Indiana Code section that policies adopted by the principal *"shall not be effective until they are reviewed and approved by the superintendent and until they shall be presented to the governing body." Oliver*, 919 F. Supp. at 1214 (quoting Ind. Code § 20-8.1-5-3); *Harless*, 937 F. Supp. at 1349. That provision no longer exists. 1995 Ind. Legis. Serv. P.L. 131-1995, § 12 (H.E.A. 1279) (West). Instead, the principal's written regulations need no further review to bind students at the school. Ind. Code § 20-33-8-10(b). Current Indiana law establishes Principal McCaffrey as a final policymaker.

The facts also show Noblesville Schools delegated Principal McCaffrey final policymaker authority over club posters and revocation. The school board's policies did not constrain Principal McCaffrey. *He* knew Noblesville High had had "no clean processes" for club and poster approval for eight years. Doc. 152-2 at 110–11. *He* knew the *Student Handbook* didn't apply to club recognition and revocation. *Id.* at 56, 111–12. *He* developed the club approval form. Doc. 158-20 at 4. *He* created and implemented the *Censorship Custom*. *See* Doc. 152-2 at 53; Doc. 158-3. *He* alone had authority to revoke club status. Doc. 158-21 at 8. There was no one else supervising his decisions.

Principal McCaffrey's decision on clubs also received no meaningful review. A board member testified that the board had no involvement

with student clubs. Doc. 164-1 at 7. Superintendent Niedermeyer also had no involvement. *Id.* at 3. The board chair understood that principals would write policy "regarding clubs." *Id.* at 15. The board wouldn't "even see" that policy from Principal McCaffrey and would have no "involvement" with it. *Id.*

The authority to set policy for clubs unquestionably resided with Principal McCaffrey. Under Indiana law, he could write policy—not subject to board review—governing student conduct. Ind. Code § 20-33-8-10(b). And the board chair testified that the principal would write policy governing student clubs. Doc. 164-1 at 15.

The board's adoption of the *Student Handbook* does not negate Principal McCaffrey's final policymaker status. *Contra* Doc. 189 at 22–23. The 2021 *Handbook* had no policy governing student clubs and did not contain Noblesville Schools' *Censorship Custom*. Doc. 152-2 at 56, 104, 111–12. That's consistent with the evidence showing that Principal McCaffrey had the authority to make policy in those areas.

That Noblesville Schools *could* adopt policies on those subjects doesn't mean Principal McCaffrey isn't a final policymaker. "[M]unicipalities often spread policymaking authority among various officers and official bodies." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (plurality). And Principal McCaffrey's policymaking status stems in part from a delegation of authority from Noblesville Schools, which means that both the district and Principal McCaffrey appropriately had

authority to make policy regarding clubs. This Court has recognized that multiple final policymakers can exist for a given topic. For example, an ordinance that gave both the village president and board of trustees power over hiring and firing did not prevent the president from being a final policymaker. *Valentino*, 575 F.3d at 676. There, the board had no "edicts" that "govern[ed] the manner in which" the president made "his hiring or firing decisions." *Id.* at 678. So too here with clubs. The district court incorrectly granted Defendants summary judgment on Counts I, II, V, and VII, and should have granted Plaintiffs summary judgment on those Counts.

## CONCLUSION

"What a lesson [Noblesville] proposes to teach its students!" *Hedges*, 9 F.3d at 1299. This Court has warned that "[s]chool districts seeking an easy way out try to suppress private speech." *Id.* Noblesville Schools wanted to avoid the "discomfort and unpleasantness that always accompany" a potentially "unpopular viewpoint." *Tinker*, 393 U.S. at 509. But for decades, clearly established law has prohibited just that. By censoring E.D.'s pro-life posters and revoking club status because of them, Noblesville Schools violated that cardinal command. "Far better" than censorship, Noblesville School should "teach" its students "about the first amendment." *Hedges*, 9 F.3d at 1299. The Constitution does not permit administrators to discriminate against pro-life viewpoints.

This Court should reverse and remand with instructions to enter summary judgment for Plaintiffs on Counts I, II, V, VI, and VII, set trial for damages, and award other appropriate relief. At minimum, the Court should reverse and remand for trial on those Counts.

Dated: June 3, 2024

Respectfully submitted,

s/Mathew W. Hoffmann

John J. Bursch                  Tyson C. Langhofer
ALLIANCE DEFENDING FREEDOM   Mathew W. Hoffmann
440 First Street NW, Suite 600    ALLIANCE DEFENDING FREEDOM
Washington, DC 20001        44180 Riverside Pkwy
(616) 450-4235               Lansdowne, VA 20176
jbursch@adflegal.org         (571) 707-4655
  tlanghofer@adflegal.org
  mhoffmann@adflegal.org

Zachary S. Kester
L. Katie Buckner
Spencer E. Rehn
CHARITABLE ALLIES, INC.
3500 Depauw Blvd., Suite 3090
Indianapolis, IN 46268
(463) 229-0229
zkester@charitableallies.org
kbuckner@charitableallies.org
srehn@charitableallies.org

*Counsel for Appellants*

# CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32(c) because this brief contains 11,707 words, including words contained in the images and excluding parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Word 365 using a proportionally spaced typeface, 14-point Century Schoolbook.

Dated: June 3, 2024

*s/Mathew W. Hoffmann*
Mathew W. Hoffmann
*Counsel for Appellants*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 3, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

*s/ Mathew W. Hoffmann*
Mathew W. Hoffmann
*Counsel for Appellants*

## CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), I certify that all material required by Circuit Rule 30(a) is included in the attached required short appendix and that no material is required to be submitted under Circuit Rule 30(b).

*s/Mathew W. Hoffmann*
Mathew W. Hoffmann
*Counsel for Appellants*

# Required Short Appendix

# REQUIRED SHORT APPENDIX

Order on Cross Motions for Summary Judgment ....................... RSA-001

Judgment...................................................................... RSA-056

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| E. D., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:21-cv-03075-SEB-TAB |
| | ) | |
| NOBLESVILLE SCHOOL DISTRICT, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

This litigation arises out of events surrounding the temporary revocation of approval by school officials for the formation of a pro-life club at Noblesville High School and the ensuing public discussion of those events on social media and in the press. Plaintiffs E.D., a minor, by and through her parents and next friends Michael and Lisa Duell, and Noblesville Students for Life, a student club formed by E.D., have jointly brought this action against Defendants Noblesville School District, Noblesville High School, and various school employees and administrators, originally alleging nineteen separate counts against Defendants under federal and state law.

Following the Court's ruling on Defendants' motion to dismiss and Plaintiffs' motion to reconsider parts of that ruling, the following claims remain to be decided: Count I (First Amendment Right of Association); Count II (First Amendment Freedom of Speech); Count III (Fourteenth Amendment Due Process); Count IV (Fourteenth Amendment Equal Protection); Counts V and VI (First Amendment Retaliation; Count VII (Equal Access Act); Count VIII (Violation of School Policies Against Bullying);

1

RSA-001

Count IX (Libel, Slander, and Defamation); Count XI (Intimidation and Bullying); Count XIII (Intentional Infliction of Emotional Distress); Count XV (Privacy by Publication of Private Facts); and Count XIX (Indiana Constitution).  These twelve claims are now before us on cross-motions for summary judgment filed by Plaintiffs [Dkt. 152] and Defendants [Dkt. 157], respectively.

For the reasons detailed below, we <u>DENY</u> Plaintiff's Motion for Summary Judgment and <u>GRANT</u> Defendant's Cross Motion for Summary Judgment.

## **Factual Background**[1]

**The Parties**

Plaintiff E.D. is a student who attends Noblesville High School ("NHS"), located in Noblesville, Indiana.  In August 2021, when E.D. was a freshman at NHS, she formed a student organization, Plaintiff Noblesville Students for Life ("NSFL").

Defendant NHS is a part of the Defendant Noblesville School District, a public, state-funded school system.  Also named as Defendants in this litigation are several individual employees of Noblesville School District.  During the time period relevant to this litigation, the individually named Defendants occupied the following positions: Dr. Beth Niedermeyer was Noblesville Schools Superintendent; Dr. Craig McCaffrey was the NHS Principal; Janae Mobley and Daniel Swafford were NHS Assistant Principals; Jeremy Luna was Dean of Students at NHS; Alison Rootes was a technical assistant who

---

[1] Plaintiffs include facts in their briefing regarding current school policies, arguing that those policies create an unconstitutional "caste system" among different categories of student groups. However, no such allegations or claims were included in Plaintiffs' amended complaint and thus are not part of this lawsuit.  Accordingly, we have not addressed those policies in this entry.

2

worked primarily at North Elementary and Stony Creek Elementary Schools; Elizabeth Kizer was a special education teacher and transition coordinator at NHS; Emily Patterson-Jackson was an instructional assistant in special education classes at Noblesville West Middle School; Grace Tuesca was an after-school and before-school teacher for grades two through five with Miller Explorers; Allison Schwingendorf-Haley was an English teacher at NHS; and Stephanie Eads was a second grade teacher at Stony Creek Elementary.  Defendant Alexandra Snider Pasko was an attendance and in-school suspension assistant at Noblesville East Middle School at the beginning of the fall 2021 semester but resigned from her employment prior to the date on which she engaged in the conduct for which she is being sued by Plaintiffs.

**NHS Student Interest Clubs**

There are several types of student groups at NHS, including school clubs, academic teams, extra-curricular activities, co-curricular activities, and student interest clubs.  McCaffrey Dep. II at 49.  With the exception of student interest clubs, these groups are school sponsored and led by a school-approved adult who is actively involved in organizing and running the group.

Student interest clubs, by contrast, are created by students who want to gather with other students who hold similar interest in a particular subject.  These groups are student-driven and student-led.  A faculty sponsor is present to supervise the students during their use of school facilities, to remain available to answer questions, and to assist with logistics, but the adult does not actively participate in the club.  In the fall of 2021, several active student interest clubs were active at NHS, including, but not limited to, the

RSA-003

Conservation Club, Campus Crusade for Christ, Fellowship of Christian Athletes, Gender and Sexuality Alliance, Key Club, Leo Club, Noblesville Young Democrats, Young Republicans, and Police Explorers.  Dkt. 158-30.

During the 2021–2022 school year, Noblesville Schools had not promulgated written rules or policies governing the procedures for starting a new student interest club. McCaffrey Dep. II at 24–25.  When students came up with club proposals, they were directed to find a faculty sponsor and fill out a brief questionnaire.  McCaffrey Dep. I at 21, 23.  Once a faculty member agreed to serve as a club sponsor, that faculty member was available to answer the student leader's questions as well as assist with meeting supervision and logistics.  *Id.* at 37–38.  Dr. McCaffrey, as principal, was responsible for reviewing all the proposals and questionnaires and for approving the formation of student interest clubs.

**Policies Regarding Student Flyers**

The 2021–2022 Noblesville High School Student Handbook set forth rules applicable to the posting of flyers at the school, which requirements provided as follows:

> Any materials posted at [NHS] must be posted only in the cafeteria and/or commons areas, and they should be removed after the date of the event. Posters must promote a school-sponsored event or have administrative approval to be posted.

> If materials promote a non-school event, they must list the sponsoring group. The sponsoring group must be local, must be clearly named on the posters, and must be a non-for-profit organization.  The event itself must be educational in nature.

Dkt. 158-13.

Other than these provisions, there was no written policy in place the fall of 2021 governing the content of student interest club advertising flyers, including whether they could contain graphics, photographs, or logos.  Nor were there written policies or procedures for receiving school approval to post such flyers.  According to Defendants, despite there being no official written policy, school administrators and club sponsors knew that flyers for all club call-out meetings were to include the name of the club and the date, time, and location of the meeting, and anything disruptive to the school environment was prohibited.  *Id.* at 34–35; Mobley Dep. I at 15–19.

During the time period relevant to this litigation, NHS students were not permitted to display posters on school walls without prior approval from an administrator. Approved posters were required to include a written take-down date and the initials of the administrator who had approved the poster and be affixed to the wall surfaces only with blue tape.  Mobley Dep. I at 14; Swafford Dep. at 19–20, 31.  During the fall of 2021, NHS administrators limited the display of posters to the main hallway of the freshman center, near bus the entrances and the auditorium, and in the cafeteria.  Swafford Dep. at 37.

**Formation of Noblesville Students for Life**

During the summer of 2021, E.D. contacted school administrators at NHS seeking information regarding the formation of a student interest club, to wit, the Noblesville Students for Life ("NSFL").  She was informed that she would first need to find a faculty advisor for the club, which she accomplished on July 28, 2021.  On August 3, 2021, which was the second day of the 2021–2022 school year, E.D. met with Dr. McCaffrey to

RSA-005

discuss the next steps for securing school approval for establishing NSFL.  E.D. Dep. I at

10.  At E.D.'s request, her mother, Lisa Duell, also attended that meeting and in fact

audio-recorded the conversation.  E.D. had asked her mother to attend because her family

had a rule that she was not to be alone with any male adult and, in addition, E.D. wanted

to have a recording of the meeting in case "Dr. McCaffrey decided [based on]

discriminatory or other false reasons not to permit [her] club," thereby allowing her to

"pursue the steps necessary to make sure [she] did get [her] club."  E.D. Dep. I at 13–14.

Neither E.D. nor Ms. Duell mentioned to Dr. McCaffrey that one of the reasons Ms.

Duell was attending the meeting was because of their family no contact policy.

During the meeting, E.D. informed Dr. McCaffrey that she wanted to start NSFL

and explained to him the club's pro-life mission.  Duell Dep. at 19; E.D. Dep. I at 13–23.

Through formation of the club, E.D. sought "to educate [her] peers on the issue of

abortion and empower [her] peers to volunteer in the local community with pregnancy-

related items."  E.D. Dep. I at 18.  Dr. McCaffrey provided E.D. with a club questionnaire

form to complete and advised that its completion and submission was the only other step

she needed to take before NSFL could be approved as a student interest club.  *Id.* at 16–

17.  He specifically stated during that meeting that, because NSFL would be designated

as a student interest club, it was important that the club be student-based.

Ms. Duell spoke at several points during the meeting, inquiring as to the date when

the club fair was scheduled, the process of securing a speaker to address the club,

whether NSFL could have a booth at NHS's activities fair and, if so, whether E.D. should

prepare anything for the fair.  She also coached E.D. to clarify for Dr. McCaffrey the

RSA-006

involvement of Students for Life of America ("SFLA"),[2] specifically, regarding whether SFLA was requiring NSFL to adhere to a code of conduct and whether SFLA's contract addressed the organization's use of photographs of NHS and its students.  This discussion prompted Dr. McCaffrey's mention to Ms. Duell of a prior situation when student photos appeared on an organization's website.  E.D. Dep. II at 18–25, 92–93.

Following the August 3rd meeting, E.D. completed the questionnaire and returned it to Dr. McCaffrey.  In her responses, E.D. explained that she intended to establish NSFL "to raise awareness and generate discussion about the abortion issue while also doing something about it through volunteering."  Dkt. 158-1; Dkt. 158-2.  She wrote that the club would "empower students to knowledgably and courageously speak about abortion," "strive to bring awareness to the abortion issue," and "positively impact [her] peers' respect and value for life and the unborn."  *Id.*  Her plans for the club's activities included "flyering, tabling, chalking, volunteering at a local pregnancy resource center, participating on national pro-life days, and conducting drives for various needs [the] local pregnancy resource center may have."  *Id.*  E.D. referenced her plan for NSFL to invite guest speakers to present programs on pro-life topics.  *Id.*  She also indicated that she would recruit members through her church and social media as well as "flyering about activities the club has planned and tabling at the clubs fair."  *Id.*

After receiving E.D.'s completed club questionnaire, Dr. McCaffrey approved the creation of NSFL as a student interest club.  E.D. Dep. I at 21–22.  Once approved, NSFL

---

[2] SFLA is a national pro-life advocacy organization that, among other things, helps organize student groups at high schools and on college campuses.

was allowed to participate in the fall activities fair at NHS held on August 19, 2021.  E.D. staffed the NSFL booth at the fair wearing a message t-shirt that stated, "I am the pro-life generation."  The booth displayed a tri-fold poster that E.D. had created with NSFL's mission statement including a sign that read, "I am the pro-life generation."  E.D. Dep. II at 40–43.  NSFL advertised at the fair the activities in which the club planned to participate in the future, including a trip to Washington D.C. for the March for Life planned for January 2022.  E.D. Dep. I at 26.  More than thirty students signed up for NSFL during the activities fair.  *Id.* at 29–30, 65.

**Noblesville Students for Life Flyers**

Approximately two weeks following the fair, on August 27, 2021, E.D. met with Assistant Principal Mobley to schedule a callout meeting date for NSFL and to secure clarification of the rules applicable to advertising flyers.  *Id.* at 26.  On August 31, 2021, E.D. emailed Ms. Mobley digital copies of two flyers she planned to post in NHS to advertise NSFL's callout meeting.  Both flyers included photographs of students in front of the United States Supreme Court building in Washington D.C. carrying signs that read, "I Reject Abortion," "Defund Planned Parenthood," and "I Am the Pro-Life Generation," among other similar messages.  The proposed flyers also contained text stating: "Pro-Life Students, It's Time to Meet Up!" and included blank spaces at the bottom for E.D. to insert specific details regarding the meeting's time, place, topic, and sponsor.  Also, at the bottom of both flyers, was a very small logo depiction for SFLA.  Neither poster included the words "Noblesville Students for Life."  *See* Dkt. 158-5.

RSA-008

The next morning, on September 1, 2021, Ms. Mobley responded to E.D.'s email

regarding NSFL's proposed flyers, as follows:

> We need flyers advertising that this is a "Noblesville Students for Life" Club meeting location, date, and time.  We do not need the pictures of the signage.  For example, our Young Republican's [sic] club does not display items for the Republican Party.  Their flyers just simply state the club name and meeting/call-out information.  Then obviously at the club meeting and call-out, you guys can discuss whatever is your topic at hand.
>
> In the future, I will probably have you run these by Mr. McCauley first to get appropriate revisions made.  After his approval, we can get them to an administrator to approve prior to hanging in the halls.

*Id.* at 3–4.

After sending this response to E.D., Ms. Mobley emailed Mr. McCauley, NSFL's

faculty advisor, asking him to work with E.D. to revise the flyers.  *Id.* at 4.  Less than an

hour after receiving Ms. Mobley's email, Mr. McCauley emailed E.D. to give her

instructions, as follows:

> The best thing to do for the flyers is to simply put this info on them:
>
> Noblesville Students for Life Club
> Meeting Date: ???
> Meeting Time: ???
> Meeting Location: ???
>
> Once you get the flyer finished, will you please email it to me so that I can approve it?

*Id.* at 4.  In his communications with E.D., Mr. McCauley also instructed E.D. to email

Mr. Luna to confirm the call-out date, time, and location.  *Id.* at 5.

Later that same evening, E.D. responded to Mr. McCauley's email, stating that she

had hoped to use the template flyers from the SFLA website for NSFL's poster and

simply add the call-out meeting details to the template.  *Id.*  She also noted that she had

been trying to contact Mr. Luna but that he was not responding.  She offered to email Mr.

Luna again, copying Mr. McCauley, but suggested that it might be better for Mr.

McCauley to reach out to Mr. Luna directly.  *Id.*

On the next morning, on September 2, 2021, at 9:29 a.m., Mr. McCauley responded

to E.D.'s email by offering to contact Mr. Luna that day for approval of the call-out date

and time.  He also reiterated his prior instructions regarding the content of the poster, as

follows:

> I think it is best just to have this info only on the flyers: (no pictures, etc.)
>
> Noblesville Students for Life Club
>
> Meeting Date: ???
>
> Meeting [T]ime: ???
>
> Meeting [L]ocation: ???
>
> Send me a pic of the final flyer and we'll get it figured out.

*Id.*  At 10:14 a.m., E.D. responded again by email as follows: "Sounds good, thanks!  I'll

get to work on making the flyers."  *Id.*

On September 3, 2021, before school began that morning, E.D. requested a

meeting with Mr. Luna.  The meeting occurred later in the morning; Ms. Duell also

attended so that E.D. would not be alone with a male adult per their family rule.  (The

reason for Ms. Duell's presence was not communicated to Mr. Luna.)  At that meeting,

E.D. requested a specific callout date for NSFL because she had not received a response

RSA-010

to her prior emails to Mr. Luna.  Mr. Luna responded that he might "do it over the weekend."  E.D. Dep. I at 43–44; Luna Dep. I at 33, 36–37.

E.D. showed Mr. Luna the posters she had previously sent to Ms. Mobley for approval.  E.D. has testified that Mr. Luna told her that the posters were inappropriate because they contained a picture and that the pictures were inappropriate because of their political nature.  E.D. Dep. I at 48–49.  According to E.D. and her mother, Mr. Luna also stated that he could not approve the posters because the school was already dancing or walking "on eggshells."  *Id.* at 49; Duell Dep. at 32.

Mr. Luna has testified that he told E.D. and her mother that the flyer could not include a political photo of a "picket" with multiple signs reading "Defund Planned Parenthood."  Luna Dep. I at 40–41.  When E.D. asked if she would be permitted to hang the flyers if she removed the "Defund Planned Parenthood" signs, Mr. Luna said that that "should" or "would possibly work," but that he was not the school administrator who approved student clubs and flyers, so he did not know what would be allowed.  Luna Dep. I at 18–19, 40–41, 42; E.D. Dep. I at 49–50.  This was not entirely consistent with what Dr. Mobley had told E.D. in informing her that any administrator could approve flyers.  E.D. Dep. I at 67; Mobley Dep. II at 40–41.

E.D. has testified that she left the meeting with Mr. Luna feeling disappointed and unsure regarding the next steps for receiving approval for NSFL's flyers and callout meeting date.  E.D. Dep. I at 51–52.

RSA-011

**Dr. McCaffrey Revokes NSFL's Club Status**

Immediately following his meeting with E.D. and her mother on the morning of September 3rd, Mr. Luna spoke with Dr. McCaffrey and Ms. Mobley about what had occurred.  According to Mr. Luna, he felt that the meeting was a three-way conversation between E.D. Ms. Duell, and himself, with Ms. Duell driving the conversation.  Luna Dep. I at 47.  Both Dr. McCaffrey and Ms. Mobley expressed their concerns to Mr. Luna regarding Ms. Duell's participation in E.D.'s meetings about NSFL.  Luna Dep. at 46, 62–63; Mobley Dep. I at 35.  Ms. Mobley also informed Dr. McCaffrey that E.D. had previously presented the same flyers to her (Mobley) for approval, but that she had declined to approve them and told E.D. what she needed to do to fix them.  McCaffrey Dep. I at 103.

Later, on September 3rd, at 11:57 a.m., Dr. McCaffrey emailed Ms. Duell to "clarify some points about student interest clubs and [NHS's] process," (Dkt. 157-3), informing her that "student interest clubs are 100% student driven and can have no involvement from any adult," which was why he viewed it as "unusual and [un]orthodox" for Ms. Duell to have attended the initial meeting he had with E.D. regarding the formation of NSFL.  *Id.*  The email further explained that Dr. McCaffrey had allowed their first meeting to continue, despite Ms. Duell's presence, because E.D. "did all of the talking and did a good job of representing what she wanted to do."  *Id.*  However, Dr. McCaffrey said, after E.D. spoke with Ms. Mobley about NSFL's flyers and was told that they were not appropriate for school, instead of revising the flyers, E.D. and Ms. Duell met with Mr. Luna again to discuss the posters, approval of which had previously been

denied by Ms. Mobley.  Consistent with what E.D. had been told by Ms. Mobley, Dr.

McCaffrey reiterated in his email to Ms. Duell that:

> A poster cannot contain any content that is political or that could disrupt the
> school environment.  Club advertising posters only state the name of the club
> and the details of the meeting time and location.  When the students actually
> meet, they are able to talk about their common interests.

*Id.*  In his email, Dr. McCaffrey stated that, because he was no longer "confident that this

club is a student-driven club," he "therefore [was] removing the club's approval to meet

in the school."  *Id.*  Dr. McCaffrey also informed Ms. Duell that NHS was in the process

of "revamping" its club approval process "to handle the large number of requests [the

school was] getting along with the wide range of interest requests" and would not be

taking new requests for student interest clubs until the new process was finalized "for the

second semester."  *Id.*  Dr. McCaffrey advised Ms. Duell that, if E.D. wanted "to apply

for her club again next semester, she [could] reach out to Mrs. Mobley in January and ask

for the updated application."[3]  *Id.*

Dr. McCaffrey testified that the decision to revoke NSFL's club status was his

alone and that he informed Dr. Niedermeyer of his decision only after he had sent the

revocation email to Ms. Duell.  McCaffrey Dep. I at 108, 131; McCaffrey Dep. II at 128.

Although E.D. was NSFL's president at the time of the revocation, Dr. McCaffrey did not

send the September 3rd email to E.D. or otherwise notify her directly of the revocation.

---

[3] E.D. resubmitted her application as instructed and NSFL was reinstated as a student interest
club at NHS in January 2022.

RSA-013

E.D. instead was informed by NSFL's faculty sponsor, Mr. McCauley, that NSFL's club

status had been revoked.  E.D. Dep. I at 511–52, 53.

**Other Student Interest Clubs at NHS**

Prior to revoking NSFL's club status in the fall of 2021, Dr. McCaffrey had never

revoked authorization for a student interest club.  In 2019, however, Dr. McCaffrey did

receive a complaint that an adult was participating in NHS's Campus Crusade for Christ

group, along with a threat of litigation by the Freedom from Religion Foundation.  Dr.

McCaffrey investigated that complaint by watching videos of club meetings and

determined that no adults had spoken during the meetings; he therefore took no corrective

action in response to the complaint.  McCaffrey Dep. II at 135–36.  Other than this 2019

complaint, Dr. McCaffrey had dealt with no other issues regarding suspected adult

involvement in a student interest club until the issue arose with NSFL.  McCaffrey Dep.

II at 132.

NHS previously approved at least one other pro-life student interest club, about

which there is no evidence that it was denied approval or ever had its club status revoked.

McCaffrey Dep. I at 147; Niedermeyer Dep. at 50–51.  Dr. McCaffrey, Ms. Mobley, and

Mr. Luna all testified that in their personal views on abortion they are pro-life and thus

their opinions align with the viewpoint and mission of NSFL.  McCaffrey Dep. at 148;

Mobley Dep. I at 41–43; Luna Dep. I at 58.  Their actions were not motivated by any

philosophic hostility to the purpose of the club.

RSA-014

**Social Media Discussion**

After NSFL's club status was revoked, Noblesville City Councilman Pete Schwartz posted on the Noblesville Schools Community Facebook page a copy of an email that E.D. had sent him regarding the revocation of NSFL's club status, in which she expressed her belief that the revocation was the result of "ideological targeting" and her desire to "get the word out" about the situation.  Dkt. 154-2.  Another Noblesville resident who is not a party to this litigation reposted a condensed version of E.D.'s email, omitting certain references in the reposting, including E.D.'s statements that she was not "a puppet, a Greta Thunberg" and that "Pastor Micah," a well-known local pastor and political candidate, believed many in the community would be supportive of her efforts.  Dkt. 154-3.  That same Noblesville resident also shared on social media a link to a news article about the revocation.  These posts garnered a large response on social media, with various of the Defendants participating in the online discussions, as described below.

Defendant Eads commented on Councilman Schwartz's post: "I really think this is inappropriate for a councilman to post [E.D.'s email] to a public forum page."  Dkt. 154-2.  When Councilman Schwartz rejoined to inquire as to what was unprofessional about his conduct, Ms. Eads wrote, "[U]sing your position as a councilman to push your buddy, Pastor Micah's agenda here."  *Id.*  Councilman Schwartz's conceded that he had "really not [done] much" to investigate the situation before posting E.D.'s email to social media, prompting Ms. Eads to respond: "[S]o basically he didn't do anything other than post this to Facebook?  Wow, tax dollars hard at work."  *Id.*  Later in the thread, Defendant Patterson-Jackson commented, "I got all I needed to know about the true intent and

purpose of this 'club' by the use of the two phrases: 'puppet, Greta Thunberg' and 'Pastor Micah.' No thanks." *Id.* Ms. Eads replied to Ms. Patterson-Jackson's comment: "EXACTLY." *Id.*

In response to the Noblesville resident's reposting of an edited version of E.D.'s email to Councilman Schwartz, Ms. Patterson-Jackson wrote: "You have deliberately and intentionally left out key parts of the original email, specifically her references to 'puppet, Greta Thunberg' and 'Pastor Micah's' endorsement. You have absolutely lost all credibility at this point. And as I said on that original post, there is no place for a club that endorses misogyny, bigotry, and conspiracy-driven politics in our public schools." Dkt. 154-3. Defendant Tuesca "liked" this comment. Dkt. 158-9. In response to Ms. Patterson-Jackson's comment, several non-parties posted comments critical of her post. In response to those comments, Ms. Patterson-Jackson reiterated her concern that the excerpt of E.D.'s email that had been posted omitted relevant portions of the original email and stated that her "critique and questioning of misogyny, bigotry, and conspiracy-driven politics" stemmed from "the endorsement by Micah Beckwith" that was referenced in E.D.'s original email. Dkt. 154-3. Ms. Patterson-Jackson posted again on the thread, as follows: "There is no place for any club that endorses those things [misogyny, bigotry, and conspiracy driven politics]. If the Students for Life club truly doesn't, then by all means, they should be able to meet. Once again, and for the final time, my criticism was based on the fact that according to the student the club is endorsed by Micah Beckwith, which, as I said, is the basis for my concern, as it is my opinion that he does, in fact, support those things." *Id.*

16

RSA-016

With reference to NSFL's proposed flyers, Ms. Patterson-Jackson commented, "So out of curiosity, would you be good with club posters in the school for the Black Student Union that said 'Defund the Police?'" Dkt. 158-6.  Defendants Rootes and Kizer both "liked" Ms. Patterson-Jackson's comment.  *Id.*  A non-party commented that the social media discussion appeared to be "proving [the] point" that "a bunch of adults were behind this [NSFL] group," and Defendant Schwingendorf-Haley "liked" that comment.  Dkt. 158-7.  Defendant Snider Pasko "liked" the following comment posted by another non-party: "Parent in on the formation meeting?  Already has legal representation?  I suppose I'm a skeptic, but it's almost like it was planned …."  Dkt. 158-8.  Ms. Tuesca "liked" several comments on these threads that she agreed with or found funny.  Tuesca Dep. at 22–38.

**The Instant Litigation**

On December 21, 2021, Plaintiffs filed their original complaint, which they later amended on January 11, 2022, alleging, *inter alia*, various violations of their First and Fourteenth Amendment rights and the Equal Access Act, as well as claims under the Indiana Constitution and various tort claims subject to the Indiana Tort Claims Act ("ITCA") notice provisions.  Defendants moved to dismiss all claims alleged against them, which motion was granted in part and denied in part.  In ruling on the motion to dismiss, the Court also *sua sponte* converted Defendants' motion to dismiss to one for summary judgment as to the ITCA notice issue and granted judgment in Defendants' favor on that issue.  However, upon reconsideration, the Court granted Plaintiffs' motion for reconsideration of the *sua sponte* conversion of the motion to dismiss and provided

RSA-017

the parties an opportunity to submit supplemental briefs and evidence on the ITCA notice

issue, which they have now done.

Now before the Court are the parties' cross-motions for summary judgment as to

the federal claims as well as the parties' supplemental submissions on summary judgment

as to the ITCA notice issue.  These motions are fully briefed and ripe for ruling.

<u>**Legal Analysis**</u>

I.      **Summary Judgment Standard**

Summary judgment is appropriate where there are no genuine disputes of material

fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a);

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  A court must grant a motion for

summary judgment if it appears that no reasonable trier of fact could find in favor of the

nonmovant on the basis of the designated admissible evidence.  *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  We neither weigh the evidence nor evaluate

the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences

flowing from them in the light most favorable to the nonmovant.  *McConnell v. McKillip*,

573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).  Because these are cross-motions for

summary judgment and the same Rule 56 standards apply, our review of the record

requires us to draw all inferences in favor of the party against whom a particular issue in

the motion under consideration is asserted.  *See O'Regan v. Arbitration Forums, Inc.*, 246

F.3d 975, 983 (7th Cir. 2001) (citing *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685,

692 (7th Cir. 1998)).

RSA-018

II.    **Federal Claims**

A. **Section 1983 and Equal Access Act Claims Against the Noblesville School District**

Plaintiffs have framed almost all their Section 1983 claims, other than their individual capacity claims for First Amendment retaliation and Equal Access Act violations, only against the municipal entity, the Noblesville School District (the "District").[4] Accordingly, the viability of these claims is governed by the requirements set forth in *Monell v. Department of Social Services*, 436 U.S. 658 (1978) and its progeny.[5]

Under *Monell*, "a municipal entity is not vicariously liable for the constitutional torts of its employees" and instead "may be liable only for conduct that is properly attributable to the municipality itself." *Milchtein v. Milwaukee Cnty.*, 42 F.4th 814, 824 (7th Cir. 2022) (internal quotations and citations omitted). A constitutional deprivation may be attributable to a municipality only "when execution of a government's policy or custom inflicts the injury." *Houskins v. Sheahan*, 549 F.3d 480, 493 (7th Cir. 2008) (quotation marks and citation omitted). A plaintiff can show that a constitutional violation resulted from the execution of a municipal policy or custom in the following

---

[4] Plaintiffs have also framed these claims as against Defendant NHS, but do not dispute that NHS is not a suable entity separate from the school district. Accordingly, all claims against NHS as such are hereby dismissed.

[5] It is true, as Plaintiffs argue, that legal standards beyond those set forth in *Monell* govern whether their constitutional rights were violated by Dr. McCaffrey's decision to revoke NSFL's club status. However, as we have previously explained to Plaintiffs, they have not brought these claims against Dr. McCaffrey in his individual capacity. To instead hold the Noblesville School District responsible for any such violation, as Plaintiffs have sought to do in this litigation, they must show not just that they suffered a constitutional injury, but that that injury is directly attributable to the governmental entity itself under *Monell*.

three ways: "(1) an express policy causing the loss when enforced; (2) a widespread practice constituting a 'custom or usage' causing the loss; or (3) a person with final policymaking authority causing the loss." *Walker v. Sheahan*, 526 F.3d 973, 977 (7th Cir. 2008) (citing *Chortek v. City of Milwaukee*, 356 F.3d 740, 748 (7th Cir. 2004)).

Here, Plaintiffs make no attempt to show that the District had either an express policy or a widespread practice or custom that caused NSFL's revocation.  Instead, Plaintiffs argue that the District's liability under *Monell* arises from the violation that was caused by Dr. McCaffrey, a final policymaker over student club policy at NHS. Specifically, Plaintiffs argue, based on testimony from the school board president and other school board members, that the school board was not involved in promulgating or approving procedures governing school clubs, but that the school district had delegated policymaking authority related to student interest clubs at NHS to Dr. McCaffrey.

In determining whether a municipal officer such as Dr. McCaffrey is acting as a final policymaker, courts look to state and local law.  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986).  In Indiana, courts have held that the final policymaker for a public school corporation, such as the District, is the board of school trustees.  *See Harless v. Darr*, 937 F. Supp. 1339, 1349 (S.D. Ind. 1996) ("[T]he school board and not the [p]rincipal or the [s]uperintendent has final policy making authority under Indiana law."); *accord Wesley v. South Bend Cmty. Sch. Corp.*, No. 3:19-cv-00032-PPS-MGG, 2019 WL 5579159, at *7 (N.D. Ind. Oct. 29, 2019) ("In Indiana, the final policymaker for a public school corporation is its board of school trustees."); *Herndon v. South Bend Sch. Corp.*,

No. 3:15 CV 587, 2016 WL 3654501, at *1 (N.D. Ind. July 8, 2016) ("[U]nder Indiana law, it is the school board, and not the principal that has final policymaking authority.").

Here, Plaintiffs contend that the Noblesville Board of School Trustees delegated its policymaking authority regarding student clubs to Dr. McCaffrey as principal of NHS. In support of their argument, Plaintiffs point to the fact that Dr. McCaffrey, acting on his own, made the decision to revoke NSFL's club status, without seeking direction or approval from either the superintendent or the school board and without having his decision subjected to official review.  However, "[u]nder the delegation theory, the person or entity with final policymaking authority must delegate the power to make *policy*, not simply the power to make *decisions*."  *Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 630 (7th Cir. 2009) (emphasis added).  Thus, the fact that Dr. McCaffrey had discretionary authority to make decisions regarding student interest clubs at NHS does not render him the final decision maker regarding policies for purposes of § 1983 municipal liability.  *See Ball v. City of Indianapolis*, 760 F.3d 636, 643 (7th Cir. 2014) ("[S]imply because a municipal employee has decisionmaking authority, even unreviewed authority, with respect to a particular matter does not render him a policymaker as to that matter."); *Kristofek v. Village of Orland Hills*, 712 F.3d 979, 987 (7th Cir. 2013) ("[T]he mere unreviewed discretion to make hiring and firing decisions does not amount to policymaking authority.  There must be a delegation of authority to set policy for hiring and firing, not a delegation of only the final authority to hire and fire.") (quoting *Valentino v. Village of S. Chi. Heights*, 575 F.3d 664, 674 (7th Cir. 2009)); *Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464, 469 (7th Cir. 2001) (holding

RSA-021

that *Monell* liability is limited "to situations in which the official who commits the alleged violation of the plaintiff's rights has authority that is final in the special sense that there is no higher authority").

Here, the kinds of day-to-day discretionary decisions that Dr. McCaffrey and other NHS administrators were authorized to make regarding the posting of flyers in the school and student club approval do not rise to the level of policymaking decisions made on behalf of the District, the governmental entity that Plaintiffs have sued. *See Harless*, 937 F. Supp. at 1349 (holding that the delegation of authority under Indiana law to the principal to make "ad hoc decisions" to maintain order within the school was distinguishable from the school board's authority to create final policy). The evidence adduced by the parties establishes that it is the Noblesville School Board who has final authority over NHS's policies, which are set forth in the Student Handbook. When asked at his deposition what role the Noblesville School Board holds regarding student groups at a high school or middle school in the District, Noblesville School Board President Joe Forgey testified that, "other than [the principal] taking *our* policy and administrating it, none." Forgey Dep. at 24 (emphasis added).

Mr. Forgey did express some confusion regarding whether he would have seen NHS's policies regarding student clubs and whether the Board has final approval of the Student Handbook, testifying that he "think[s] it comes to a vote to the board to approve the handbooks," but was "not sure" and "didn't want to say for sure." *Id.* at 33. However, Dr. Niedermeyer and Dr. McCaffrey both testified that NHS policies which are contained in Noblesville Schools' Student Handbooks are drafted by the principal and curriculum

22

RSA-022

team at each school and then presented to the School Board for approval every school year.  Dkt. 166-1 at 21, 42; Dkt. 166-4 at 24–25.

Mr. Forgey's uncertainty regarding whether he would have seen policies regarding student clubs and whether the Noblesville School Board is responsible for approving NHS's Student Handbook is not enough to create a genuine issue of material fact on this issue.  Federal Rule of Evidence 201 permits a court to take judicial notice of a fact that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," and such notice can be taken *sua sponte* and at any stage in a proceeding.  We therefore take judicial notice of the agenda and minutes of the June 15, 2021 regular school board meeting of the Noblesville School Board, which are accessible from the Noblesville Schools website and reflect that, on that date, the Board approved the 2021–2022 Noblesville Elementary and Secondary Student/Parent Handbooks in a 4 to 1 vote.  *See* Section 6.7, Noblesville School Board Meeting Agenda for June 15, 2021 Regular School Board Meeting, go.boarddocs.com/in/noblesville/Board.nsf/Public (last visited March 13, 2024); *see*, *e.g.*, *Miller v. Goggin*, 672 F. Supp. 3d 14, 28 n.9 (E.D. Penn. 2023) (noting that the court had previously taken judicial notice of school board meeting minutes).  Accordingly, although Dr. McCaffrey may have had discretionary authority over *decisions* affecting student clubs within NHS, the evidence before us clearly shows that the Noblesville School Board, not Dr. McCaffrey, was the entity responsible for establishing final government *policy* covering such matters.

Finally, to the extent that Plaintiffs argue that the lack of policies in the NHS Student Handbook regarding the formation and approval of student interest clubs and the

posting of flyers to advertise such clubs supports an inference that the Noblesville School

Board delegated its final policymaking authority on such matters to Dr. McCaffrey, such

an argument is not well-made.  Seventh Circuit law is clear that "the absence of a written

policy is not enough to support an inference that final policymaking authority has been

delegated to a subordinate." *Cornfield by Lewis v. Consol. High Sch. Dist. No. 230*, 991

F.2d 1316, 1325 (7th Cir. 1993).

Although the absence of a policy is not enough to show a delegation of final

policymaking authority to an employee, under certain circumstances the lack of a policy

can nonetheless subject the governmental entity to liability under *Monell*.  "But proving

*Monell* liability based on an absence of policy is difficult, because 'a failure to do

something could be inadvertent and the connection between inaction and a resulting

injury is more tenuous,' and, therefore 'rigorous standards of culpability and causation

must be applied to ensure that the municipality is not held liable solely for the action of

its employee." *Watson v. Ind. Dep't of Correction*, No. 18-02791, 2020 WL 5815051, at

\*4 (S.D. Ind. Sept. 30, 2020) (quoting *J.K.J. and M.J.J. v. Polk Co. and Christensen*, 960

F.3d 367, 378 (7th Cir. 2020)).  Insofar as Plaintiffs here have referenced the District's

failure to enact a policy regarding student organization formation as the cause of their

constitutional injuries, no such claim has been developed in a legally sufficient manner.

To hold the District liable under *Monell* for the failure to enact a policy, Plaintiffs

must show that the District had "'actual or constructive knowledge that its agents [such as

those approving student club status] will probably violate constitutional rights' in the

absence of a [relevant] policy." *Watson*, 2020 WL 5815051, at \*4 (quoting *Glisson v. Ind.*

RSA-024

*Dep't of Corr.*, 849 F.3d 372, 381 (7th Cir. 2017)).  In addition, to establish liability for the absence of a policy, a plaintiff typically must provide "more evidence than a single incident."  *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005).  Again, Plaintiffs' briefing has fallen short of establishing that the District knew or had reason to know that, without a formal policy regarding student interest club formation, its school administrators were likely to permit, deny, or revoke a club's status based upon the club's viewpoint.  As Defendants argue, the evidence shows that NHS administrators routinely approved the formation of student groups with a variety of ideologies and political viewpoints, including Young Republicans, Young Democrats, Campus Crusade for Christ, Fellowship of Christian Athletes, and Gender and Sexuality Alliance.  We have been presented no evidence showing that any NHS student interest club had previously been denied or revoked for any reason, let alone for the content of the club's speech.  Plaintiffs have thus failed to adduce the necessary evidence to prove that "there is a true municipal policy at issue, not a random event" as is required to hold the District responsible for a gap in policy.  *Id.*

For the foregoing reasons, we find that Plaintiffs have failed to show that their constitutional injury was caused by an official policy, widespread practice or custom, or decision by a final policymaker of the governmental entity they have sued.  The District is thus entitled to summary judgment in its favor on Plaintiff's § 1983 claims against it, to wit, Counts I (First Amendment freedom of association), II (First Amendment freedom of speech), III (Fourteenth Amendment due process), IV (Fourteenth Amendment equal protection), V (First Amendment retaliation), and Count VII (Equal Access Act).

RSA-025

Defendant's summary judgment motion is therefore <u>GRANTED</u>, and Plaintiff's motion is correspondingly <u>DENIED</u> as to these claims brought by Plaintiffs against the Noblesville School District.

### B.  Individual Capacity Claims Against Defendants Niedermeyer, Mobley, and Luna

Plaintiffs assert § 1983 claims for First Amendment retaliation and Equal Access Act violations against Defendants Niedermeyer, Mobley, and Luna in their individual capacities, based on the revocation of NSFL's club status.  However, the undisputed evidence establishes that the revocation decision was made by Dr. McCaffrey alone, and Plaintiffs do not argue otherwise.  Because the evidence shows that neither Dr. Niedermeyer, Ms. Mobley, nor Mr. Luna was personally involved, consulted, or otherwise acquiesced in the decision to revoke NSFL's club status, these defendants cannot be held liable for whatever injury that revocation caused Plaintiffs.  *See Minix v. Canarecci*, 597 F.3d 824, 833 (7th Cir. 2010) ("[I]ndividual liability under § 1983 requires personal involvement in the alleged constitutional deprivation.") (internal quotation marks and citation omitted).

Accordingly, Defendants' motion for summary judgment is <u>GRANTED</u> as to the individual capacity First Amendment retaliation (Count VI) and Equal Access Act (Count VII) claims brought against Defendants Niedermeyer, Mobley, and Luna in their individual capacities, and Plaintiffs' motion for summary judgment on these claims is therefore <u>DENIED</u>.

RSA-026

### C. Individual Capacity First Amendment Retaliation Claims Against Defendants McCaffrey, Snider-Pasko, Rootes, Schwingednorf-Haley, Kizer, Patterson-Jackson, Tuesca and Eads

We turn next to address Plaintiffs' First Amendment retaliation claims brought against the remaining Defendants each sued in their individual capacity. Plaintiffs allege that, in retaliation for E.D.'s expressed pro-life views, Defendant McCaffrey revoked NSFL's club status and Defendants Snider Pasko, Rootes, Schwingednorf-Haley, Kizer, Patterson-Jackson, Tuesca, and Eads created a hostile environment for E.D. by participating in a public discussion on social media regarding NSFL's revocation, including writing negative comments and "liking" posts critical of NSFL.

To prevail on their First Amendment retaliation claims, Plaintiffs must show that: (1) E.D. engaged in activity protected by the First Amendment; (2) she suffered a deprivation that would likely deter future First Amendment activity; and (3) the First Amendment activity was "at least a motivating factor" in Defendants' decision to take retaliatory action. *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009) (citing *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008)). "The 'motivating factor' amounts to a causal link between the activity and the unlawful retaliation," *Manuel v. Nalley*, 966 F.3d 678, 680 (7th Cir. 2020), which element may be shown using either direct or circumstantial evidence, such as "suspicious timing, ambiguous oral or written statements, behavior toward or comments directed at other[s] … in the protected group." *Long v. Teachers' Ret. Sys. of Ill.*, 585 F.3d 344, 350 (7th Cir. 2009) (citation omitted). If Plaintiffs succeed in establishing a prima facie claim, the burden shifts to Defendants to rebut the claim and establish that the deprivation "would have occurred regardless of the

protected activity." *Manuel*, 966 F.3d at 680 (citing *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012)).  If such a showing is made, the burden then shifts back to Plaintiffs to show that Defendants' proffered non-retaliatory reason "is pretextual or dishonest." *Id.*

Having set forth the legal principles applicable to Plaintiffs' First Amendment retaliation claims, we turn next to address the merits of these claims.

### 1.  First Amendment Retaliation Claim Against Defendant McCaffrey

Plaintiffs argue that they are entitled to summary judgment on their First Amendment retaliation claim against Dr. McCaffrey because the evidence establishes that he revoked NSFL's club status shortly after E.D. had sought approval to post flyers containing pro-life messages and images to advertise the NSFL's call-out meeting. Specifically, Plaintiffs argue that, when E.D. requested approval from NHS administrators to post flyers related to the pro-life movement to advertise NSFL's call-out meeting, she was given conflicting information from various administrators regarding the rules governing what could be posted, and that, within hours of seeking to clarify the rules at a meeting with her mother and Mr. Luna, Dr. McCaffrey revoked NSFL's club status.  Plaintiffs claim, based on the conflicting information they say they were given regarding permissible content for the flyers and the proximity in time between E.D. seeking to clarify the rules and secure approval for her flyers and Dr. McCaffrey's revocation decision, that they have shown that their protected First Amendment activity was at least a motivating factor in Dr. McCaffrey's decision to revoke NSFL's club status.

Defendants rejoin that summary judgment should instead be entered in Dr. McCaffrey's favor because Plaintiffs have failed to establish that the viewpoint of the

RSA-028

proposed flyers or any other protected First Amendment activity on Plaintiffs' part was a motivating factor in the revocation decision.  Rather, the evidence establishes that Dr. McCaffrey revoked NSFL's club status because of Plaintiffs' conduct—not their speech—referencing his concern about the involvement of E.D.'s mother in what was supposed to be a student-run club and his belief that E.D.'s conduct of "shopping" administrators in an effort to find one who would approve the flyer that had previously been rejected by two other NHS administrators for failing to comply with the rules applicable to NHS student interest club flyers was insubordinate behavior.

There can be no dispute that Plaintiffs' formation of a pro-life club and their efforts to advertise that club in the same manner afforded to all other student interest clubs at NHS constitutes protected activity under the First Amendment.  It is also undisputed that the revocation of NSFL's club status is the kind of deprivation that would likely deter future First Amendment activity.  Accordingly, Plaintiffs have satisfied these first two elements of their First Amendment retaliation claim against Dr. McCaffrey.  However, we find that Plaintiffs have failed to establish the third element of their claim, to wit, that their protected First Amendment activity was a motivating factor in Dr. McCaffrey's revocation decision.

To prove that their protected speech activity was at least a motivating factor in Dr. McCaffrey's decision, Plaintiffs rely primarily on the proximity in time between E.D.'s request to post flyers advertising NSFL's call-out meeting and Dr. McCaffrey's revocation decision.  It is well-settled Seventh Circuit law, however, that "[s]uspicious timing alone will rarely be sufficient to create a triable issue because '[s]uspicious timing may be just

that—suspicious—and a suspicion is not enough to get past a motion for summary judgment.'" *Manuel*, 966 F.3d at 681 (quoting *Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 315 (7th Cir. 2011)).  In any event, rather than being suspicious in an adverse sense, the timing here supports Dr. McCaffrey's proffered non-retaliatory reasons for his decision, to wit, that it was Plaintiffs' conduct, not their protected speech activity, that motivated his decision to revoke NSFL's club status.

Dr. McCaffrey, a self-professed pro-life supporter,[6] approved NSFL's club status in August 2021 with full knowledge of its mission and pro-life message and allowed Plaintiffs to participate in NHS's activities fair later that same month at which E.D. represented NSFL and wore an "I am the pro-life generation" t-shirt and displayed a trifold poster containing that same statement as well as NSFL's pro-life mission statement, all without objection from any NHS administrator.  Dr. McCaffrey's decision to revoke NSFL's club status was made only after he learned that E.D. and her mother had met with Mr. Luna on September 3, 2021 in an attempt to secure approval for E.D.'s proposed flyer advertising NSFL's call-out meeting, despite the fact that flyer had already been rejected by two other NHS administrators—NHS Assistant Principal Mobley, and NSFL's faculty advisor, Mr. McCauley.

---

[6] Plaintiffs maintain that Dr. McCaffrey's views are irrelevant.  While clearly not dispositive, intent may in some cases be relevant to the inquiry of whether a causal relationship existed between the protected speech and the adverse action alleged.  *See Whitfield v. Spiller*, 76 F.4th 698, 712 (7th Cir. 2023) (recognizing that "[a]t times, it is necessary to determine what exactly motivated a defendant," if that evidence sheds light on causation).

Immediately following his meeting with E.D. and Ms. Duell, Mr. Luna reported to Dr. McCaffrey that he felt it had been a "three-way" discussion among himself, E.D., and her mother.[7] At that time, Dr. McCaffrey also learned that Ms. Mobley and Mr. McCauley had each previously instructed E.D. on how to fix her flyer so that it could be approved, and, although E.D. had assured Mr. McCauley that she would make the changes, she instead ignored their instructions and, accompanied by her mother, attempted to obtain approval from Mr. Luna to post the original flyer.

Contrary to Plaintiffs' contention that E.D. was given inconsistent information regarding what changes she needed to make to her proposed flyers before they could be posted in NHS hallways and thus needed to consult Mr. Luna for clarification, the undisputed evidence shows that she was given clear and consistent direction from each administrator she consulted. Ms. Mobley and Mr. McCauley both told E.D. that her flyer should list the name of her club and the date, time, and location of the call-out meeting, and that the photograph on the proposed flyer (which pictured students holding signs that included messages such as "Defund Planned Parenthood") needed to be removed. Ms. Mobley went on to explain that NHS's Young Republican group, for example, "does not display items for the Republican Party" on their call-out flyers; rather, the call-out posters "just simply state the club name and meeting/call-out information" and "[t]hen obviously at the club meeting and call-out, you guys can discuss whatever is your topic at hand."

---

[7] Although Plaintiffs argue that Ms. Duell's attendance was due to a family rule that E.D. not be alone with adults, particularly men, there is no evidence that either Dr. McCaffrey or Mr. Luna was ever made aware of that rule at the time of these meetings.

RSA-031

Dkt. 158-5.  Nor is there any indication that E.D. was confused or otherwise upset by these instructions.  To the contrary, she responded to Mr. McCauley, "Sounds good, thanks!  I'll get to work on making the flyers."  *Id.*

The next morning, however, E.D. and her mother met with Mr. Luna and presented him with the original flyer for his approval.  Consistent with Ms. Mobley's and Mr. McCauley's instructions, Mr. Luna told E.D. that the photograph needed to be removed before the flyer could be posted.  When E.D. told him that other flyers posted at NHS contained images, he explained that her photograph needed to be removed because it was political.  He told E.D. that he believed her flyer could be approved once the "Defund Planned Parenthood" sign was removed, but that he was not usually the administrator who approved flyers.

Dr. McCaffrey, Mr. Luna, and Ms. Mobley all testified consistently that their discussion following Mr. Luna's meeting with E.D. and her mother centered around their shared concern regarding Ms. Duell's participation in the meeting, which represented the second NSFL-related meeting she had attended within approximately one month's time, as well as the inappropriateness of E.D.'s having gone to Mr. Luna after she had already been instructed on how to fix her flyers so that they could be approved and posted in the NHS hallways.  McCaffrey Dep. II at 103; *accord* Mobley Dep. II at 35; Luna Dep. II at 46.  There is no evidence of any concern being raised at that time by Dr. McCaffrey or the other NHS administrators regarding NSFL's pro-life mission or E.D.'s right to advertise NSFL's call-out meeting in the same manner as other NHS student

RSA-032

organizations, only that E.D. had eschewed those rules and then, together with her mother, had sought approval to post the flyer from a different administrator.

Within a few hours of this discussion, Dr. McCaffrey informed Ms. Duell of his decision to temporarily revoke NSFL's club status.  In that email, Dr. McCaffrey expressed his concerns regarding Ms. Duell's involvement in NSFL and her attendance at a meeting at which E.D. attempted to secure approval for her flyer from Mr. Luna without making the changes necessary to comply with the instructions that she had been given by other NHS administrators.  Consistent with what E.D. had been told by Ms. Mobley, Mr. McCauley, and Mr. Luna, Dr. McCaffrey reiterated in his email to Ms. Duell that flyers advertising clubs at NHS must "state the name of the club and the details of the meeting time and location" and "cannot contain any content that is political or could disrupt the school environment."  Dkt. 157-3.

This timeline supports Dr. McCaffrey's purported non-retaliatory reasons for revoking NSFL's club status: he had approved NSFL as a student organization with full knowledge of its pro-life message, permitted Plaintiffs to participate in the activities fair and promote NSFL using pro-life messaging, and took action against Plaintiffs only after E.D. and her mother met with Mr. Luna in what Dr. McCaffrey viewed as an attempted end-around Ms. Mobley's and Mr. McCauley's instructions.  Plaintiffs in contrast have pointed to no evidence that casts any doubt on the veracity of Dr. McCaffrey's belief that Ms. Duell's participation at both meetings between E.D. and NHS administrators about NSFL raised concerns by school officials that NSFL was not entirely student-run. Plaintiffs cite the fact that Dr. McCaffrey admitted that E.D. had represented herself well

in the first meeting as evidence that his concern regarding Ms. Duell's involvement was disingenuous, but Dr. McCaffrey explained in his revocation email that his concerns increased following E.D.'s mother's attendance at a second meeting and participation in E.D.'s attempt to obtain Mr. Luna's approval for the original flyer.

To the extent Plaintiffs argue that they had a protected First Amendment right to post a flyer containing political speech on NHS's walls, this argument is a non-starter. Plaintiffs maintain that the Supreme Court's seminal decision in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969) governs this analysis, in which "[b]alancing the speech rights of students with the need for school officials to set standards for student conduct, the Court held that restrictions on student speech are constitutionally justified if school authorities reasonably forecast that the speech in question 'would materially and substantially disrupt the work and discipline of the school' or invade the rights of others." *N.J. by Jacob v. Sonnabend*, 37 F.4th 412, 423 (7th Cir. 2022) (quoting *Tinker*, 393 U.S. at 513). The "substantial disruption" standard requires "more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint" or an "undifferentiated fear or apprehension of disturbance … to overcome the right to freedom of expression." 393 U.S. at 508, 509. Plaintiffs argue that there is no evidence on the record before us to support a finding that *Tinker*'s substantial disruption standard has been satisfied here; thus, E.D. must be deemed to have been engaging in protected First Amendment activity when she sought to post her flyer that included the "Defund Planned Parenthood" message on school walls.

Since *Tinker*, however, the Court has "identified 'three specific categories of speech that schools may regulate' regardless of whether the circumstances satisfy *Tinker*'s 'substantial disruption' standard." *Sonnabend*, 37 F.4th at 423.  One of these categories is student speech that others "might reasonably perceive to bear the imprimatur of the school." *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 271 (1998).  At issue in *Kuhlmeier* was the issue of school officials' authority to maintain editorial control over the content of a high school student newspaper that was school-sponsored, supported, and supervised.  The Court found under those circumstances that the editorial content of the newspaper, although written by students, carried the imprimatur of the school.  "The issue, then, was not the same as in *Tinker*: the question was not whether the school must *tolerate* particular student speech but whether it must *affirmatively promote* particular student speech." *Sonnabend*, 37 F.4th at 424.  Rather than apply *Tinker*, the *Kuhlmeier* Court instead applied established First Amendment forum doctrine.  484 U.S. at 267–70.  Concluding that the school-sponsored newspaper was a non-public forum, the Court held that school officials were entitled to regulate its contents "in any reasonable manner," which, in the public-education setting, permits regulation "reasonably related to legitimate pedagogical concerns." *Id.* at 273.

The student expression at issue in our case is more akin to that addressed in *Kuhlmeier* than *Tinker*.  Here, E.D. was not prohibited, for example, from personally expressing a political message on a t-shirt she wore in the classroom nor was she told she would be prohibited from sharing a political message, including "Defund Planned Parenthood," if she so desired at NSFL meetings.  NHS administrators told her only that

she could not include such a political message on flyers that would be displayed on school walls to advertise NSFL's call-out meeting.  Hanging flyers on school walls advertising clubs that meet during school hours and on school grounds with a faculty advisor is expressive activity that could reasonably be perceived to bear the imprimatur of the school.  As Defendants argue, it would be reasonable for parents and other members of the public entering NHS for sporting events, student concerts, theater performances, parent-teacher conferences, or any other reason who observed such flyers displayed on school walls to erroneously attribute any political messaging they contained to the school district or the school itself, despite the clubs being student-run. Accordingly, we apply that First Amendment forum analysis, rather than the *Tinker* standard as the appropriate template here.

The evidence before us establishes that, during the time period relevant to this litigation, NHS administrators limited the information and materials that students could post on the walls of the school and members of the general public were not permitted to post flyers on school walls.  Student interest clubs at NHS were permitted to advertise their call-out meetings by posting flyers on the walls in designated areas of the school containing the club name and details regarding the date, time, and location of the call-out meeting after receiving approval from an administrator, thereby establishing a nonpublic forum for speech under First Amendment jurisprudence.  This term ("nonpublic forum") denotes areas "where the government controls public property which is not, by tradition or designation, a forum for public communication, and is open only for selective access." *John K. MacIver Inst. for Pub. Policy*, 994 F.3d 602, 609 (7th Cir. 2021) (citing *Perry*

36

RSA-036

*Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 48 (1983)).  In such locations, "[t]he government, like other private property holders, can reserve property for the use for which it was intended, 'as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view.'" *Id.* (quoting *Perry*, 460 U.S. at 46); *see also Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985) ("Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral.").

The evidence before use here shows that, during the relevant time period, other than identifying the name of the student organization (which might in some cases be political, such as the Young Republicans), no advertising flyers for NHS student organizations were permitted to include political speech, regardless of viewpoint.  The evidence further supports Defendants' contention that such a prohibition has a valid educational purpose as it ensures the school does not become a facilitator of warring political messages on its walls that could unnecessarily disrupt the learning environment. As the Supreme Court has recognized, schools "must [] retain the authority to refuse … to associate the school with any position other than neutrality on matters of political controversy." *Kuhlmeier*, 484 U.S. 272.  Thus, we will not hold, for obvious reasons, that a prohibition on political speech in flyers advertising student clubs that are displayed on school walls "has no valid educational purpose" as would "require judicial intervention to protect students' constitutional rights."  *Id.* at 273.

RSA-037

Although Plaintiffs contend that E.D. was provided inconsistent and unclear information regarding this rule, that contention is not supported by the evidence. As detailed above, each administrator E.D. consulted told her that her flyer should contain only NSFL's name and the pertinent details regarding the date, time, and location of the call-out meeting and that the photograph depicting students holding protest signs reading, among other things, "Defund Planned Parenthood," would need to be removed before the flyer could be posted. No administrator ever told E.D. that she was prohibited altogether from advertising NSFL's call-out meeting, that her flyer would be rejected even if she removed the politically-charged photograph, or that she would be restricted in some way from speaking freely on the topics of her choice at NSFL's meetings.

Nor does the evidence support Plaintiffs' contention that NHS administrators applied the prohibition inconsistently on political speech in student organization advertising flyers. The only specific example cited by Plaintiffs of a student interest club at NHS that was permitted to post flyers containing political speech was a flyer advertising the Black Student Union that contained a graphic at the bottom left-hand corner of the flyer depicting three raised fists of varying skin tones. Even assuming that the image displayed on the Black Student Union flyer is properly construed as political speech, the only evidence cited by Plaintiffs to establish that the flyer was ever posted at NHS or that it was posted with the approval of any NHS administrator is the testimony of Ms. Mobley. However, Ms. Mobley testified only that, while she "[p]ossibly" may have seen the flyer posted at NHS, it was "not something [she could] remember that [she] walked by." Mobley Dep. I at 43–44. When asked if she had approved the flyer, she said

RSA-038

she had not, and when asked if she could tell from looking at the flyer whether it had been approved, she responded, "[n]o, not really." *Id.* at 44.

Moreover, the Black Student Union flyer contained neither a take-down date nor the initials of the administrator who approved it, which Dr. McCaffrey testified were typically required before a flyer could be posted on the wall at NHS.  The fact that a single, unauthorized flyer containing political speech may on one occasion have been posted at NHS is not sufficient evidence to establish that the prohibition on political speech was enforced in a viewpoint discriminatory way by NHS administrators.  Because viewpoint neutral subject matter restrictions are permissible in a limited forum such as that at issue here, Plaintiffs have not shown that they had a protected First Amendment right to post a flyer advertising NSFL's call-out meeting that contained political speech.

In sum, the adduced evidence would not permit a reasonable jury to conclude that Plaintiffs' protected First Amendment activity was a motivating factor in Dr. McCaffrey's decision to revoke NSFL's club status.  Rather, the evidence establishes that Dr. McCaffrey's revocation decision was motivated, not by Plaintiffs' protected First Amendment activity, to wit, forming NSFL and seeking to advertise their call-out meeting in a manner equal to all other student organizations at NHS, but instead by their conduct, namely, what he believed were E.D.'s and her mother's efforts to "shop" administrators to find one who would approve a flyer advertising NSFL's call-out meeting that, contrary to the constitutionally-permissible restriction on political speech applicable to NHS student organization advertising flyers, contained a political message.

Plaintiffs have failed to establish that they had a First Amendment right to post their political speech on the school walls.  Accordingly, they cannot show that Dr. McCaffrey's decision to revoke NSFL's club status based on E.D.'s efforts, with her mother's knowledge and participation, to find an administrator who would let her do so was a decision made in retaliation for Plaintiffs' protected First Amendment activity.  For these reasons, Plaintiffs' First Amendment retaliation claim against Dr. McCaffrey does not survive summary judgment.  Defendants' summary judgment motion on this claim is <u>GRANTED</u> and Plaintiffs' corresponding request for summary judgment is <u>DENIED</u>.

### 2. First Amendment Retaliation Claim Against Defendants Snider-Pasko, Rootes, Schwingendorf-Haley, Kizer, Patterson-Jackson, Tuesca, and Eads

We turn next to Plaintiffs' First Amendment retaliation claim against Defendants Snider-Pasko, Rootes, Schwingendorf-Haley, Kizer, Patterson-Jackson, Tuesca, and Eads. The specific complaint against them is that they each personally commented and/or "liked" others' comments on social media in response to two posts from nonparties sharing an email E.D. sent to Noblesville City Councilman Pete Schwartz regarding the revocation of NSFL's club status.  Even if we assume that Defendants' conduct constitutes activity "under the color of law," as required under § 1983, Defendants are entitled to summary judgment on this claim because Plaintiffs have failed to establish the second essential element of their First Amendment retaliation claim, to wit, that an adverse action was taken against them.

For purposes of First Amendment retaliation, an action is adverse if it is "likely [to] deter a person of ordinary firmness from continuing to engage in protected activity."

40

RSA-040

*Surita v. Hyde*, 665 F.3d 860, 878 (7th Cir. 2011) (citations omitted).  As Defendants

posit, where, as here, the alleged adverse action "is in itself speech," that "[r]etaliatory

speech is generally actionable only in situations of 'threat, coercion, or intimidation that

punishment, sanction, or adverse regulatory action will immediately follow.'"  *Novoselsky*

*v. Brown*, 822 F.3d 342, 356 (7th Cir. 2016) (quoting *Hutchins v. Clarke*, 661 F.3d 947,

956 (7th Cir. 2011)).  Although "[i]n certain cases, a public official may also face liability

where he retaliated by subjecting an individual to 'embarrassment, humiliation, and

emotional distress,'" such cases are "usually limited to the release of 'highly personal and

extremely humiliating details'" to the public.  *Id.* (quoting *Hutchins*, 661 F.3d at 957).

Short of these extremes, "the First Amendment gives wide berth for vigorous debate …."

*Id.*

Defendants maintain, and we agree, that, even viewing the evidence in the light

most favorable to Plaintiffs, none of Defendants' social media activity "rise[s] to the level

of threat, coercion, intimidation, or profound humiliation."  *Id.* at 357; *see also X-Men*

*Security, Inc. v. Pataki*, 196 F.3d 56, 71 (2d Cir. 1999) (holding that legislators' public

accusations that private security firm was part of a hate group and practiced "racism,

gender discrimination, anti-semitism, and other religious discrimination" fell short of

"any semblance of threat, coercion, or intimidation").  In fact, the majority of the

comments challenged by Plaintiffs were directed at or were critical of third parties not

involved in this litigation and thus cannot be said to have qualified as retaliation against

E.D.  Plaintiffs do not argue otherwise or posit that the applicable legal standard is

relaxed or in some relevant way altered when a minor is involved.  Indeed, Plaintiffs,

having failed to address this argument anywhere in their responsive briefing, have waived it.  *See*, *e.g.*, *Rock Hemp Corp. v. Dunn*, 51 F.4th 693, 704 (7th Cir. 2022) ("[P]erfunctory and undeveloped arguments, as well as arguments that are unsupported by pertinent authority, are waived.") (quotation marks and citation omitted).  Accordingly, Plaintiffs' First Amendment retaliation claim against Defendants Snider-Pasko, Rootes, Schwingednorf-Haley, Kizer, Patterson-Jackson, Tuesca, and Eads cannot survive summary judgment.[8]

### D.  Equal Access Act Claim Against Individual Defendants

Under the Equal Access Act, it is

> unlawful for any public secondary school which receives Federal financial assistance and which has a limited public forum to deny equal access or a fair opportunity to, or discriminate against, any students who wish to conduct a meeting within that limited open forum on the basis of religious, political, philosophical, or other content of the free speech at such meetings.

20 U.S.C. § 4071(a).  Under this statute, a limited public forum is created "whenever such school grants an offering to or opportunity for one or more noncurriculum related student groups to meet on school premises during noninstructional time."  *Id.* § 4071(b).

Plaintiffs claim that Dr. McCaffrey violated the Equal Access Act by revoking NSFL's club status and by denying them the right to conduct meetings due to the content

---

[8] Even if Plaintiffs had managed to establish a constitutional violation, Defendants would still be entitled to summary judgment on qualified immunity grounds, given Plaintiffs' failure to cite any analogous case establishing that Plaintiffs' First Amendment right to be free from such social media commentary was clearly established at the time Defendants engaged in the challenged conduct.  *See Siddique v. Laliberte*, 972 F.3d 898, 903 (7th Cir. 2020) (holding that the plaintiff bears the burden of establishing that the federal constitutional right alleged to be violated was "clearly established" at the time of the alleged violation to avoid dismissal based on qualified immunity and that "the clearly established law must be 'particularized' to the facts of the case").

of their speech at such meetings.[9]  This claim fails for the same reasons Plaintiffs' First

Amendment retaliation claim against Dr. McCaffrey failed.  The evidence establishes that

Dr. McCaffrey did not revoke NSFL's club status because of the content of Plaintiffs'

speech at their meetings.  Nor did he engage in viewpoint discrimination or otherwise

deny NSFL the right to announce or advertise its meetings "on equal terms" with other

student organizations at NHS.  *See Gernetzke*, 274 F.3d at 466 ("Had the school,

therefore, while permitting the Bible Club to meet on school premises, forbidden it to

announce its meetings or otherwise compete on equal terms with comparable but

nonreligious student groups, it would have violated the [Equal Access] Act. … But there

is no evidence of discrimination against the Bible Club.").  Accordingly, Dr. McCaffrey is

entitled to summary judgment on Plaintiffs' Equal Access Act claim.  For all these

reasons, Defendants' motion for summary judgment on this claim is <u>GRANTED</u> and

Plaintiffs' summary judgment motion is <u>DENIED</u>.

### III.   State Law Claims

#### A. Indiana Constitution

Plaintiffs claim that Defendants Noblesville School District, Dr. Niedermeyer, Dr.

McCaffrey, Ms. Mobley, Mr. Swafford, and Mr. Luna violated Article I, Section 9 of the

---

[9] In their briefing, Plaintiffs also argue that it was a violation of the Equal Access Act for NHS
administrators to deny NSFL the privilege of advertising political speech in school hallways,
having permitted other clubs to do so.  However, the only Equal Access Act claim asserted in
Plaintiffs' amended complaint and statement of claims is based on the revocation of NSFL's club
status and Defendants' failure to allow Plaintiffs "to conduct meetings due to the content of their
speech." Dkt. 140.  Plaintiffs are prohibited from raising a new theory of liability under the
Equal Access Act for the first time on summary judgment.

RSA-043

Indiana Constitution by revoking NSFL's club status, thereby "restricting [Plaintiffs'] expressive activity."  Am. Compl. ¶ 541.  Plaintiffs seek a declaration that Defendants violated the free speech provisions of Article I, Section 9 of the Indiana Constitution, a declaration "that NSFL is a valid student group at NHS," and an injunction "against NHS's revocation of the student organization NSFL."[10]  *Id.* at 63, ¶¶ f–h.

For the foregoing reasons, we find that Plaintiffs have failed to establish entitlement to injunctive or declaratory relief under the Indiana Constitution.  It is well-established under Indiana law that "injunctive relief is improper when the applicant cannot demonstrate the present existence of an actual threat that the action sought to be enjoined will come about."  *Kennedy v. Kennedy*, 616 N.E.2d 39, 42 (Ind. Ct. App. 1993).  Nor is injunctive relief appropriate "simply to eliminate a possibility of a future injury."  *Id.*  Here, NSFL's club status was revoked on September 3, 2021 and reinstated approximately four months later in January 2022.  To our knowledge, NSFL has been active at NHS since that time, and Plaintiffs have presented no evidence that any imminent or actual threat of revocation exists.  Accordingly, there are no grounds to issue an injunction "against NHS's revocation of the student organization NSFL" as Plaintiffs request.

"It is also too late for a declaratory judgment because it could do [Plaintiffs] no practical good."  *UWM Student Ass'n v. Lovell*, 888 F.3d 854, 860 (7th Cir. 2018).  NSFL was reinstated as a student interest club at NHS in January 2022 and has been recognized

---

[10] We previously held that Plaintiffs are not entitled to seek damages for their claim under the Indiana Constitution.

as a valid student organization since that time.  Courts "cannot grant declaratory relief when there is no 'immediate and definite governmental action or policy that has adversely affected and continues to affect a present interest.'"  *Carver Middle Sch. Gay-Straight All. v. Sch. Bd. of Lake Cnty., Fla.*, 842 F.3d 1324, 1330 (11th Cir. 2016) (citing *Super Tire Eng'g Co. v. McCorkle*, 416 U.S. 115, 125–26 (1974)); *accord UWM Student Ass'n*, 888 F.3d 854 at 860–61 ("[A]ctions that the [defendants] allegedly took several years ago … could no longer affect plaintiffs in a real or immediate way and are not continuing or 'brooding' with a substantial adverse effect on plaintiffs' interests.").  Here, the action that Plaintiffs contend adversely affected their interests was Dr. McCaffrey's revocation decision.  Because NSFL's status has since been reinstated and Plaintiffs have presented no evidence that its temporary revocation restricts Plaintiffs' current ability to engage in expressive activity, their request for a declaratory judgment would at most serve "to secure emotional satisfaction from a declaration that they were wronged," but vindication alone does not justify declaratory relief.  *UWM Student Ass'n*, 888 F.3d at 862.

For these reasons, Defendants are entitled to summary judgment as to Plaintiffs' claims brought pursuant to the Indiana Constitution.  Plaintiffs' request for summary judgment on these claims is therefore denied.

### B.  Tort Claims

The following state law tort claims remain as a part of this litigation: Count VIII (Violation of School Policies Against Bullying); Count XI (Libel, Slander, and Defamation); Count XI (Intimidation and Bullying); Count XIII (Intentional Infliction of Emotional Distress); and Count XV (Privacy by Publication of Private Facts).  There is

45

RSA-045

no dispute that each of these tort claims is covered by Indiana's Tort Claim Act ("ITCA"), which provides, in relevant part, that a tort claim brought "against a political subdivision is barred unless notice is filed with: (1) the governing body of that political subdivision; and (2) … the Indiana political subdivision risk management commission … within one hundred eighty (180) days after the loss occurs." IND. CODE § 34-13-3-8.  Notice "must include the circumstances which brought about the loss, the extent of the loss, the time and place the loss occurred, the names of all persons involved if known, the amount of damages sought, and the residence of the person making the claim at the time of the loss and at the time of filing the notice." IND. CODE § 34-13-3-10.

After receiving notice of the claim, the government entity must approve or deny the claim within ninety days.  IND. CODE § 34-13-3-11.  "A person may not initiate a suit against a governmental entity unless the person's claim has been denied in whole or in part." IND. CODE § 34-13-3-13.  Thus, the filing of a claim against a political subdivision is a "two-step process—the filing of a claim, and, if denied, the filing of a lawsuit." *Brown v. Alexander*, 876 N.E.2d 376, 383 n.4 (Ind. Ct. App. 2007).

To "avoid denying plaintiffs an opportunity to bring a claim where the purpose the statute has been satisfied," *id.* at 381, "[n]ot all technical violations of the statute are fatal to a claim …." *Escobedo v. City of Ft. Wayne*, No. 1:05-CV-424-TS, 2008 WL 1971405, at *43 (N.D. Ind. May 5, 2008).  Strict non-compliance may be excused and "[s]ubstantial compliance with the statutory notice requirements is sufficient when the purpose of the notice requirement is satisfied." *Chariton v. City of Hammond*, 146 N.E.3d 927, 934 (Ind. Ct. App. 2020) (quotation marks and citation omitted).  "The

46

RSA-046

purposes of the notice statute include informing the officials of the political subdivision

with reasonable certainty of the accident and surrounding circumstances so that [the]

political [sub]division may investigate, determine its possible liability, and prepare a

defense to the claim." *Town of Cicero v. Sethi*, 189 N.E.3d 194, 210 (Ind. Ct. App. 2022)

(quotation marks and citation omitted).

As we have previously determined, Plaintiffs here failed to file a formal notice of

tort claim or otherwise to substantially comply with the ITCA notice requirements prior

to filing their original complaint in this matter.[11]  On December 30, 2021, nine days after

filing their complaint, Plaintiffs for the first time sent a document titled Notice of Tort

Claim to Defendants Noblesville School District, Noblesville High School,

Superintendent Niedermeyer, and Principal McCaffrey via U.S. Mail.  Defendants

received this document on January 10, 2022, and Plaintiffs filed their amended complaint

one day later, on January 11, 2022.

As Defendants highlight, there are several procedural and substantive deficiencies

in Plaintiffs' December 30, 2021 letter titled "Notice of Tort Claim" (the "Notice Letter"),

including that it was neither delivered in person nor sent by certified mail as required by

Indiana Code § 34-13-3-12; that it was sent only to Defendants' counsel and NHS's

---

[11] In making this determination, the Court considered Plaintiffs' November 12, 2021 demand letter, a January 5, 2022 letter from the Indiana Political Subdivision Committee acknowledging receipt of Plaintiffs' December 30, 2021 Notice of Tort Claim; and several email communications between Plaintiffs' and Defendants' counsel that are attached as Exhibit B to Plaintiffs' Additional Evidence Disclosure [Dkt. 169].  Having held as a matter of law that none of these documents either strictly or substantially complied with the ITCA's notice requirements, we do not address them further in this order.

superintendent and principal rather than the school board, which is the governing body of the school; that it did not identify the extent of Plaintiffs' losses or the amount of damages sought; that it did not identify E.D.'s residence at the time of the loss or at the time of filing the notice; and that it did not include allegations related to Plaintiffs' invasion of privacy claims.

Apart from these deficiencies in the notice itself, Defendants cite Plaintiffs' failure to wait until they had received a denial of their claims or ninety days had passed with no response from Defendants before filing suit in violation of Indiana Code § 34-13-3-13. Defendants point out that, by statute, the earliest date Plaintiffs were permitted to initiate their state law claims against Defendants absent a denial was April 10, 2022—ninety days after receipt of the Notice Letter.  Instead, Plaintiffs filed their amended complaint on January 11, 2022, one day after Defendants received the Notice Letter.

Based on the procedural and substantive deficiencies detailed above, we cannot find that Plaintiffs strictly complied with the ITCA notice requirements prior to filing their amended complaint against Defendants.  Accordingly, we address whether the notice Plaintiffs provided nonetheless substantially complied with the ITCA's notice requirements.  In assessing substantial compliance, "[t]he crucial consideration is whether the notice supplied by the claimant of his intent to take legal action contains sufficient information for the city to ascertain *the full nature of the claim* against it so that it can determine its liability and prepare a defense."  *Town of Cicero*, 189 N.E.3d at 210 (quoting *Schoettmer v. Wright*, 992 N.E.2d 702, 707 (Ind. 2013)) (emphasis in *Town of Cicero*).  "[M]ere actual knowledge of an occurrence, even when coupled with routine

48

RSA-048

investigation, does not constitute substantial compliance." *Id.* Here, although the filing

of the Notice represents an attempt on Plaintiffs' part to comply with the ITCA's notice

requirement provisions, that document falls well short of providing Defendants sufficient

information from which they could ascertain the full nature of the claims against them,

lacking as it did any information that identified any names of the individuals involved,

explaining how or to what extent Plaintiffs were damaged by Defendants' alleged

conduct, or specifying the amount of damages Plaintiffs were seeking.

The Notice Letter contained no mention at all of Plaintiffs' invasion of privacy tort

claims. With regard to Plaintiffs' claims for bullying, intimidation, and defamation, the

Notice Letter stated only that these claims were based on "[m]ultiple Noblesville teachers

[having] posted rude comments about E.D. on social media," and "administration

members of Noblesville High School [having] pulled E.D. out of class and harassed her

following the revocation of her student group's status," but included no information

regarding how Plaintiffs were injured by such conduct or the extent of those injuries.

Dkt. 169-4. The Notice Letter provided slightly more information related to Plaintiffs'

intentional infliction of emotional distress claim, stating that Defendants were liable "for

administrators' actions of calling her out of class, refusing to meet with her at another

time, declining E.D.'s request to have another adult present, and requesting to go through

her phone," which interaction the Notice Letter stated "left the student distressed, nearly

in tears, and physically shaking." *Id.* The Notice Letter included no specific damages

amount, stating merely that "E.D. demands monetary compensation for the violations of

laws outlined in this Notice." *Id.* At some later point in the litigation, Plaintiffs provided

RSA-049

Defendants information regarding the amount and types of damages E.D. alleges she incurred, including a claim for lost scholarship and employment opportunities, but the Notice itself provided no indication that Plaintiffs were alleging any such damages, much less disclose even a ballpark range of the amount of compensation Plaintiffs were seeking for these losses.

Plaintiffs argue that, even if the Notice Letter was in some way deficient, Defendants were fully informed of the extent of Plaintiffs' claimed losses prior to receiving the Notice Letter from the parties' preparations for depositions to respond to Plaintiffs' motion for preliminary injunction as well as in communications between counsel that occurred the first week of January 2024, a few days prior to the filing of the amended complaint.  The only reference in those communications to Plaintiffs' tort claims, however, is the following statement by Plaintiffs' counsel: "[T]here are serious problems with FERPA/ARPA, harassment, bullying, actual malice defamation, etc., that we simply cannot ignore. … The vilification of a 15-year-old 5' tall freshman young woman by the senior leadership of your client is breathtaking. … We'd expect very serious disciplinary action against the teachers, among other things."  Dkt. 169-3 at 2. That statement contains no information regarding the extent of Plaintiffs' injury from the alleged "vilification" or the scope of their claimed damages.

Insofar as Plaintiffs contend that Defendants were on notice of the nature of the tort claims based on its preparations in order to respond to Plaintiffs' motion seeking preliminary injunctive relief, Plaintiffs' request for injunctive relief was limited to their federal claims alleging violations of their constitutional rights, which involved facts,

50

RSA-050

individuals, and claims for relief wholly separate from Plaintiffs' state law tort claims. Additionally, the referenced email exchanges largely contain standard communications related to planning depositions and attendance at a settlement conference.  None of the emails included any of the six elements of notice required under the ITCA, nor did they satisfy the form or substance requirements of the ITCA.

Even assuming that the content of the Notice Letter was sufficient to substantially comply with the ITCA, the provision of adequate notice is not the only procedural prerequisite to suit under the ITCA.  As detailed above, the statute requires that the government entity must be given time to respond to the claim.  Here, Plaintiffs failed to comply with this second step of the ITCA notice process by filing their amended complaint only one day after Defendants' receipt of the Notice Letter, without having either waited the statutory ninety-day period or received a formal denial of their claims, whichever came first.  It is well-established that the ITCA "prohibits a claimant from filing his suit before the claims procedure has been complied with."  *Bradley v. Eagle-Union Cmty. Sch. Corp. Bd. of Sch. Trustees*, 647 N.E.2d 672, 676 (Ind. Ct. App. 1995).

Plaintiffs' contention that defense counsel's November 23, 2021 response to their November 12, 2021 demand letter constitutes a denial of the state law tort claims set forth in the Notice Letter is a nonstarter.  Initially, Plaintiffs fail to explain how Defendants' actions a month and a half prior to receipt of the Notice Letter qualifies as a denial of the claims set forth in the Notice Letter.  In any event, as we previously detailed in holding that Plaintiffs' demand letter did not comply with the ITCA's notice provisions, the demand letter addressed only Plaintiffs' federal constitutional claims and did not provide

*any* allegations regarding their state law tort claims.  Accordingly, Defendants' counsel's response to that demand letter by declining to reinstate Plaintiffs' student club—one of the remedies requested by Plaintiffs in connection with their federal claims—cannot constitute a denial of Plaintiffs' tort claims of bullying, intimidation, defamation, intentional infliction of emotional distress, and invasion of privacy, which claims, as described above, involve facts, individuals, and forms of relief wholly separate from those related to the decision to revoke NSFL's club status.

Insofar as Plaintiffs argue that Defendants' engagement in settlement negotiations surrounding the motion for preliminary injunction that Plaintiffs had filed contemporaneously with their original complaint constituted a denial of their tort law claims, we are not persuaded by this argument.  As detailed above, Plaintiffs' request for a preliminary injunction, like their November 12, 2021 demand letter, dealt only with the federal claims raised in this litigation.  Accordingly, Defendants' engagement in preparations to respond to the motion for preliminary injunction could not reasonably have been understood by Plaintiffs as a denial of their state law tort claims.

For these reasons, we hold that Plaintiffs failed to either strictly or substantially comply with the ITCA's notice requirements and prematurely filed suit before receiving a denial of their claims or ninety days had passed after Defendants' receipt of the Notice Letter.  In cases where a claimant prematurely files suit but submits an adequate notice of tort claim within 180 days of the date of loss, courts have determined that dismissal without prejudice is the appropriate remedy.  *See Orem v. Ivy Tech State Coll.*, 711 N.E.2d 864, 869–70 (Ind. Ct. App. 1999) (citing *Bradley*, 647 N.E.2d at 676).  Here, however,

RSA-052

the Notice Letter provided by Plaintiffs was *not* adequate and more than 180 days have

now passed since the events upon which Plaintiffs base their state law tort claims

occurred.  Thus, any tort claims notice served at this point would be untimely and futile.

It is, of course, true that, "[s]o long as [the ITCA's] essential purpose has been

satisfied, it should not function as a trap for the unwary."  *Schoettmer*, 992 N.E.2d at 706

(quotation marks and citation omitted).  But the legislature's purpose in enacting the

ITCA has not been fulfilled here and Plaintiffs cannot be described as unwary.  They

knew of the existence and requirements of the ITCA at least by the time they sent the

Notice Letter, yet still failed to satisfy the form, timing, and content requirements of the

statute.  When Plaintiffs' failure to comply with the ITCA notice requirements was first

raised by Defendants in their motion to dismiss, the 180-day period had not yet run

during which time period Plaintiffs could have remedied the deficiencies brought to their

attention by Defendants' filing.  Yet, Plaintiffs undertook no efforts to ensure their

compliance with the ITCA at that time.  In response to Defendants' motion to dismiss,

Plaintiffs did not argue that the Notice Letter remedied the problem, nor did they even

inform the Court of its existence.  Instead, they compounded the problem when they

again failed to make a cogent argument that the Notice Letter satisfied the ITCA notice

requirements in their request for reconsideration of our initial dismissal of their state law

tort claims for failure to comply with the ITCA.  Under these circumstances, Defendants

are entitled to summary judgment on Plaintiffs' state law tort claims for failure to comply

with the ITCA's notice requirements.

**IV.    Conclusion**

For the reasons detailed above, Plaintiffs' Motion for Summary Judgment [Dkt.

152] is <u>DENIED</u> and Defendant's Motion for Summary Judgment [Dkt. 157] is

<u>GRANTED</u>.  All other currently pending motions are hereby <u>DENIED AS MOOT</u>.  Final

judgment shall be entered accordingly.

IT IS SO ORDERED.

Date: _____3/15/2024_____          _____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

RSA-054

Distribution:

Laura Kathleen Buckner
Charitable Allies
kbuckner@charitableallies.org

Cassie Nichole Heeke
Church, Church, Hittle and Antrim
cheeke@cchalaw.com

Zachary S. Kester
Charitable Allies, Inc.
zkester@charitableallies.org

Spencer Eastman Rehn
Charitable Allies
srehn@charitableallies.org

Liberty L. Roberts
CHURCH CHURCH HITTLE & ANTRIM (Noblesville)
lroberts@cchalaw.com

RSA-055

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| E. D., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:21-cv-03075-SEB-TAB |
| | ) | |
| NOBLESVILLE SCHOOL DISTRICT, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**JUDGMENT**

The Court having this day made its Order directing the entry of final judgment, the

Court now enters FINAL JUDGMENT.

Judgment is entered in favor of Defendants and against Plaintiffs.  Plaintiffs shall

take nothing by their complaint and this action is terminated.

Date:  _____3/15/2024_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

1

RSA-056

Distribution:

Laura Kathleen Buckner
Charitable Allies
kbuckner@charitableallies.org

Cassie Nichole Heeke
Church, Church, Hittle and Antrim
cheeke@cchalaw.com

Zachary S. Kester
Charitable Allies, Inc.
zkester@charitableallies.org

Spencer Eastman Rehn
Charitable Allies
srehn@charitableallies.org

Liberty L. Roberts
CHURCH CHURCH HITTLE & ANTRIM (Noblesville)
lroberts@cchalaw.com

RSA-057