NO. 24-1608

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

E.D., a minor by and through her parents and next friends MICHAEL DUELL and
LISA DUELL, NOBLESVILLE STUDENTS FOR LIFE, et al.

*Plaintiffs-Appellants*,

v.

NOBLESVILLE SCHOOL DISTRICT, *et al.*,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Southern District of Indiana
Case No. 1:21-cv-03075-SEB-TAB

## BRIEF OF AMICUS CURIAE CATHOLICVOTE.ORG EDUCATION FUND IN
## SUPPORT OF PLAINTIFFS-APPELLANTS AND REVERSAL

Scott W. Gaylord
N.C. Bar No. 26740
201 North Greene Street
Greensboro, NC 27401
Phone: (336) 279-9331
Email: sgaylord@elon.edu
*Counsel for Amicus Curiae*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

*Amicus curiae* is an independent, not-for-profit 501(c)(3) corporation under the law of Michigan; it has no parent corporation, and no publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ...........................................................i

TABLE OF AUTHORITIES .................................................................................. iii

INTEREST OF AMICUS CURIAE .........................................................................1

   I.  Argument ....................................................................................................2

       A. Because NSFL's speech is student-sponsored, *Kuhlmeier* does
          not apply, and NHS can prohibit NSFL's proposed pictures
          only if NHS shows that the student group's expression would
          substantially interfere with school operations. .......................................5

       B. *Mansky* precludes NHS from censoring nondisruptive
          "political" expression of student interest clubs because such an
          unmoored standard provides no objective, workable guidelines
          for school officials and, therefore, is unreasonable.............................20

   II.  Conclusion ..............................................................................................29

CERTIFICATE ...................................................................................................30

# TABLE OF AUTHORITIES

## Cases

*Adderley v. Florida,*
    385 U.S. 39 (1966) ................................................................. 21

*American Freedom Defense Initiative v. Washington Metro. Area Transit Auth.,*
    901 F.3d 356 (D.C. Cir. 2018) ........................................25, 29

*Bd. of Airport Comm'rs of Los Angeles v. Jews for Jesus, Inc.,*
    482 U.S. 569 (1987) ................................................ 23, 24, 25

*Bd. of Educ. of Westside Cmty. Sch. v. Mergens,*
    496 U.S. 226 (1990) ................................................................. 20

*Bethel Sch. Dist. No. 403 v. Fraser,*
    478 U.S. 675 (1986) ............................................................. 3, 22

*Burson v. Freeman,*
    504 U.S. 191 (1992) ................................................................. 22

*Capitol Square Review and Advisory Bd. v. Pinette,*
    515 U.S. 753 (1995) .................................................. 16, 17, 19

*Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.,*
    473 U.S. 788 (1985) ................................. 6, 13, 21, 22, 26

*Ctr. for Investigative Reporting v. Se. Pa. Transp. Auth.,*
    975 F.3d 300 (3d Cir. 2020) ...................................... 25, 27

*E.D. v. Noblesville School District,*
    2024 WL 1140919 (S.D. Ind. 2024) ...................... *passim*

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972) ...................................................... 27, 28

*Greer v. Spock,*
    424 U.S. 828 (1976) ...................................................... 22, 27

*Hazelwood School Dist. v. Kuhlmeier,*
    484 U.S. 260 (1988) ........................................................ *passim*

*Heffron v. Int'l Soc. for Krishna Consciousness, Inc.,*
    452 U.S. 640 (1981) ...................................................... 24, 26

*Int'l Soc. for Krishna Consciousness, Inc. v. Lee,*
    505 U.S. 672 (1992) ................................................................. 20

*Johanns v. Livestock Marketing Ass'n,*
    544 U.S. 550 (2005) ..................................................... 19

*Kennedy v. Bremerton Sch. Dist.,*
    597 U.S. 507 (2022) ..................................................... 17

*Keyishian v. Bd. of Regents,*
    385 U.S. 589 (1967) ..................................................... 14

*Minnesota Voters Alliance v. Mansky,*
    585 U.S. 1 (2018) ................................................... *passim*

*Morse v. Frederick,*
    551 U.S. 393 (2007) ..................................................... 3

*N.J. by Jacob v. Sonnabend.*
    37 F.4th 412 (7th Cir. 2022) .............................. 5, 6, 7, 11

*NAACP v. City of Philadelphia,*
    834 F.3d 435 (3d Cir. 2016) .............................................. 27

*Perry Educ. Ass'n v. Perry Local Educator's Ass'n,*
    460 U.S. 37 (1983) .................................................... 6, 21

*Shelton v. Tucker,*
    364 U.S. 479 (1960) ..................................................... 14

*Shurtleff v. City of Boston,*
    596 U.S. 243 (2022) ................................. 16, 18, 19, 20

*Terminiello v. City of Chicago,*
    337 U.S. 1 (1949) ..................................................... 11

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
    393 U.S. 503 (1969) ............................................... *passim*

*United States v. Associated Press,*
    52 F.Supp. 362 (S.D.N.Y. 1943) ..................................... 14

*W. Va. State Bd. of Educ. v. Barnette,*
    319 U.S. 624 (1943) ...................................................... 1

*Ward v. Rock Against Racism,*
    491 U.S. 781 (1989) ..................................................... 24

CatholicVote.org Education Fund ("CVEF") is a nonpartisan voter education program devoted to serving our country by supporting educational activities that promote an authentic understanding of ordered liberty and the common good. Given its educational mission, CVEF is deeply concerned about the First Amendment issues implicated by *E.D. v. Noblesville School District*, 2024 WL 1140919 (S.D. Ind. 2024). The district court's opinion directly conflicts with both *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) and *Minnesota Voters Alliance v. Mansky*, 585 U.S. 1 (2018), allowing public schools to censor passive, non-disruptive speech of student-led groups whenever school officials decide a message or image is "political." Such a rudderless standard threatens freedom of expression, divesting students of their First Amendment rights "at the schoolhouse gate" whenever a school believes certain speech *might* cause disruption or be overly political. *Tinker*, 393 U.S. at 506. As a result, CVEF comes forward to support the right of all students to respectfully participate in nondisruptive expression on school grounds regarding important national and political issues even when—or perhaps especially when—those issues are controversial. *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943)

---

[1] Pursuant to Rule 29(a)(4)(E), *amicus* states that no counsel for a party authored this brief in whole or in part and that no person other than the *amicus* and its counsel made any monetary contribution intended to fund the preparation or submission of this brief.

("That [schools] are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes.").

## I. Argument

The Supreme Court has long-recognized that public school students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker*, 393 U.S. at 506. The First Amendment protects their right to "express[] their personal views on the school premises," *Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988), whether "in the cafeteria, or on the playing field, or on the campus during the authorized hours." *Tinker*, 393 U.S. at 512-13. This right is not unlimited, however; its contours must be understood "in light of the special characteristics of the school environment." *Id*. at 506. School officials can preserve the school property for its intended purpose—educating children. But under the Court's First Amendment precedents, they can bar the private expression of students in only three limited circumstances, where (1) officials "have reason to believe that such expression will 'substantially interfere with the work of the school or impinge upon the rights of other students'," *Kuhlmeier*, 484 U.S. at 266 (quoting *Tinker*, 393 U.S. at 509); (2) student expression is "wholly inconsistent with the 'fundamental values' of public school

education" or the school's "basic educational mission," such as the "sexually explicit" speech at the student assembly in *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 685-86 (1986); or (3) student speech "would [be] interpret[ed by a reasonable observer] as advocating illegal drug use and … can[not] plausibly be interpreted as commenting on any political or social issue, including speech on issues such as 'the wisdom of the war on drugs or of legalizing marijuana for medicinal use.' " *Morse v. Frederick*, 551 U.S. 393, 422 (2007) (Alito, J., concurring). What school officials cannot do is adopt a policy precluding nondisruptive student speech under an amorphous standard, such as "political expression," because that type of undefined, content-based restriction is objectively unreasonable. *Mansky*, 585 U.S. at 16-17.

The flyers in this case were the private expression of Noblesville Students for Life ("NSFL"), a student-run club. The proposed flyers neither included sexually explicit expression nor implicated illegal drug use. Consequently, NHS had no authority to prohibit NSFL's flyers unless the flyers were school-sponsored speech, like the school-run newspaper in *Kuhlmeier*, or NHS had specific evidence that the proposed pictures would "substantially interfere with the work of the school." *Tinker*, 393 U.S. at 509. As the district court's opinion makes clear, NSFL's flyers were the expression of NSFL itself, not NHS. Student interest clubs like NSFL "are student-driven and student-led" and, therefore, unlike all other

student groups at NHS, which "are school sponsored and led by a school-approved adult who is actively involved in organizing and running the group." *E.D.*, 2024 WL 1140919 at *2. E.D. started NSFL " 'to educate [NHS students] on the issue of abortion and empower [them] to volunteer in the local community with pregnancy-related items.' " *Id*. at *3 (citation omitted). NHS had no role in formulating NSFL's mission or its messaging. As a result, the district court erred in applying *Kuhlmeier* instead of *Tinker*.

Moreover, under the proper *Tinker* standard, NHS cannot censor NSFL's speech. NHS proffered no evidence that the pictures NSFL sought to include on its flyers would substantially interfere with the educational mission or operation of the school. Rather, NHS simply rejected NSFL's proposed flyers, stating that "[a] poster cannot contain any content that is political or that *could* disrupt the school environment." *Id*. at *5 (emphasis added); *id*. at *16 (emphasis added) (crediting NHS's assertion "that such a prohibition has a valid educational purpose as it ensures the school does not become a facilitator of warring political messages on its walls that *could unnecessarily disrupt* the learning environment"). As *Tinker* makes clear, such speculative concern about disruption or controversy is insufficient: "in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Tinker*, 393 U.S. at 508; *Id*. at 509 (citation omitted) ("Certainly where there is no finding and no

showing that engaging in the forbidden conduct would 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school,' the prohibition cannot be sustained.").

Finally, even assuming that *Tinker* did not govern this case, NHS's barring "political" speech was not a reasonable restriction of student expression in the nonpublic forum that is NHS's campus. *Mansky*, 585 U.S. at 16-17 (noting that "the State must be able to articulate some sensible basis for distinguishing what may come in from what must stay out" in a nonpublic forum and explaining how "the unmoored use of the term 'political' in the Minnesota law … cause[d] Minnesota's restriction to fail even this forgiving test").

### A. Because NSFL's speech is student-sponsored, *Kuhlmeier* does not apply, and NHS can prohibit NSFL's proposed pictures only if NHS shows that the student group's expression would substantially interfere with school operations.

The district court rejected E.D.'s argument that *Tinker* secured "a protected First Amendment right to post a flyer containing political speech on NHS's walls," calling it "a non-starter." *E.D.*, 2024 WL 1140919 at *15. Invoking *Kuhlmeier*, the lower court concluded that NHS had the authority to regulate "student speech that others 'might reasonably perceive to bear the imprimatur of the school,' " *id*. (quoting *Kuhlmeier*, 484 U.S. at 271), even if that speech did not " 'satisfy *Tinker*'s "substantial disruption" standard.' " *Id*. (quoting *N.J. by Jacob v. Sonnabend*. 37 F.4th 412, 423 (7th Cir. 2022)). Because the school newspaper in

5

*Kuhlmeier* "was school-sponsored, supported, and supervised," it "carried the imprimatur of the school." *Id*. Although students wrote the articles included in the newspaper, they did so as part of the school's curriculum. The central question, therefore, " 'was not whether the school must *tolerate* particular student speech [as in *Tinker*] but whether it must *affirmatively promote* particular student speech' " as part of its journalism class. *Id*. (quoting *Sonnabend*, 37 F.4th at 424). The Supreme Court said "no," relying on its nonpublic forum doctrine under which school officials could regulate the content of the school-sponsored newspaper in any way "reasonably related to legitimate pedagogical concerns." *Kuhlmeier*, 484 U.S. at 273. The lower court reached the same conclusion in this case, taking NHS's ban on political pictures to be a reasonable and viewpoint neutral way to avoid having NSFL's speech attributed to the school. *Perry Educ. Ass'n v. Perry Local Educator's Ass'n*, 460 U.S. 37, 46 (1983) (holding that content-based restrictions are permissible in a nonpublic forum "[a]s long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's viewpoint"); *Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985) (same).

The lower court apparently took solace in the fact that E.D. could express her views in other ways, such as "personally expressing a political message on a t-shirt she wore in the classroom" or "sharing a political message, including 'Defund

Planned Parenthood,' if she so desired at NSFL meetings." *E.D.* 2024 WL 1140919 at *15. The school precluded only one form of expression—"a political message on flyers that would be displayed on school walls to advertise NSFL's call-out meeting"—that the court believed "could reasonably be perceived to bear the imprimatur of the school." *Id*. Someone entering NHS for any reason might "reasonabl[y]" but "erroneously attribute any political messaging [on the posters] to the school district or the school itself, despite the clubs['] being student-run." *Id*. For the district court, this allegedly reasonable—yet erroneous—attribution of NSFL's message to NHS moved this case outside of *Tinker* and within *Kuhlmeier* because NHS appeared (to some hypothetical viewers) to be " '*affirmatively promot[ing]* particular student speech' " in a nonpublic forum. *Id*. (quoting *Sonnabend*, 37 F.4th at 424).

According to the district court, the ban on political expression on student flyers was reasonable because NHS had "a valid educational purpose as it ensures the school does not become a facilitator of warring political messages on its walls that could unnecessarily disrupt the learning environment." *Id*. at *16. Under this interpretation of *Kuhlmeier*, NHS "must [] retain the authority to refuse … to associate the school with any position other than neutrality on matters of political controversy." 484 U.S. at 272. NHS's "valid educational purpose," in turn,

removed the need for "judicial intervention to protect students' constitutional rights." *Id*. at 273.

There are at least two problems with the district court's analysis, each of which is fatal. First, the district court's attempt to squeeze this case under *Kuhlmeier* is unavailing. To sidestep *Tinker*, the court below asserted that "[t]he student expression at issue in our case is more akin to that addressed in *Kuhlmeier* than *Tinker*." *E.D.*, 2024 WL 1140919 at *15. The court was wrong. In drawing a distinction "between speech that is sponsored by the school and speech that is not," 484 U.S. at 271 n.3, *Kuhlmeier* explained that the former "concerns educators' authority over school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school." *Id*. at 271. Attributing *school-sponsored* activities to the school was reasonable because, as *Kuhlmeier* further clarified, such activities "may fairly be characterized as part of the school curriculum, whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skill to student participants and audiences." *Id*.

The contrast with the present case is striking. The newspaper in *Kuhlmeier* was school-sponsored and school-run, being "part of the educational curriculum and a 'regular classroom activit[y]' " that "the journalism teacher … 'both had the

authority to exercise and in fact exercised a great deal of control over.' " *Id*. at 268 (citation omitted). Because the newspaper provided "a supervised learning experience for journalism students," "school officials were entitled to regulate the contents of [the newspaper] in any reasonable manner." *Id*. at 270. In curriculum-related situations, "[e]ducators are entitled to exercise greater control … to assure that participants learn whatever lessons the activity is designed to teach, that readers or listeners are not exposed to material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously attributed to the school." *Id*. at 271. Because school-sponsored expression remains the speech of the school that authorized and approved the activity, a school "retain[s] the authority to refuse to sponsor student speech that might reasonably be perceived to … associate the school with any position other than neutrality on matters of political controversy." *Id*. at 272. Accordingly, the ultimate rule adopted in *Kuhlmeier* was that "educators do not offend the First Amendment by exercising editorial control over the style and content of *student speech in school-sponsored expressive activities* so long as their actions are reasonably related to legitimate pedagogical concerns." *Id*. at 273 (emphasis added).

The district court did not mention, let alone discuss, this rule for good reason—NSFL's expressive activity was *not* school-sponsored. In *Kuhlmeier*, the

school maintained control over all facets of the newspaper, which was published as part of a journalism course offered for academic credit within NHS's curriculum. *Id*. at 267. The journalism teacher "was the final authority with respect to almost every aspect of the production and publication of [the newspaper], including its content." *Id*. at 268 (internal punctuation and citation omitted). Among other things, the journalism teacher selected the editors, assigned story ideas, advised student writers, edited articles, chose and edited letters to the editor, scheduled publication dates, and dealt with the printing company. *Id*. Given this extensive control over a school-sponsored publication, *Kuhlmeier* concluded that the school's refusing to publish two pages of the newspaper was "reasonably related to legitimate pedagogical concerns." *Kuhlmeier*, 484 U.S. at 273.

NHS cannot plausibly make the same argument. Whereas all other student groups at NHS "are school sponsored and led by a school-approved adult who is actively involved in organizing and running the group," student interest clubs, like NSFL, "are created by students who want to gather with other students who hold similar interest in a particular subject." *E.D.*, 2024 WL 1140919 at *2. Unlike their school-sponsored counterparts, student interest clubs "are student-driven and student-led." *Id*. Although they have a faculty sponsor, "the adult does not actively participate in the club." *Id*. In fact, the district court's opinion cited nothing in the record indicating that NHS viewed NSFL or its speech activity as

school-sponsored or school-endorsed. The expression at issue is the private speech of NSFL, not NHS's expression. Consequently, *Kuhlmeier* does not apply; *Tinker* does.

Second, *Tinker* safeguards NSFL's expression. Like the armbands in *Tinker*, the proposed flyers were passive, nondisruptive expressions of NSFL's views. As the Seventh Circuit has acknowledged, *Tinker* "[b]alanc[ed] the speech rights of students with the need for school officials to set standards for student conduct" and concluded that "restrictions on student speech are constitutionally justified if school authorities reasonably forecast that the speech in question 'would materially and substantially disrupt the work and discipline of the school' or invade the rights of others." *Sonnabend*, 37 F.4th at 423 (quoting *Tinker*, 393 U.S. at 513). To restrict speech based on "substantial disruption," however, a school must ground its decision on "more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint" or an "undifferentiated fear or apprehension of disturbance." *Tinker*, 393 U.S. at 508-09. Such amorphous standards would severely undermine the free speech rights of students given that "[a]ny variation from the majority's opinion may inspire fear" and "[a]ny word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance." *Id*. at 508; *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949) ("[A] function of

free speech under our system of government is to invite dispute…. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea."). Accordingly, "where there is no finding and no showing that engaging in the forbidden [speech] would 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school,' the prohibition cannot be sustained." *Tinker*, 393 U.S. at 509.

NHS proffered no evidence that the proposed pictures of students holding pro-life banners in front of the Capitol building would substantially interfere with the school's operations. All NHS could muster were statements from school officials that the pictures were "political" and "could disrupt the school environment." *E.D.*, 2024 WL 1140919 at *14. The same general concerns motivated the school officials in *Tinker*, yet the Court rejected them. This Court should do the same here. NSFL's proposed pictures, like the black armbands in *Tinker*, were a form of "silent, passive expression of opinion, unaccompanied by any disorder or disturbance." 393 U.S. at 508. As in *Tinker*, "[i]t is also relevant that the school authorities did not purport to prohibit the" expression of political messages (including pro-life messages) on clothing, buttons, or stickers on books and computers. *Id*. at 510. In fact, "E.D. staffed the NSFL booth at the [NHS activities] fair wearing a message t-shirt that stated, 'I am the pro-life generation' " and "displayed a tri-fold poster … with NSFL's mission statement including a

sign" with the same message without creating any reported disruption or disturbance. *E.D.*, 2024 WL 1140919 at *3. Given the lack of any evidence that such political messages had any effect, let alone a substantial or material one, on the functioning of the school, it is difficult to credit NHS's professed concern that allowing student interest clubs to post flyers with pictures on walls in "the main hallway of the freshman center, near bus [] entrances and the auditorium, and in the cafeteria," *id*. at *2, would interfere with the operation of the school.

The student protesters in *Tinker* also had other protected means of expressing their views—*e.g.*, wearing t-shirts or meeting in a group to discuss their opposition to Vietnam—but the Court focused only on the right of the students to engage in their *chosen* form of expression, wearing black armbands. *Id*. at *15 (suggesting *Kuhlmeier* governs because "E.D. was not prohibited … from personally expressing a political message on a t-shirt she wore in the classroom nor was she told she would be prohibited from sharing a political message … if she so desired at NSFL meetings"). It is small consolation to NSFL that it can say what it wants during its meetings when it is precluded from conveying information about the group and its mission to generate student interest in attending those meetings. *Cornelius*, 473 U.S. at 799 ("Although the CFC does not entail direct discourse between the solicitor and the donor, the CFC literature facilitates the dissemination of views and ideas by directing employees to the soliciting agency to obtain more

extensive information."). After all, "personal intercommunication among the students … is also an important part of the educational process." *Tinker*, 393 U.S. at 512. Pictures on flyers (like black armbands) convey a powerful message to a wider audience—all those who view the flyers (or armbands)—and do so without interfering with the educational mission of the school. As a result, the First Amendment protects NSFL's expression:

> In our system, students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate. They may not be confined to the expression of those sentiments that are officially approved. In the absence of a specific showing of constitutionally valid reasons to regulate their speech, students are entitled to freedom of expression of their views.

*Id*.; *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967) (" 'The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.'… The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, (rather) than through any kind of authoritative selection.' ") (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960) and *United States v. Associated Press*, 52 F.Supp. 362, 372 (S.D.N.Y. 1943)).

Furthermore, the fact that NSFL's expression was that of a student-run club precludes the district court's reliance on any type of "reasonable perception" standard. Under *Kuhlmeier*, a school may regulate student expression that is part

of "a supervised learning experience," such as "school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school." *Kuhlmeier*, 484 U.S. at 271. In such situations, the perception that the school is "promot[ing] particular speech" is reasonable—and accurate—because the school-sponsored "activities may fairly be characterized as part of the school curriculum" being "supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences." *Id*.

The district court expanded the scope of *Kuhlmeier* (and significantly narrowed *Tinker*) by removing *Kuhlmeier*'s requirement that the regulated expressive activity be school-sponsored. Under the lower court's revised standard, *Tinker* does not apply to *any* student expression at the school—whether school-sponsored or not—that "could reasonably be perceived to bear the imprimatur of the school." *E.D.*, 2024 WL 1140919 at *15. And the perception can be reasonable, according to the district court, even if the perception is "erroneous[]," *i.e.*, even if the expression is that of an entirely student-run club like NSFL. *Id*. ("[I]t would be reasonable for parents and other members of the public … who observed such flyers displayed on school walls to erroneously attribute any political messaging they contained to the school district or the school itself, despite the clubs['] being student-run.").

The district court's analysis is wrong for at least two reasons. First, that is not what *Kuhlmeier* said. *Kuhlmeier* expressly limited its holding to school-sponsored expressive activities, like the newspaper created in a journalism course, that are part of the school-approved and school-controlled curriculum. Allowing school officials greater authority over student expression that is part of school-sponsored activities was meant to avoid erroneous attribution, not condone it. 484 U.S. at 271 ("Educators are entitled to exercise greater control over [school-sponsored] student expression to assure … that the views of the individual speaker are not erroneously attributed to the school."). And to the extent NHS is worried about the misattribution of student-sponsored expression, the school can avoid that problem simply by posting a disclaimer where the student flyers are displayed or sending a letter to parents explaining that student-sponsored speech is not the expression of NHS. *Shurtleff v. City of Boston*, 596 U.S. 243, 266 (2022) (Alito, J., concurring) ("The government can always disavow any messages that might be mistakenly attributed to it.").

Second, allowing the government to bar the private speech of a student group that otherwise has permission to use the nonpublic forum because a viewer might erroneously attribute that speech to the government is inconsistent with *Capitol Square Review and Advisory Bd. v. Pinette*, 515 U.S. 753 (1995) and *Shurtleff*. In *Capitol Square*, the Court upheld a religious cross display on a parcel

of land surrounding the statehouse in Columbus, Ohio that had been opened up for public expression. Those challenging the display adopted the same argument as the district court in this case (albeit in the religion context)—"that, because an observer might mistake private expression for officially endorsed religious expression, the State's content-based restriction is constitutional." 515 U.S. at 763 (plurality opinion). The Court rejected this argument because there was no threat of an Establishment Clause violation where "[t]he State did not sponsor respondents' expression, the expression was made on government property that had been opened to the public for speech, and permission was requested through the same application process and on the same terms required of other private groups." *Id*. The fact that "outsiders or individual members of the community uninformed about the school's practice … *might* leap to the erroneous conclusion of state endorsement" was not dispositive because, given a forum open to the kind of speech at issue and "private sponsorship, erroneous conclusions do not count." *Id*. at 765. The plurality expressly rejected the view "that the distinction [between government and private speech] disappears whenever private speech can be mistaken for government speech." *Id*.; *id*. at 768 ("It has radical implications for our public policy to suggest that neutral laws are invalid whenever hypothetical observers may—*even reasonably*—confuse an incidental benefit to religion with state endorsement."); *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 535 (2022)

(citation omitted) (explaining that the Establishment Clause does not " 'compel the government to purge from the public sphere' anything an objective observer could reasonably infer endorses or 'partakes of the religious' ").

Similarly, in *Shurtleff* the Court held that the central inquiry was the same as that in *Kuhlmeier*—"whether the government intends to speak for itself or to regulate private expression."  596 U.S. at 252.  In making that determination, *Shurtleff* did not take "the public's likely perception as to who (the government or a private person) is speaking" to be dispositive.  596 U.S. 243 (2022).  The City of Boston frequently allowed private groups to raise their own flags on one of three flagpoles outside Boston City Hall, which otherwise flew the City's flag.  The City never refused a single request until a religious group asked to fly the Christian flag as part of a Constitution Day event at the flagpole.  Whether a viewer might attribute the Christian flag to the government was only one of several factors bearing on whether the City or the private group was speaking through the particular flag.  While "the public seem[ed] likely to see the flags as 'conveying some message' on the government's behalf," others seeing "a group of private citizens conducting a ceremony without the city's presence [might] associate the new flag with them, not Boston."  *Id*. at 256 (quoting *Walker*, 576 U.S. at 212).  Thus, the key factor was "the extent to which the government has actively shaped or controlled the expression."  *Id*. at 252.  Boston did neither, "lack[ing] …

meaningful involvement in the selection of flags or the crafting of their messages." *Id* at 258. As a result, the Court concluded the private flags were government speech even though some might erroneously attribute them to Boston.

Although the context differs in this case, the free speech inquiry is the same: who is speaking through the student flyers on NHS's walls—NHS or the student interest group. *Shurtleff*, 596 U.S. at 271-72 ("[P]rivate-party expression in any type of forum recognized by our precedents does not constitute government speech."). NHS opened part of its nonpublic forum (certain walls in the school) to student expression (club flyers). NHS did not sponsor NSFL's expression; in fact, the district court acknowledged that student interest groups speak for themselves. *E.D.*, 2024 WL 1140919 at *2. Like the groups in *Capitol Square* and *Shurtleff*, NSFL sought to post its flyers only in locations opened up to private expression, and it sought permission through the normal, school-established channels. That some parents or members of the public might *erroneously* believe that NHS sponsored or endorsed NSFL's expression is irrelevant because "erroneous conclusions do not count." *Capitol Square*, 515 U.S. at 765 (plurality opinion); *Johanns v. Livestock Marketing Ass'n*, 544 U.S. 550, 564 n.7 (2005) (explaining that "the correct focus" when determining whether the government is speaking "is not on whether the … reasonable viewer would identify the speech as the government's."). Why? Because, as this case demonstrates, "public perception

cannot be relevant to whether the government *is* speaking, as opposed [to] merely *appearing* to speak. Focusing on public perception encourages courts to categorize private expression as government speech in circumstances in which the public is liable to misattribute that speech to the government." *Shurtleff*, 596 U.S. at 265-66 (Alito, J., concurring). Consequently, *Kuhlmeier*'s discussion of what the public might "reasonably perceive" has no bearing on whether NSFL was speaking. *Bd. of Educ. of Westside Cmty. Sch. v. Mergens*, 496 U.S. 226, 250 (1990) ("We think that secondary school students are mature enough and are likely to understand that a school does not endorse or support student speech that it merely permits on a nondiscriminatory basis."). *Tinker*, therefore, supplies the governing standard, and NFSL's speech is constitutionally protected under that standard.

**B. *Mansky* precludes NHS from censoring nondisruptive "political" expression of student interest clubs because such an unmoored standard provides no objective, workable guidelines for school officials and, therefore, is unreasonable.**

Even assuming for the sake of argument that *Tinker* does not govern NFLS's expression (which it does), NHS still cannot ban pro-life pictures on NSFL's flyers due to their being "political." In place of *Tinker*, the district court turned to the Supreme Court's forum analysis. The Court's " 'forum based' approach for assessing restrictions that the government seeks to place on the use of property," *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992), recognizes that "[n]othing in the Constitution requires the Government

freely to grant access to all who wish to exercise their right of free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius*, 473 U.S. at 799-800. The nature of the government's property (*i.e.*, the type of forum) determines the standard that applies to the challenged speech restriction.

In the present case, there is no dispute that NHS's campus (including the walls on which the flyers hang) is a nonpublic forum—government property that "is not by tradition or designation a forum for public communication." *Perry*, 460 U.S. at 46 (1983). In such a space, "the government has much more flexibility to craft rules limiting speech." *Mansky*, 585 U.S. at 11-12. In particular, the government may preserve its property "for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry*, 460 U.S. at 46. Reasonableness and viewpoint neutrality ensure that the government, "no less than a private owner of property," has the "power to preserve the property under its control for the use to which it is lawfully dedicated." *Adderley v. Florida*, 385 U.S. 39, 47 (1966); *Perry*, 460 U.S. at 49 ("The touchstone for evaluating these distinctions [in a nonpublic forum] is whether they are reasonable in light of the purpose which the forum at issue serves."). As a

result, while schools must allow Tinker's armband, they need not tolerate Cohen's jacket. *Fraser*, 478 U.S. at 682.

In fact, the government may even impose some limited restrictions on "political advocates and forms of political advocacy" in a nonpublic forum. *Mansky*, 585 U.S. at 12; *Burson v. Freeman*, 504 U.S. 191, 193-94 (1992) (plurality opinion) (upholding a law imposing a 100-foot campaign-free zone around the entrances to polling places); *Cornelius*, 473 U.S.at 806-09 (permitting the President to exclude political advocacy groups from participating in a charity drive, the Combined Federal Campaign, directed at federal employees in the workplace); *Greer v. Spock*, 424 U.S. 828, 831-33 (1976) (prohibiting political candidates from distributing campaign literature on a military base). Yet, as *Mansky* confirms, any ban on "political" expression in a nonpublic forum must be "reasonable in light of the purpose served by the forum." *Cornelius*, 473 U.S. at 806.

In *Mansky*, the Court considered a Minnesota law stating that a "political badge, political button, or other political insignia may not be worn at or about the polling place." *Mansky*, 585 U.S. at 8 (internal punctuation and citation omitted). State election judges, who were temporary government employees working the polls on election day, had "the authority to decide whether a particular item falls within the ban." *Id*. The question before the Court was whether Minnesota's ban

22

was reasonable in light of the purpose of the nonpublic forum—voting. And the Court held that Minnesota's ban was not. Although a State "may reasonably take steps to ensure that partisan discord not follow the voter up to the voting booth, and distract from a sense of shared civic obligation at the moment it counts the most," it still "must be able to articulate some sensible basis for distinguishing what may come in from what must stay out." *Id*. at 15-16. Minnesota's "unmoored use of the term 'political' … caused Minnesota's restriction to fail even this forgiving test." *Id*. at 16-17.

Like NHS's policy here, the Minnesota statue did not define the word "political," which can have an "expansive" scope—including anything relating to the government or governmental affairs as well as anything regarding the structure or affairs of government, the political system, or the state. *Id*. at 17. Minnesota argued for a narrower construction of the term—relating only to "words and symbols that an objectively reasonable observer would perceive as conveying a message about the electoral choices at issue in [the] polling place"—but the Court rejected this modified definition because it "introduce[d] confusing line-drawing problems." *Id*. at 17-18; *Bd. of Airport Comm'rs of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 575-76 (1987) (holding that the government could not save a resolution barring all "First Amendment activities" at a municipal airport through a "murky" construction excluding "airport-related" activity). Because "fair

enforcement" of the Minnesota law would require an election judge "to maintain a mental index of the platforms and positions of every candidate and party on the ballot," the law was "not reasonable." *Id*. at 19.

While "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity," *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989), *Mansky* confirmed that "[i]t is 'self-evident' that an indeterminate prohibition carries with it '[t]he opportunity for abuse, especially where [it] has received a virtually open-ended interpretation.' " 585 U.S. at 21 (quoting *Jews for Jesus*, 482 U.S. at 576); *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 649 (1981) (warning about "more covert forms of discrimination that may result when arbitrary discretion is vested in some governmental authority"). Even though most election judges would attempt to apply the statute in an evenhanded manner, their "discretion must be guided by objective, workable standards" to avoid having their "own politics … shape [their] views on what counts as 'political'." *Mansky*, 585 U.S. at 21-22. Accordingly, Minnesota's attempt to regulate political expression in a nonpublic forum was unconstitutional because the law's amorphous term "political" was not "capable of reasoned application." *Id*. at 23.

NHS claimed to restrict NSFL's desired expression for the same reason—it was "political." Yet NHS never even tried to give any "objective, workable

standards" to establish a reasoned way to determine whether student expression violated its prohibition on "political" speech. *Ctr. for Investigative Reporting v. Se. Pa. Transp. Auth.*, 975 F.3d 300, 316 (3d Cir. 2020) (quoting *Jews for Jesus*, 482 U.S. at 576) ("A policy as ill-defined as SEPTA's [prohibiting advertisements that are political in nature or discuss matters of public debate] carries 'the opportunity for abuse, especially where [it] has received a virtually open-ended interpretation.' "). Instead, NHS simply asserted that NSFL's proposed poster (which contained "photographs of students in front of the United States Supreme Court building in Washington D.C. carrying signs that read, "I Reject Abortion," "Defund Planned Parenthood," and "I am the Pro-Life Generation," among other similar messages") was "political." *Id*. at *4; *id*. at *5 (describing how Mr. Luna "told E.D. and her mother that the flyer could not include a political photo of a 'picket' with multiple signs reading 'Defund Planned Parenthood' "); *Id*. (quoting an email from Dr. McCaffrey that stated "[a] poster cannot contain any content that is political or that could disrupt the school environment"); *id*. at *14 (same). Whereas Minnesota at least attempted to narrow the term to "the electoral choices at issue in [the] polling place," NHS proffered no such limiting construction, claiming the authority to reject student-sponsored speech whenever school officials determined a picture, image, or message was political. *American Freedom Defense Initiative v. Washington Metro. Area Transit Auth. (WMATA)*, 901 F.3d

356, 372 (D.C. Cir. 2018) ("[W]hen government censors control access to a forum, but have no standards to govern their decisions, first amendment freedoms are abridged."). Without objective or workable standards to cabin the discretion of school officials, NHS's invocation of "political" speech is not "capable of reasoned application." *Mansky*, 585 U.S. at 23.

Furthermore, uneven application of this subjective standard already has occurred at NHS, reinforcing what *Tinker* already established—that passive political expression is consistent with "[t]he purpose served by the forum." *Cornelius*, 473 U.S. at 806; *Heffron*, 452 U.S. at 650-51 ("[C]onsideration of a forum's special attributes is relevant to the constitutionality of a regulation since the significance of the governmental interest must be assessed in light of the characteristic nature and function of the particular forum involved."). As the district court noted, several of the recognized student interest clubs were quite political—Crusade for Christ, Fellowship of Christian Athletes, Gender and Sexuality Alliance, Young Democrats, and Young Republicans—yet were permitted to post flyers at the school. *E.D.*, 2024 WL 1140919 at *2. A poster listing the name of the Gender and Sexuality Alliance or the Young Republicans is political (under a common-sense understanding of the term) because it highlights, among other things, LGBT issues or one of the two dominant political parties in the United States. To the extent NHS truly believed that someone entering the

school and "observ[ing] such flyers displayed on school walls [might] erroneously attribute any political messaging they contained to the school district or the school itself," then the same observer seeing a flyer for the Gender and Sexuality Alliance or the Young Republicans might (erroneously) think that NHS sponsored or shared the beliefs of such groups. That NHS banned the use of political pictures by all student interest groups (and not just NSFL) does not make the prohibition reasonable; it simply means that NHS is violating the First Amendment rights of all student-sponsored groups through the same subjective, vague standard. *E.D.*, 2024 WL 1140919 at *16 (denying "that NHS administrators applied the prohibition inconsistently on political speech in student organization advertising flyers")

NHS offered no explanation as to why the ban on some forms of political expression was reasonable in light of the purpose that the school serves generally or that the designated walls serve for student groups in particular. *Ctr. for Investigative Reporting*, 975 F.3d at 314 (quoting *NAACP v. City of Philadelphia*, 834 F.3d 435, 445 (3d Cir. 2016)) ("The government actor bears the burden of 'tying the limitation on speech to the forum's purpose.' "); *Greer*, 424 U.S. at 843 (Powell, J., concurring) ("Some basic incompatibility must be discerned between the communication and the primary activity of an area."); *Grayned v. City of Rockford*, 408 U.S. 104, 112 (1972) (explaining that, in the school context, "the

prohibited disturbances are easily measured by their impact on the normal activities of the school").  Despite the political nature of many student interest clubs, NHS's position was that adding a picture of a rainbow flag or an elephant to each group's respective flyer would transform the posters into "political" speech.  Yet NHS never explained how such images are incompatible with the school's purpose when NHS recognized the underlying student groups and permitted their members to wear apparel with political messages, display pictures at activities fairs, and discuss political issues at meetings and in classes.  For example, while staffing NSFL's booth at an NHS fall activities fair in 2021, E.D. wore a t-shirt with a pro-life message and displayed a tri-fold poster that included the group's mission statement, including a "I am the pro-life generation" sign.  NHS never expressed concern about the message being political or that the shirt substantially interfered with the operation of the school.  *E.D.*, 2024 WL 1140919 at *3.  What distinguished this form of political speech from that on the proposed flyers?  NHS never said.  The school merely invoked the "political" nature of the proposed pictures.  *Grayned*, 408 U.S. at 116 ("The crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time.  Our cases make clear that in assessing the reasonableness of a regulation, we must weigh heavily the fact that communication is involved.").  The lack of any objective, manageable standards makes NHS's ban

on this form of "political" student speech unreasonable and, therefore, unconstitutional. *WMATA*, 901 F.3d at 372 ("The crux of the Court's [*Mansky*] decision was that the State's discretion in enforcing the statute had to be 'guided by objective, workable standards.' Because the unqualified ban on 'political' apparel did not provide those standards, it was unreasonable.")

## II. Conclusion

For the foregoing reasons, this Court should reverse the district court and hold that NSFL's expression is protected under *Tinker* because it does not disrupt the operation of the school and because NHS's attempt to ban "political" student speech is objectively unreasonable under *Mansky*.

Respectfully submitted,

s/ Scott W. Gaylord
Scott W. Gaylord
201 North Greene Street
Greensboro, NC 27401
Phone: (336) 279-9331
Email: sgaylord@elon.edu

*Counsel for Amicus Curiae CatholicVote.org Education Fund*

Dated: June 10, 2024

<u>CERTIFICATE OF COMPLIANCE</u>

1. This brief has been prepared in a proportionally spaced typeface using Microsoft Word, Times New Roman, 14 point.

2. Exclusive of the corporate disclosure statement, table of contents; table of citations; certificate of compliance and the certificate of service, this Amicus Brief contains 6,821 words.

I understand that a material misrepresentation can result in the court's striking the brief and imposing sanctions. If the Court so directs, I will provide an electronic version of the brief and a copy of the word or line printout.

June 10, 2024

By: _____ s/ Scott W. Gaylord _____
Scott W. Gaylord
201 North Greene Street
Greensboro, NC 27401
Phone: (336) 279-9331
Email: sgaylord@elon.edu

*Counsel for Amicus Curiae CatholicVote.org Education Fund*