APPEAL NO. 24-1608

# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

E.D., a minor, by her parents and next friends, MICHAEL DUELL and
LISA DUELL; NOBLESVILLE STUDENTS FOR LIFE,

*Plaintiffs-Appellants*,

v.

NOBLESVILLE SCHOOL DISTRICT, et al.

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Southern District of Indiana
Case No. 1:21-cv-03075-SEB-TAB

## PETITION FOR REHEARING AND REHEARING EN BANC

JOHN J. BURSCH
ALLIANCE DEFENDING FREEDOM
440 First Street, NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@adflegal.org

L. KATIE BUCKNER
SPENCER E. REHN
CHARITABLE ALLIES, INC.
3500 Depauw Blvd., Suite 3090
Indianapolis, IN 46268
(463) 229-0229
kbuckner@charitableallies.org
srehn@charitableallies.org

TYSON C. LANGHOFER
MATHEW W. HOFFMANN
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
tlanghofer@adflegal.org
mhoffmann@adflegal.org

DAVID A. CORTMAN
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
dcortman@adflegal.org

*Counsel for Appellants*

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 24-1608

Short Caption: E.D., et al. v. Noblesville School District, et al.

 To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

 The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

  [ ] **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

 E.D., a minor by and through her parents and next friends Michael Duell and Lisa Duell;

 Noblesville Students for Life

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

 Alliance Defending Freedom; Charitable Allies, Inc.

(3) If the party, amicus or intervenor is a corporation:

 i) Identify all its parent corporations, if any; and

  N/A

 ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

  N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

 N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

 N/A

Attorney's Signature: s/ L. Katie Buckner  Date: September 11, 2025

Attorney's Printed Name:  L. Katie Buckner

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** [✓] **No** [ ]

Address:  3500 Depauw Blvd., Suite 3090

 Indianapolis, IN 46268

Phone Number:  463-229-0229  Fax Number: _____

E-Mail Address:  kbuckner@charitableallies.org

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-1608

Short Caption: E.D., et al. v. Noblesville School District, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    E.D., a minor by and through her parents and next friends Michael Duell and Lisa Duell;

    Noblesville Students for Life

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Alliance Defending Freedom; Charitable Allies, Inc.

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: s/ Spencer E. Rehn    Date: September 11, 2025

Attorney's Printed Name: Spencer E. Rehn

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☐   **No** ☑

Address: 3500 Depauw Blvd., Suite 3090

    Indianapolis, IN 46268

Phone Number: 463-229-0229    Fax Number:

E-Mail Address: srehn@charitableallies.org

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-1608

Short Caption: E.D., et al. v. Noblesville School District, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    E.D., a minor by and through her parents and next friends Michael Duell and Lisa Duell;

    Noblesville Students for Life

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Alliance Defending Freedom; Charitable Allies, Inc.

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: s/ John J. Bursch      Date: September 11, 2025

Attorney's Printed Name: John J. Bursch

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐   **No** ☑

Address: 440 First Street NW, Suite 600

    Washington, DC 20001

Phone Number: 616-450-4235      Fax Number: _____

E-Mail Address: jbursch@adflegal.org

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-1608

Short Caption: E.D., et al. v. Noblesville School District, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    E.D., a minor by and through her parents and next friends Michael Duell and Lisa Duell;

    Noblesville Students for Life

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Alliance Defending Freedom; Charitable Allies, Inc.

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: s/ Tyson C. Langhofer    Date: September 11, 2025

Attorney's Printed Name:  Tyson C. Langhofer

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** ☐  **No** ☑

Address:  44180 Riverside Pkwy

    Lansdowne, VA 20176

Phone Number: 571-707-4655    Fax Number:

E-Mail Address: tlanghofer@adflegal.org

rev. 12/19 AK

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-1608

Short Caption: E.D., et al. v. Noblesville School District, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

E.D., a minor by and through her parents and next friends Michael Duell and Lisa Duell;

Noblesville Students for Life

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Alliance Defending Freedom; Charitable Allies, Inc.

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

N/A

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: s/ Mathew W. Hoffmann    Date: September 11, 2025

Attorney's Printed Name: Mathew W. Hoffmann

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes [ ]  No [✓]

Address: 44180 Riverside Pkwy

Lansdowne, VA 20176

Phone Number: 571-707-4655    Fax Number: 

E-Mail Address: mhoffmann@adflegal.org

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: __24-1608__

Short Caption: __E.D., et al. v. Noblesville School District, et al.__

　　To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

　　The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐　　**PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)　　The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

　　__E.D., a minor by and through her parents and next friends Michael Duell and Lisa Duell;__

　　__Noblesville Students for Life__

(2)　　The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

　　__Alliance Defending Freedom; Charitable Allies, Inc.__

(3)　　If the party, amicus or intervenor is a corporation:

　　i)　　Identify all its parent corporations, if any; and

　　　　__N/A__

　　ii)　　list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

　　　　__N/A__

(4)　　Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

　　__N/A__

(5)　　Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

　　__N/A__

Attorney's Signature: __s/ David A. Cortman__　　　　Date: __September 11, 2025__

Attorney's Printed Name: __David A. Cortman__

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).　**Yes** ☐　**No** ☑

Address: __1000 Hurricane Shoals Rd. NE Suite D-1100__

　　__Lawrenceville, GA 30043__

Phone Number: __770-339-0774__　　　　Fax Number: _____

E-Mail Address: __dcortman@adflegal.org__

rev. 12/19 AK

# TABLE OF CONTENTS

Disclosure Statement ...................................................................i

Table of Authorities............................................................... iii

FRAP 40 Statement ............................................................... 1

Background........................................................................... 3

Argument............................................................................. 5

I.    The panel's decision conflicts with binding student-speech precedent. ...................................................................... 5

    A.    The decision conflicts with Supreme Court precedent...........5

    B.    The decision conflicts with this Court's precedent................9

    C.    The decision unnecessarily creates a circuit split. ...............11

II.    The panel violated the summary judgment standard by discounting E.D.'s causation evidence. .........................................13

Conclusion ........................................................................17

Certificate of Compliance .......................................................19

Certificate of Service ............................................................20

# TABLE OF AUTHORITIES

## Cases

*Bannon v. School District of Palm Beach County,*
  387 F.3d 1208 (11th Cir. 2004) .................................................. 2, 12

*Board of Education v. Mergens ex rel. Mergens,*
  496 U.S. 226 (1990) ...................................................... 2, 6, 8, 9, 10

*Fleming v. Jefferson County School District R-1,*
  298 F.3d 918 (10th Cir. 2002) ..................................................... 2, 11

*Good News Club v. Milford Central School,*
  533 U.S. 98 (2001) ............................................................................ 7

*Greene v. Doruff,*
  660 F.3d 975 (7th Cir. 2011) ....................................................... 2, 13

*Hazelwood School District v. Kuhlmeier,*
  484 U.S. 260 (1988) ...................................................................... 2, 5

*Hedges v. Wauconda Community Unit School District No. 118,*
  9 F.3d 1295 (7th Cir. 1993) ............................................. 2, 9, 10, 11

*Mahanoy Area School District v. B.L.,*
  594 U.S. 180 (2021) .................................................................. 1, 5, 6

*Muller by Muller v. Jefferson Lighthouse School,*
  98 F.3d 1530 (7th Cir. 1996) ........................................... 2, 9, 10, 11

*N.J. by Jacob v. Sonnabend,*
  37 F.4th 412 (7th Cir. 2022) ........................................................ 2, 9

*Peele v. Burch,*
  722 F.3d 956 (7th Cir. 2013) ...................................................... 2, 14

*Surita v. Hyde,*
  665 F.3d 860 (7th Cir. 2011) ...................................................... 2, 17

*Tinker v. Des Moines Independent Community School District,*
  393 U.S. 503 (1969) ..................................................................... 2, 6

*Whitfield v. Spiller*,
    76 F.4th 698 (7th Cir. 2023) ..................................................... 2, 16

*Yahnke v. Kane County*,
    823 F.3d 1066 (7th Cir. 2016) ............................................ 2, 14, 16

## **Statutes**

20 U.S.C. § 4071 .................................................................................. 7

20 U.S.C. § 4072 ............................................................................... 7, 8

## FRAP 40 STATEMENT

When a student or community member entered Noblesville High's main hallway in the 2021 school year, she could see flyers from over 70 student-interest groups posted on the walls. A poster with a logo inviting students to attend the Young Democrats club could be next to one for the Young Republicans. A Gender and Sexuality Alliance poster could abut one for the Fellowship of Christian Athletes. But there was no Students for Life poster. That's because the Defendant school officials censored the group's messages and suspended the club.

Ordinarily, such censorship would be unconstitutional. But the panel here upheld it, reasoning that a reasonable observer would view each of these student-created flyers—advertising a student-led meeting during noninstructional time—as bearing *the school's* imprimatur. That gives public schools immense power to regulate student messages in a forum set up specifically for student speech in one of this Circuit's many "nurseries of democracy." *Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 190 (2021). Equally problematic, the panel construed the facts against Plaintiffs to hold that they offered insufficient evidence to show that their speech motivated Defendants' retaliation.

Those twin holdings violate binding precedent. The conclusion that Plaintiff Noblesville Students for Life's flyers were somehow school-sponsored speech conflicts with three Supreme Court cases, two of this Court's cases, and two authoritative decisions from other

circuits. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969); *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988); *Bd. of Educ. v. Mergens ex rel. Mergens*, 496 U.S. 226 (1990); *Muller by Muller v. Jefferson Lighthouse Sch.*, 98 F.3d 1530 (7th Cir. 1996)*, as modified by N.J. by Jacob v. Sonnabend*, 37 F.4th 412 (7th Cir. 2022); *Hedges v. Wauconda Cmty. Unit Sch. Dist. No. 118*, 9 F.3d 1295 (7th Cir. 1993); *Fleming v. Jefferson Cnty. Sch. Dist. R-1*, 298 F.3d 918 (10th Cir. 2002); *Bannon v. Sch. Dist. of Palm Beach Cnty.*, 387 F.3d 1208 (11th Cir. 2004) (per curiam). The holding that "[n]o reasonable jury could find that E.D.'s protected expression was a motivating factor" in Defendants' retaliation and revocation, Op.22, violates five of this Court's cases. *Greene v. Doruff*, 660 F.3d 975 (7th Cir. 2011); *Yahnke v. Kane Cnty.*, 823 F.3d 1066 (7th Cir. 2016); *Peele v. Burch*, 722 F.3d 956 (7th Cir. 2013); *Whitfield v. Spiller*, 76 F.4th 698 (7th Cir. 2023); *Surita v. Hyde*, 665 F.3d 860 (7th Cir. 2011).

This Court should grant rehearing or rehearing en banc to correct these "doctrinal misstep[s]." *See N.J.*, 37 F.4th at 425. As this case and *N.J.*—which reversed a district court's incorrect application of *Kuhlmeier*—show, confusion in school-speech cases endures. And the Federal Rules do not require plaintiffs to meet a near-impossible evidentiary burden on causation just to get to trial. Further review will provide clarity to district courts and help protect the rights of Noblesville's 3,200 students and all students in this Circuit.

## BACKGROUND

Plaintiff E.D., a Noblesville High student, created flyers to advertise a student-run meeting for fellow students of Plaintiff Noblesville Students for Life, a "student-led and initiated" club. Op.Br.25. The school operated a limited open forum under the Equal Access Act for over 70 approved noncurricular student interest groups—from the Young Democrats to the Young Republicans—to hold meetings for students and post flyers. *Id.* at 8; Doc. 101 ¶¶ 344, 349.

Noblesville's requirements for administrative approval of flyers required significant "guessing" from students. Op.Br.13. For example, Principal McCaffrey didn't "know" how students could anticipate which administrator had poster-approval authority. *Id.* Similarly, when E.D. asked Assistant Principal Mobley about her proposed posters, E.D. found Mobley's response "unclear" as to "whether there was an issue with the specific picture on [the] flyer, an issue that there was a picture at all, or whether" the flyer simply "lack[ed] call out meeting information." *Id.* at 10. Mobley suggested E.D. work with her faculty adviser. Doc. 158-5 at 4. So she did. *Id.* Her faculty adviser told her the posters could not have pictures, but Defendants' policy allowed pictures. *Id.*; Op.Br.14.

The next day, E.D. met with Dean Luna whom she had been trying to contact to schedule a meeting date. Op.Br.10. She asked Luna "why" the flyers "had been vetoed previously." *Id.* Luna identified the

flyers' "Defund Planned Parenthood" image and told E.D. that the
school was "dancing on eggshells," referring to controversies about
"political ideology." *Id.*

That same morning, McCaffrey revoked the club's recognition
entirely. *Id.* at 11. He claimed the flyers were "not appropriate for
school due to the content" and that flyers "cannot contain any content
that is political." *Id.* Principal McCaffrey later wrote publicly that he
revoked the group's status "due to multiple instances of disregard for
school protocols," including the "political" image, *id.* at 11–12—even
though the club never posted the flyers.

Despite all that, the panel affirmed the district court's grant of
summary judgment to Defendants on Plaintiffs' free speech, retaliation,
and Equal Access Act claims. The panel recognized that "student
interest club[s]" are "student-initiated, student-led groups." Op.3. It also
understood that "student club flyers" would include "the club's name
and the meeting's time, date, and location." *Id.* at 4. But it applied the
school-sponsored speech rule from *Kuhlmeier* instead of *Tinker*'s
student-speech rule and held these posters might reasonably be
perceived to bear the school's "imprimatur." *See id.* at 10–13.

On causation for the revocation, retaliation, and statutory claims,
the panel held that McCaffrey "suspended the club only for neutral,
conduct-related reasons." *Id.* at 2. This was so despite evidence showing
that McCaffrey objected to the "content" of the flyers. *Id.* at 7.

4

## ARGUMENT

### I.  The panel's decision conflicts with binding student-speech precedent.

The panel's free-speech holding conflicts with three Supreme Court cases and two of this Court's cases that limit the *Kuhlmeier* rule to speech that's part of a school's curriculum. The decision also unnecessarily splits with the Tenth and Eleventh Circuits.

#### A.  The decision conflicts with Supreme Court precedent.

The *Kuhlmeier* rule applies only to "speech that others may reasonably perceive as bearing the imprimatur of the school, such as that appearing in a school-sponsored newspaper." *Mahanoy*, 594 U.S. at 188 (citation modified). Such speech "may fairly be characterized as part of the school curriculum … so long as [it is] supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences." *Kuhlmeier*, 484 U.S. at 271.

The *Kuhlmeier* newspaper was "part of the educational curriculum and a regular classroom activity." *Id.* at 268 (citation modified). School officials "selected the editors of the newspaper, scheduled publication dates, decided the number of pages for each issue, assigned story ideas to class members, advised students on the development of their stories, reviewed the use of quotations, edited stories, selected and edited the letters to the editor, and dealt with the printing company"—largely "without consultation" with students. *Id.*

Absent lewd messages or those that promote illegal drug use, *Tinker* controls student speech outside a school's curriculum. *Mahanoy*, 594 U.S. at 188. A school can't regulate that speech unless it shows the speech caused or was likely to cause "substantial disruption of or material interference with school activities." *Tinker*, 393 U.S. at 514. The "mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint" doesn't suffice. *Id.* at 509. Thus, the *Tinker* school couldn't discipline students for wearing black armbands to protest the Vietnam War. *Id.* at 514.

Supreme Court precedent also establishes that "a school does not endorse or support student speech that it merely permits on a nondiscriminatory basis." *Mergens*, 496 U.S. at 250 (citing *inter alia Tinker*). For three reasons, the *Mergens* Court rejected the argument that because student "meetings are held under school aegis … an objective observer in the position of a secondary school student will perceive official school support for such religious meetings." *Id.* at 249–50.

First, allowing student speech doesn't endorse it. *Id.* at 250. Second, the Equal Access Act requires student groups meet during "noninstructional time" and limits school-official participation at meetings. *Id.* at 251. Third, the "broad spectrum" of 30 "officially recognized student clubs … and the fact that" students could "initiate and organize additional student clubs counteract[ed] any possible message of official endorsement." *Id.* at 252 (citation omitted).

The panel's ruling conflicts with all three cases. As in *Tinker*, E.D.'s posters originated with her, outside of any school-sponsored activity. Principal McCaffrey testified that "clubs are student-led and initiated. They are not school sponsored." Op.Br.25. Unlike in *Kuhlmeier*, E.D.'s student club was not part of a class nor designed to teach a specific lesson. The panel relied on "supervision of a faculty adviser." Op.12. But Principal McCaffrey established that—unlike the *Kuhlmeier* faculty supervisors who selected newspaper editors, assigned story topics, and edited stories—E.D.'s faculty adviser "cannot have anything to do with the club other than advising on school rules and policy and making sure everyone is safe." Op.Br.25. That squares with Noblesville's Equal Access Act duty, as discussed in *Mergens*, to ensure student-group meetings are "voluntary and student-initiated" with faculty supervising only for "custodial purposes." 20 U.S.C. §§ 4071(c)(1), 4072(2).

In conflict with those precedents, the panel concluded that "where and how E.D. sought to display her flyers" meant "they could reasonably be perceived as bearing the school's imprimatur." Op.11. But under *Mergens*, no reasonable observer "aware of the history and context of the community and forum" would conclude that Noblesville lent its imprimatur to E.D.'s student-generated poster advertising her student-led club meeting for fellow students. *See Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 119 (2001).

7

The club's name and a related image or club logo (like E.D. wanted to post) separate student-group materials from school-sponsored materials. The name and logo and the over 70 groups in Noblesville's student-initiated and led club forum dispel any "message of state approval or endorsement." *See Mergens*, 496 U.S. at 252. E.D.'s club was "merely one of many different student-initiated voluntary clubs," which means that "students should perceive no message of government endorsement." *Id.*

And under the Equal Access Act, student-group posters fall within the definition of a protected student-group activity. *See* 20 U.S.C. § 4072(3). The panel erred in assuming against E.D. that her posters "would have been posted alongside official school-sponsored communications" and "indistinguishable" from those materials. *See* Op.11, 13. Noblesville's policy *allowed* students to post school-sponsored flyers. *See* Op.Br.12. In addition to this legal error, the record doesn't show that such flyers in fact appeared on the walls, let alone their quantity and frequency. And Defendants did not make that argument.

Regardless, the club's name—"Noblesville Students for Life"—and associated logo ensured the club's flyers were "distinguishable" from school-sponsored speech. Other club flyers had images and logos. *See* Docs. 43-9, 43-10, 43-11, 43-12, 43-13. Noblesville allowed such pictures (if not, why the need to prohibit "disruptive" or "political" content?). *See* Op.Br.14; Op.4. A poster advertising a "Noblesville Students for Life"

(or a "Young Democrats" or "Young Republicans") meeting with an associated logo in Noblesville's noncurricular, student-initiated and led club forum conveys that posters speak for students—not the school. *See Mergens*, 496 U.S. at 252.

### B.    The decision conflicts with this Court's precedent.

Under this Court's precedent, flyers "inviting classmates to attend a Bible study" at a church, even when distributed or displayed on bulletin boards in school, "could not reasonably be perceived as bearing the imprimatur of the school." *N.J.*, 37 F.4th at 424–25 (citing *Muller*, 98 F.3d at 1532–33). That's true even though the principal had to approve all flyers in advance. *Muller*, 98 F.3d at 1534 nn.2–3. These materials "originate[d] with the students themselves, outside the purview of any school-sponsored activity." *Id.* at 1546 (Rovner, J., concurring in part).

In accord with *Mergens*, this Court rejects the argument that "the school endorses whatever it permits." *Hedges*, 9 F.3d at 1298. While the panel thought that posting flyers in "high-traffic common areas throughout the school" increased the likelihood people would think the school sponsored E.D.'s posters, Op.13, *Hedges* held that logic "backwards," 9 F.3d at 1300. *Hedges* rejected the proposition that requiring "pupils to distribute permitted literature from a table just inside the door of the school … might lend the school's imprimatur to speech that the school does not support." *Id.* Rather, "[a] central location for distribution may help the school dissociate itself from the students'

expression, because the table will be used to disseminate opposing
points of view and may bear a sign reminding recipients that the school
does not endorse what the students hand out." *Id.* Noblesville's central
location doesn't communicate sponsorship of a student group's poster,
but merely—as one administrator put it—allows "kids" to "see it." Doc.
158-27 at 2.

*Muller* and *Hedges*—like *Tinker*, *Kuhlmeier*, and *Mergens*—show
that E.D.'s student-generated posters inviting students to a student-
club meeting do not bear Noblesville's imprimatur. The panel's attempt
to distinguish *Muller* draws a distinction without a difference. While
"E.D.'s flyers did not advertise a private, off-campus event," they *did*
promote an extracurricular student club meeting. *See* Op.12. That the
club meeting occurred during the school day doesn't matter. As required
by the Equal Access Act, student club meetings occur during "nonin-
structional time." *Mergens*, 496 U.S. at 251.

*Muller* and *Hedges* also invalidate the panel's conclusion that
posters "[u]ntethered to any identifiable student" communicate school
sponsorship. *See* Op.11. The *Muller* policy didn't require connection to
"an identifiable student" to distribute or post on a bulletin board, just
"the name of the sponsoring organization and/or individual." 98 F.3d at
1534 n.2. As the panel noted, Noblesville required posters to include
"the club's name." Op.4. That name "will *itself* dissipate any perception
of endorsement." *Hedges*, 9 F.3d at 1300. As the over 70 approved

10

noncurricular student groups demonstrate, "students will disagree among themselves, and the audience will understand that the school does not endorse incompatible positions." *See id.*

The panel's reliance on "a faculty member's initials for approval," Op.11, likewise fuels "the misconception that whatever speech the school permits, it espouses," *Hedges*, 9 F.3d at 1299. A poster required "the initials of whoever approved it." Doc. 158-27 at 7. This is an extension of the preapproval requirement, which doesn't establish that the school has sponsored the student group's speech. *See Muller*, 98 F.3d at 1534 n.2. The panel's decision conflicts with *Muller* and *Hedges*.

## C.    The decision unnecessarily creates a circuit split.

The panel's ruling also conflicts with the Tenth and Eleventh Circuit cases it cites. *See* Op.13. The Tenth Circuit case involved "permanently affixed tiles on the walls" of the school. *Fleming*, 298 F.3d at 930. That, "coupled with organizing, supervising, approving the funding, and screening the tiles," showed that "the school's decision permanently to mount them on the walls conveys a level of approval of the message." *Id.* The court distinguished that "level of involvement" from "the school cases involving extracurricular activities, such as *Good News Club*, where the school did not call the meetings, invite participants, set the agenda, approve funding, or supervise the meetings." *Id.*

The Eleventh Circuit case involved painting on walls, which "would remain a part of the school for up to four years." *Bannon*, 387

F.3d at 1210. The court held *Kuhlmeier* applied because "the beautification project was designed to impart particular knowledge and skills to student participants and audiences; it allowed student participants to express themselves artistically, allowed student audiences to appreciate their fellow students' artwork, and promoted school spirit." *Id.* at 1215. What's more, the murals "appear[ed] in prominent locations in the school" and were "approved in advance by Principal Harris, advertised by the school, supervised by [an administrator], limited to students and faculty who paid a fee to participate, and subject to the school's editorial control." *Id.* at 1214.

*Fleming* identifies the crucial distinction here: E.D.'s posters advertised an extracurricular activity for which *she* called the meetings, *she* invited participants, and *she* set the agenda—all outside substantive faculty supervision akin to the "editorial control" in *Kuhlmeier* and *Bannon*. The faculty advisor served as a mere custodian, not an active group participant. Finally, as the panel noted, E.D.'s paper posters would appear on walls for mere "days," not years—or forever. Op.11. Student interest groups allow students to "talk about their common interests"—not the curriculum. Op.Br.8. *Fleming* and *Bannon* explain the difference.

**II.    The panel violated the summary judgment standard by discounting E.D.'s causation evidence.**

The panel recognized that it must "draw all reasonable inferences" in favor of E.D. But it then proceeded to adopt Defendants' causation narrative for the revocation, retaliation, and Equal Access Act claims. Op.8, 22–23. That contradicts Circuit precedent.

E.D. more than met the standard for providing causation evidence at summary judgment. In *Greene*, the plaintiff, who worked in the prison library, testified that he told the prison librarian that he filed a grievance against another prison official. 660 F.3d at 976. The next day, the prison official filed a conduct report against the plaintiff alleging he had improperly used library materials for personal use and stole a judicial opinion from the library, which led to punishment. *Id.* This Court held that the plaintiff had "create[d] a triable issue" on causation based on only two pieces of evidence. *Id.* at 980.

First, the court "credit[ed] the plaintiff's testimony"—as it recognized it "must" at summary judgment—that he told the librarian about the grievance. *Id.* The "librarian report[ed]" to the official "and would be likely to pass along such information to him." *Id.* Second, "the rather threadbare nature of the report" about the plaintiff's alleged conduct suggested that the official retaliated because of speech. *Id.*

Other circuit precedent confirms that "all [E.D.] need do at this stage of the proceedings is demonstrate a genuine issue of material fact"

as to causation. *Yahnke*, 823 F.3d at 1071. The *Yahnke* defendant argued he had "permissible" reasons to terminate the plaintiff, "namely that he violated regulations that required him to be honest in all department dealings and that he had failed to comply with the order that he cease secondary employment." *Id.* But the plaintiff "easily demonstrate[d] a genuine issue" of fact by citing testimony that in response to a question about lesser forms of discipline available under the progressive discipline policy, the defendant said, "I'm not giving him any time off, I'm firing him. He thinks he's going to run for Sheriff against me some day." *Id.* That evidence indicated the defendant fired the plaintiff not for violating regulations but for his political activity, which "is more than enough to defeat summary judgment." *Id.* at 1072.

This Court has also confirmed that "even if suspicious timing *alone* is not enough to create a triable issue in a particular case, suspicious timing remains an important evidentiary ally of the plaintiff." *Peele*, 722 F.3d at 960 (citation modified). In that case, the defendant demoted the plaintiff the day after his comments about a mayoral election appeared in a news story. *Id.* That, coupled with another employee's testimony that the defendant said the plaintiff was demoted because he "made the mayor mad," "could be enough to lead a reasonable jury to decide in [the plaintiff's] favor." *Id.* at 961.

The panel acknowledged key pieces of evidence favoring Plaintiffs, yet still concluded that the "record does not permit [an] inference" of

causation—contra *Greene*, *Yanke*, and *Peele*. *See* Op.22. The panel
recognized:

- McCaffrey said in his revocation email that E.D.'s flyers
  were "not appropriate for school due to the content";

- Dean Luna said the school was "walking 'on eggshells'" when
  he responded to E.D.'s request about why she couldn't post
  her "Defund Planned Parenthood" flyers; and

- The suspicious timing between when E.D. proposed her
  flyers and when McCaffrey revoked recognition. *Id.* at 18, 21.

The record has more causation evidence that the panel ignored:
McCaffrey publicly wrote that he revoked status "due to *multiple*
instances of disregard for school protocols," which he testified included
E.D.'s request to hang her pro-life posters. Op.Br.39 (emphasis added).
And McCaffery revoked the group's status immediately after learning
about the posters for the very first time. *Id.* at 11, 39.

The record also contains sufficient evidence for a jury to conclude
that Defendants' reasons for the retaliation—accepted by the panel—
were pretextual. *See id.* at 41–43; Reply.Br.12–14. E.D. testified that
she didn't understand Mobley's ambiguous reason for suggesting
changes to the flyers. Op.Br.43. McCaffrey didn't "know" how students
would know which administrator to go to for approval; the approval
policy required significant "guessing" by students. *Id.* at 42. For one of

only two meetings Mrs. Duell participated in, E.D. "did all of the talking and did a good job of representing what she wanted to do." *Id*. at 41.

The panel opinion thus conflicts with *Greene*, *Yahnke*, and *Peele* by failing to construe both McCaffrey and E.D.'s testimony in Plaintiffs' favor. Properly viewed, that testimony establishes that McCaffrey revoked status—at least in part—because of the posters' content and that E.D. didn't understand administrators' ambiguous statements about Noblesville's unwritten approval policy and therefore didn't try "to game the system," as the panel assumed against her. *See* Op.20. Contrary to *Yahnke*, the panel accepted Defendants' policy-violation rationale despite the contrary evidence, which showed that "a trial must be held to determine [Defendants'] true motivation." 823 F.3d at 1072. Finally, under *Peele*, the panel doubly erred by holding that suspicious timing didn't help E.D. and inferring that it cut against her. *See* Op.21.

Precedent also forecloses the panel's ruling that some of Defendants' personal pro-life views negate causation. *Contra* Op.18, 22. Evidence of personal beliefs "must shed light on causation, not on subjective intent." *Whitfield*, 76 F.4th at 712. A defendant "can insist that she bore no ill will towards [the plaintiff], but that does not answer the question whether she can identify a permissible justification for her action." *Id*. The panel conflated Defendants' personal beliefs with the reasons for their decision. Perhaps some Defendants supported the club's existence and some of its activities. But the record makes clear

16

that Defendants' objection to E.D.'s posters created a triable issue on causation. The "dancing on eggshells" comment and McCaffrey's statement about the "content" of E.D.'s posters—properly construed at summary judgment—indicate that even if Defendants subjectively wanted to "Defund Planned Parenthood," they didn't want that message in school. *That's* why McCaffrey revoked the group's status.

That Noblesville allowed E.D.'s club to operate in other ways can't count against E.D. *Contra* Op.20–22. This Court has previously rejected that argument: "[O]ther conduct that comports with the Constitution does not excuse conduct that violates it." *Surita*, 665 F.3d at 878. The *Surita* defendant "offer[ed] his reactions to other protest activity by" the plaintiff "as evidence that he did not intentionally retaliate against her." *Id.* He had previously saved seats at a meeting for the plaintiff and appeared at other events at her request. *Id.* That evidence couldn't establish that the defendant didn't retaliate against the plaintiff for the event in question. *Id.*

So too here. Just because Noblesville recognized the club and allowed it to participate in the club fair, Op.20, doesn't mean that McCaffrey didn't revoke status because of the group's posters. E.D.'s evidence created at least a triable issue on that fact.

## CONCLUSION

This Court should grant the petition.

17

Respectfully submitted,

Dated: September 11, 2025          By: */s/ Mathew W. Hoffmann*

JOHN J. BURSCH
ALLIANCE DEFENDING FREEDOM
440 First Street, NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@adflegal.org

L. KATIE BUCKNER
SPENCER E. REHN
CHARITABLE ALLIES, INC.
3500 Depauw Blvd., Suite 3090
Indianapolis, IN 46268
(463) 229-0229
kbuckner@charitableallies.org
srehn@charitableallies.org

TYSON C. LANGHOFER
MATHEW W. HOFFMANN
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
tlanghofer@adflegal.org
mhoffmann@adflegal.org

DAVID A. CORTMAN
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
dcortman@adflegal.org

*Counsel for Appellants*

## CERTIFICATE OF COMPLIANCE

I certify that this petition for rehearing complies with Fed. R. App. P. 40(d)(3)(A) because it contains 3,894 words, excluding the parts exempted by Fed. R. App. P. 32(f), as determined by the word counting feature of Microsoft Office 365.

I also certify that this petition complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using 14-point Century Schoolbook.

*/s/ Mathew W. Hoffmann*
Mathew W. Hoffmann
Counsel for Appellants

September 11, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on September 11, 2025, I electronically filed the foregoing petition for rehearing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

*/s/ Mathew W. Hoffmann*
Mathew W. Hoffmann
Counsel for Appellants

In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 24-1608

E.D., a minor, by her parent and next friend, LISA DUELL, *et al.*

*Plaintiffs- Appellants,*

*v.*

NOBLESVILLE SCHOOL DISTRICT, *et al.*

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:21-cv-03075-SEB-TAB — **Sarah Evans Barker**, *District Judge.*

———————————

ARGUED OCTOBER 29, 2024 — DECIDED AUGUST 14, 2025

———————————

Before EASTERBROOK, JACKSON-AKIWUMI, and MALDONADO, *Circuit Judges.*

MALDONADO, *Circuit Judge.* E.D. came to Noblesville High School intent on starting a pro-life student club. The school made it happen. Administrators explained the process, approved the club within weeks, and gave her a table at the activities fair where she wore a pro-life shirt and displayed pro-life signs while recruiting more than thirty members.

The trouble began when E.D. submitted flyers with political slogans and images for posting on the school's walls. Administrators told her—multiple times—to revise them to comply with the school's neutral content rules for all student-club wall postings. Instead, she brought her mother to meet with another administrator to press for approval, an attempted end-run around the officials who had already rejected the flyers. Concerned that the club was no longer student-led and that E.D. had violated established procedures, the principal suspended the club's status for the remainder of the semester. The principal stated that E.D. could reapply for recognition a few months later; she did so, and the club has remained active since.

E.D., through her parents Michael and Lisa Duell, sued the school district and several officials, claiming the rejection of her flyers and the club's suspension were driven by hostility to her pro-life views, in violation of the First Amendment and the Equal Access Act, 20 U.S.C. § 4071(a). The district court disagreed and granted summary judgment to the defendants.

We affirm. The record shows that school officials approved E.D.'s club, reasonably accommodated her speech, and suspended the club only for neutral, conduct-related reasons.

## BACKGROUND

The following facts are undisputed unless otherwise noted and are presented in the light most favorable to the Duells. *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 708 (7th Cir. 2017).

### I.   Facts

In the summer of 2021, before beginning her freshman year at Noblesville High School (NHS), E.D. contacted school

administrators to ask how she could form a student club focused on pro-life advocacy. She was promptly told that to form a student interest club—a category reserved for student-initiated, student-led groups—she would need to find a faculty sponsor and complete a brief questionnaire describing the club's mission and activities. With student interest clubs, faculty sponsors supervise the use of school facilities and provide logistical support. Dr. Craig McCaffrey, NHS's principal, reviewed questionnaire responses and approved student interest clubs.

On August 3, the second day of the school year, E.D. met with Principal McCaffrey to discuss next steps after she successfully secured a faculty sponsor. E.D.'s mother, Lisa Duell, also attended the meeting. During the meeting, E.D. explained that she wanted to start a group called Noblesville Students for Life (NSFL) to educate peers on abortion and promote pro-life events. E.D. led the conversation, though her mother chimed in with several logistical questions and also recorded the meeting. McCaffrey was supportive. He gave E.D. a copy of the required club questionnaire and told her that submission of the form was the only step remaining before the club could be approved.

Within a few weeks, E.D. submitted the completed questionnaire, Principal McCaffrey approved the club, and E.D. represented NSFL at the fall activities fair. At her table, she displayed a tri-fold board with the club's mission statement, a sign reading "I Am the Pro-Life Generation," and wore a t-shirt with the same phrase. More than 30 students signed up to participate.

After the fair, E.D. met with Assistant Principal Janae Mobley to discuss scheduling the club's first meeting and

posting flyers to advertise it. At the time, NHS had no formal written policy governing the content of flyers for student interest clubs, beyond the general guidance in the 2021–2022 NHS Student Handbook. The handbook stated that flyers must be posted only in designated areas and must be taken down after the event date. It also required that all posters either promote a school-sponsored event or have administrative approval. NHS officials testified that, in practice, administrators expected student club flyers to include only the club's name and the meeting's time, date, and location, and to exclude any "disruptive" or "political" content. In addition, all flyers had to be approved in advance, include a written take-down date, and bear the initials of the administrator who approved them.

E.D. emailed Mobley two flyer templates she had obtained from Students for Life of America (SFLA), a national pro-life organization. The proposed flyers had the headline, "Pro-Life Students, It's Time to Meet Up!", followed by images of young protestors holding signs reading "Defund Planned Parenthood" and "I Am the Pro-Life Generation." Below the images were spaces to fill in the club's meeting details.

 

The next day, Mobley emailed back that the flyers should include only the name of the club and the time, date, and location of the meeting and not include the pictures. As a point of comparison, she noted that NHS's Young Republicans Club did not use party logos or slogans on its flyers but only included meeting information. Mobley told E.D. that club members could, of course, make these very statements at their meetings, she just could not post them on the school's walls. That same day, Mobley emailed NSFL's faculty sponsor, Brian McCauley, and asked him to work with E.D. to revise the flyer.

McCauley and E.D. exchanged several emails over the following day. McCauley, whose role was to provide faculty support to E.D.'s effort, reiterated that the "best thing" was for the flyer to include only the club's name and meeting information, with "no pictures." E.D. initially responded that she had hoped to use the SFLA template, but after McCauley

again emphasized the guidelines, she replied: "Sounds good, thanks! I'll get to work on making the flyers." McCauley also advised her to contact Dean of Students Jeremy Luna to schedule NSFL's first meeting.

A couple days later, E.D. met with Luna, accompanied again by her mother. Despite her earlier agreement with McCauley, E.D. re-raised the issue of the flyer. Luna told them the flyer could not be approved because it included a political image and that the school was already walking "on eggshells." Specifically, he explained that the flyer could not include the "Defund Planned Parenthood" sign and that a version without the image "should" or "would possibly work," but that approval was not ultimately his decision.

After the meeting, Luna debriefed with Principal McCaffrey and Assistant Principal Mobley and told them he thought the conversation had been driven primarily by E.D.'s mother. Mobley then explained to McCaffrey that E.D. had previously submitted the flyers to her, that she had rejected them, and that she had already explained what content was acceptable. Based on that email exchange, Mobley believed there was a plan in place to revise the flyers accordingly. But after E.D.'s mother re-appeared in the meeting with Luna, McCaffrey and Mobley voiced concerns with Luna about Mrs. Duell's leadership role in the club. Student clubs are supposed to be student-run.

On September 3, Principal McCaffrey suspended NSFL's status as an approved student interest club. He viewed E.D.'s effort to revisit the flyer issue with Luna—after having already received guidance from Assistant Principal Mobley and faculty sponsor McCauley—as an "attempt at insubordination led by an outside adult advocating with the student." In

McCaffrey's view, E.D. and her mother's attempted end-run around the problems with her flyers warranted discipline. He testified that the decision to suspend NSFL's club status was his alone, and that he did not inform Superintendent Beth Niedermeyer until after he issued his decision.

Principal McCaffrey sent an email to E.D.'s mother later that day explaining why he suspended NSFL's club status and outlining the school's process for student interest clubs. He noted that while it was "unusual and [un]orthodox" for Mrs. Duell to attend the initial meeting since student interest clubs are supposed to be "100% student driven and can have no involvement from any adult," he allowed it to proceed because E.D. had done the talking.

He then expressed confusion as to why E.D. and Mrs. Duell had approached another administrator about a flyer that had already been denied by the assistant principal. He reiterated that "posters cannot contain any content that is political or that could disrupt the school environment," and that flyers should "only state the name of the club and the details of the meeting time and location." Once the students actually meet, he wrote, they are free to "talk about their common interests." He stated that he was "no longer confident that th[e] club [wa]s student-driven" and was "removing the club's approval to meet in the school." He added that he was not accepting new club applications at the time due to a "revamp" of the process, but that E.D. could reapply in January.

E.D. resubmitted her application as instructed and Principal McCaffrey reinstated NSFL in January 2022.

## II.  Procedural History

On appeal, the Duells press only a handful of the numerous claims they pleaded, each under 42 U.S.C. § 1983. First, they assert that Noblesville School District violated E.D.'s free speech rights by vetoing the pictures in her flyers. Second, they contend the District violated E.D.'s First Amendment rights again (both free speech and freedom of association) by suspending NSFL's club status. Third, they maintain that the District, Superintendent Niedermeyer, and Principal McCaffrey, retaliated against E.D., again in violation of the First Amendment, when they suspended NSFL's club status. Finally, they allege that the District, the same two officials, as well as Assistant Principal Mobley and Dean Luna, all violated the Equal Access Act, also based on the suspension of NSFL's club status.

On cross-motions for summary judgment, the district court ruled for the defendants on each claim. The Duells now appeal.

## DISCUSSION

We review the district court's grant of summary judgment de novo. *N.J. ex rel. Jacob v. Sonnabend*, 37 F.4th 412, 420 (7th Cir. 2022). On an appeal from cross-motions for summary judgment, we view the evidence and draw all reasonable inferences "in favor of the party against whom the motion under consideration [was] made." *Id.* (quoting *Dunnet Bay Constr. Co. v. Borggren*, 799 F.3d 676, 688 (7th Cir. 2015)). "Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Kemp v. Liebel*, 877 F.3d 346, 350 (7th Cir. 2017) (citation omitted).

## I.  First Amendment Claims

Before turning to the merits, we note that the Duells bring the free speech and association claims solely against Noblesville School District and not against any of the individual defendants. Because the District is a municipal entity, liability under 42 U.S.C. § 1983 must meet the requirements of *Monell v. Department of Social Services*, 436 U.S. 658, 694–95 (1978). That is, the Duells must show not only a constitutional violation, but also that an official policy, a widespread practice, or a decision by a final policymaker caused the violation. *See First Midwest Bank, Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021).

The parties dispute not only whether any constitutional violations occurred, but also whether the District can be held liable under *Monell*. The district court resolved the claims against the District solely on *Monell* grounds and did not reach the underlying constitutional questions. We take the opposite approach: we do not address *Monell* liability and instead resolve the case on the merits.[1] *See LaPorta*, 988 F.3d at 987. We hold that the Duells have not established any constitutional violation—against the District or any individual official—an outcome that is dispositive regardless of *Monell* liability.

### A.  Regulation of E.D.'s flyers

We begin with the Duells' claim that the District violated E.D.'s First Amendment right to free speech when it rejected the images on her proposed flyers. To assess that claim, we

---

[1] We may affirm summary judgment on any ground supported by the record. *Moore v. W. Ill. Corr. Ctr.*, 89 F.4th 582, 595 (7th Cir. 2023).

must first resolve a threshold issue: whether *Tinker v. Des Moines Independent Community School District,*, 393 U.S. 503 (1969) or *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988) supplies the governing standard.

### 1. *Tinker* or *Kuhlmeier*

In *Tinker*, the Supreme Court struck a balance regarding student speech. It held that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," but recognized that those rights are subject to the realities of the school environment. *Tinker*, 393 U.S. at 506. There, the Court struck down suspensions imposed on high school students for wearing black armbands to protest the Vietnam War, finding no evidence that the expression "would materially and substantially disrupt the work and discipline of the school"—the standard it established for evaluating school-based speech. *Id.* at 513–14.

Since *Tinker*, the Supreme Court has identified three different categories of student speech that public schools may regulate even absent a substantial disruption. *See Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 187–88 (2021). Relevant here is the category addressed in *Kuhlmeier*: student speech that others "might reasonably perceive to bear the imprimatur of the school." 484 U.S. at 271. There, school officials removed two articles, one on student pregnancy and the other on the impact of divorce on students, from a school-sponsored newspaper produced as part of a high school journalism class. Applying First Amendment forum analysis, the Court held that school officials could "exercis[e] editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Id.* at

273. The Court distinguished *Tinker*, explaining that while *Tinker* concerned whether schools must tolerate private student speech, *Kuhlmeier* addressed whether they must affirmatively promote it. *Id.* at 270–71. Critically, the Court recognized that school-sponsored speech appears to bear the school's imprimatur, so schools must be able to assert greater authority over it. *Id.* at 271–72.

The Duells argue that *Tinker*'s substantial disruption standard governs because E.D.'s flyers represented her private student speech. The District counters that *Kuhlmeier*'s forum-analysis approach applies, given the school's central role in facilitating the flyers' placement on its walls. We agree that *Kuhlmeier* provides the appropriate framework.

Because of where and how E.D. sought to display her flyers, they could reasonably be perceived as bearing the school's imprimatur. If posted, the flyers would have appeared on school walls alongside announcements for school-sponsored events and remained in common areas for days. Untethered to any identifiable student and indistinguishable from official school materials, they would naturally (and perhaps inevitably) be seen by students, parents, and visitors as reflecting the school's endorsement. In fact, every student flyer in the school must bear a faculty member's initials for approval—a literal stamp of the school's authority. That risk of mistaken attribution is precisely the kind of institutional concern *Kuhlmeier* addresses. This is not a case about tolerating private student speech. To the contrary, E.D. was permitted to wear her pro-life shirt to school and hand out her flyers to students at the activities fair. Instead, it is a case about whether the school must lend its resources (here, literally its

walls)—and, by extension, its authority—to disseminate student messages. *See id.* at 271–72.

The Duells resist this conclusion, relying chiefly on Judge Rovner's concurring opinion in *Muller ex rel. Muller v. Jefferson Lighthouse School*, 98 F.3d 1530 (7th Cir. 1996), which was later endorsed by this Court in *N.J. ex rel. Jacob v. Sonnabend*, 37 F.4th 412, 425 (7th Cir. 2022). In *Muller*, an elementary school student was prohibited from distributing and posting flyers inviting classmates to a Bible study at his church. *Muller*, 98 F.3d at 1532. The majority applied *Kuhlmeier* and upheld the restriction. *Id.* at 1537. Judge Rovner agreed that the restriction did not violate the First Amendment but contended that *Tinker* instead applied. *Id.* at 1546. In *Sonnabend*, our Court expressly adopted the reasoning of that concurrence and overruled *Muller* to the extent it had "mistakenly applied *Kuhlmeier* and speech-forum analysis." 37 F.4th at 425.

But we held that principle to be limited to *Muller*'s facts. *Sonnabend* concluded that the flyers in *Muller*, which promoted an off-campus church event, could not reasonably be perceived as bearing the school's imprimatur. *Id.* As a result, *Kuhlmeier* did not apply; however, *Sonnabend* did not hold that *Tinker* governs all restrictions on posting student flyers. It simply reaffirmed that *Kuhlmeier* is limited to situations where student speech might reasonably be attributed to the school, which it found lacking in *Muller*.

This case is completely different. E.D.'s flyers did not advertise a private, off-campus event; they did the opposite. They promoted a club meeting during school hours, on school property, and under the supervision of a faculty advisor. Unlike *Muller*, where flyers were confined to a designated bulletin board for private, unsanctioned materials, *Muller*, 98 F.3d

at 1541, E.D.'s flyers would have been posted alongside official school-sponsored communications in high-traffic common areas throughout the school. In that setting, a reasonable observer could easily conclude that the flyers reflected the school's endorsement.

Accordingly, even under the *Muller* concurrence and *Sonnabend*, the proper inquiry remains whether the speech bears the school's imprimatur. Because E.D.'s flyers were closely tied to school resources and would appear on the school's walls largely indistinguishable from other school-sponsored postings, *Kuhlmeier* applies. That conclusion is also consistent with decisions from other circuits, which have applied *Kuhlmeier* to student speech displayed on school property that reasonably appears school-sanctioned. *See Fleming v. Jefferson Cnty. Sch. Dist. R-1*, 298 F.3d 918, 924–26 (10th Cir. 2002); *Bannon v. Sch. Dist. of Palm Beach Cnty.*, 387 F.3d 1208, 1214 (11th Cir. 2004).[2]

### 2.  Application of *Kuhlmeier*

Applying *Kuhlmeier*, we now consider whether the school's restriction was "reasonably related to legitimate

---

[2] The Duells also argue that *Fujishima v. Bd. of Educ.*, 460 F.2d 1355 (7th Cir. 1972), requires us to invalidate the District's pre-approval flyer policy. There, under the prior-restraint doctrine, we struck down a rule that prohibited any person from distributing materials on school premises without prior approval from the superintendent. *Id.* at 1358–59. But *Fujishima* predates *Kuhlmeier*, which significantly reshaped the legal framework for student speech. *See Muller*, 98 F.3d at 1540 ("Prior restraint of student speech in a nonpublic forum is constitutional if reasonable."). In any event, *Fujishima* addressed a blanket restriction on distribution of materials, not a school's decision to control what may be posted on its own walls. That is a materially different question, and one *Fujishima* did not consider.

pedagogical concerns." 484 U.S. at 273. Under this standard, schools may regulate student expression in school-sponsored forums so long as their actions are tied to a valid educational purpose. *Id.* The Supreme Court has "cautioned courts … to resist substituting their own notions of sound educational policy for those of the school authorities which they review." *Christian Legal Soc'y v. Martinez*, 561 U.S. 661, 686 (2010) (citation modified). "[T]he education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges." *Kuhlmeier*, 484 U.S. at 273. We conclude that the District's decision to prohibit E.D.'s flyers satisfies that standard and did not violate the First Amendment.

The District's restriction on political content in student flyers is reasonably related to legitimate pedagogical concerns. The school designated its walls as a limited public forum for the narrow purpose of allowing student clubs to advertise only meeting times and locations. In keeping with that purpose, the District may impose reasonable limitations to preserve the forum's intended function. *See id.* at 269–70. That includes requiring preapproval of flyers and restricting messaging to basic club information. Excluding political content, in particular, serves the pedagogical goal of maintaining neutrality on matters of political controversy. Schools must "retain the authority to refuse to sponsor student speech that might reasonably be perceived to … associate the school with any position other than neutrality on matters of political controversy." *Id.* at 272. Flyers promoting a polarizing political slogan ("Defund Planned Parenthood") and bearing an administrator's initials alongside school-sponsored postings could mislead observers into thinking the school endorses that view. The potential for such misunderstanding—and for

disruption—is greater here than in *Kuhlmeier*, where the disputed student articles addressed pregnancy and divorce. That concern with disruption is itself part of the school's broader pedagogical mission. "Order and discipline are part of any high school's basic educational mission; without them, there is no education." *Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464, 467 (7th Cir. 2001). The District could reasonably conclude that covering its walls with warring political messages would undermine that order and divert attention from the business of learning.

In short, the District's content restriction aligns with both the nature of the school walls as a limited forum for student expression and its broader pedagogical duty to create a stable, neutral educational environment. It passes constitutional muster under *Kuhlmeier*.

The Duells see it differently. They argue that the District's restriction on political content suppresses the very kind of robust debate secondary schools should encourage. But this dramatically overstates both the scope and effect of the District's policy. Recall that E.D. was permitted to form NSLF, promote it at the student activities fair, and distribute materials without limitation on what she could wear, say, or hand out. She is free to express her views and engage in debate during club meetings and elsewhere on campus. The "no political message" restriction applies only to the use of school walls to post flyers, not to students' broader right to express political opinions. The rule merely limits how certain messages may be disseminated, not whether they may be expressed at all. That distinction matters. So long as the restriction is tied to the purpose of the forum—and here, it plainly is—it satisfies *Kuhlmeier*'s standard.

The Duells also cite to *Minnesota Voters Alliance v. Mansky*, 585 U.S. 1 (2018), arguing that the District's restriction on "political" content is too vague to be enforced fairly. *See id.* at 16–17. But *Mansky* is both factually and legally distinguishable. First, *Mansky* did not involve student speech or schools at all. It involved a polling place, which is an entirely different constitutional context where political neutrality is required for constitutional reasons. *Cf. Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886) ("[T]he political franchise of voting … is … a fundamental political right, because [it is] preservative of all rights."). By contrast, schools have broader authority to restrict speech that may be perceived as bearing the school's imprimatur or undermining the learning environment. *See Kuhlmeier*, 484 U.S. at 271–72.

Second, even if *Mansky*'s standards apply, they are satisfied. *See Mansky*, 585 U.S. at 16 (requiring "some sensible basis" for a rule limiting "political" messaging at polling places). The flyer policy gives administrators sufficient guidance to make reasoned decisions: flyers may contain the club's name and meeting information, but no political messaging. *See Muller*, 98 F.3d at 1541 ("The Supreme Court has never held that a detailed administrative code is required before student speech may be regulated."). The risks of arbitrary enforcement that were dispositive in *Mansky* are simply not present.

Finally, the Duells argue that the school rejected E.D.'s flyers because of their pro-life message, amounting to impermissible viewpoint discrimination. Courts are divided over whether *Kuhlmeier* requires viewpoint neutrality in school-sponsored speech. *See Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 290 (4th Cir. 2021) (noting circuit split). We have yet to rule on the issue, and we need not do so now

because the Duells offer no evidence that E.D.'s flyers were rejected because of the views they expressed.

The flyer policy is viewpoint neutral both on its face and in its application. Under the handbook, all flyers for non–school-sponsored events must receive prior administrative approval, regardless of the views expressed. As noted, administrators also enforced a rule limiting club flyers to basic content—the club's name and meeting details—while excluding any material "political in nature." This restriction regulates content, not viewpoint. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828–29 (1995) (distinguishing content-based from viewpoint-based restrictions).

School officials also applied the policy evenhandedly. According to undisputed testimony, the rule equally prohibits all clubs from including political content on flyers beyond the club name. The same rule barred any group from promoting pro-choice messaging or using political images. Nothing in the record suggests that officials treated E.D.'s flyers differently because of their pro-life perspective. To the contrary, the policy disallowed political messages of any kind, from any speaker. *Cf. Choose Life Ill., Inc. v. White*, 547 F.3d 853, 866 (7th Cir. 2008) (upholding viewpoint-neutral restriction on abortion-related license plates).

The Duells point to no example of an approved flyer with opposing political content. Their only reference involves a flyer posted by the Black Student Union featuring an image of three raised fists. But that issue was raised only in passing at oral argument and does not appear in their appellate briefing. It is therefore waived. *Roberts v. Columbia Coll. Chicago*, 821 F.3d 855, 862 n.2 (7th Cir. 2016) (arguments not preserved in briefing are waived).

Even setting waiver aside, the argument fails. The Duells offer no evidence that school officials ever even approved the Black Student Union flyer. Assistant Principal Mobley testified only that she "possibly" saw it posted, but she neither approved it nor remembered when or where she saw it. The flyer also lacked the required administrator initials and takedown date, further suggesting that it was never officially approved. At oral argument, the Duells suggested that the flyer's presence on the school walls implies approval. But speculation is insufficient to survive summary judgment. *Flowers v. Kia Motors Fin.*, 105 F.4th 939, 946 (7th Cir. 2024). At most, the record shows that one unauthorized flyer may have been posted at some point. That isolated fact does not create a triable issue as to whether administrators applied the content policy in a discriminatory or inconsistent manner.

Nor do the comments of any NHS staff support an inference of viewpoint discrimination. Administrators consistently told E.D. that club flyers must include only basic logistical information. Nothing suggested that her flyers were rejected because of their message. Mobley explained that other clubs followed the same rules. Luna and Principal McCaffrey both testified that no club was permitted to include political content. The Duells cite Luna's remark that the school was already walking "on eggshells" and McCaffrey's email saying that the flyers were "not appropriate for school due to the content." But these statements, in context, reflect concern over compliance with the content-neutral policy, not hostility toward E.D.'s viewpoint. In fact, Mobley, Luna, and McCaffrey each testified that they personally agreed with E.D.'s pro-life views. Their personal beliefs, while not dispositive, make it especially difficult to infer discrimination based on viewpoint.

The record, taken as a whole, reflects a consistently enforced policy applied equally to all viewpoints. No reasonable jury could conclude otherwise. The Duells have not identified a single instance in which the school approved a flyer with political content to be posted while denying E.D.'s because of its message. The policy is facially neutral, and the evidence confirms that it was applied without regard to viewpoint.

**B.  Suspension of NSFL's club status**

We next consider the Duells' claim that the District violated E.D.'s free speech and association rights when Principal McCaffrey suspended NSFL's status as an approved student interest club. The parties agree that the Supreme Court's limited-public-forum precedent governs. "[A] limited public forum … is a place the government has opened only for specific purposes or subjects." *Milestone v. City of Monroe*, 665 F.3d 774, 783 n.3 (7th Cir. 2011). Speech restrictions in limited public fora must be "reasonable in light of the purpose served by the forum" and "viewpoint neutral." *Martinez*, 561 U.S. at 685, 690 (citations omitted). When dealing with limited public fora in schools, courts proceed "with special caution," recognizing that schools "enjoy … a significant measure of authority over the type of officially recognized activities in which their students participate." *Id.* at 686–87 (citations omitted). Applying those principles, we conclude that the suspension of NSFL's club status was constitutionally permissible.

The District reasonably applied its generally applicable rules when it suspended NSFL's club status. The purpose of NHS's student-interest-club forum is to facilitate extracurricular opportunities that are entirely student-led and student-run. That structure serves legitimate pedagogical goals: it fosters student initiative, prevents outside domination of the

forum, and keeps the school's resources directed toward student-driven activities. McCaffrey reasonably concluded that NSFL was not adhering to this requirement. After approving the club with full knowledge of its pro-life mission, he learned that E.D. and her mother attempted to game the system, seeking approval from another administrator for their template flyer with an explicitly political message after it had already been rejected. Luna reported that Mrs. Duell—not E.D.—led that conversation. In McCaffrey's view, this was contrary to the basic premise of "student run" clubs.

In addition, the family's approach to the flyer issue reflected noncompliance with the procedural rules governing the forum. Administrators, including the faculty sponsor who supported the club, had instructed E.D. to revise the flyer to remove prohibited political images before resubmitting it for approval and she agreed at first (i.e., "Sounds good."). But then with her mother accompanying her, she later sought approval from another administrator without making the required changes. The school may insist that recognized student groups adhere to school rules and procedures, including "reasonable standards respecting conduct." *Healy v. James*, 408 U.S. 169, 193 (1972). Nothing in the record suggests that McCaffrey's response was disproportionate—particularly given that the suspension was temporary, with a reasoned explanation, and with a defined opportunity to reapply.

The undisputed evidence also shows that McCaffrey's decision to suspend the club was not motivated by disagreement with E.D.'s pro-life views. He approved NSFL knowing its mission, permitted E.D. to promote it at the activities fair wearing pro-life slogans and distributing pro-life materials, and reinstated the club a few months later with the same

mission intact. Those actions are inconsistent with any intent to suppress E.D.'s views. Instead, McCaffrey consistently identified two neutral grounds for his decision: the involvement of Mrs. Duell in what must be a student-run process, and E.D.'s perceived insubordination in trying to obtain permission to post her already-rejected flyer. Those reasons apply regardless of the content of the club's advocacy: they "draw[] no distinction between groups based on their message or perspective." *Martinez*, 561 U.S. at 694. The record contains no example of another club being allowed to circumvent the student-led requirement or flyer rules based on the message it sought to promote.

The Duells nonetheless argue that the temporal proximity between the flyers incident and McCaffrey's suspension decision suggests that suppressing her speech was the true motive at work. But "suspicious timing alone [is] rarely [] sufficient to create a triable issue." *Manuel v. Nalley*, 966 F.3d 678, 681 (7th Cir. 2020) (citation modified). And, regardless, the timing of the decision supports rather than undermines McCaffrey's stated reasoning. He allowed the club to form knowing its pro-life mission and permitted it to operate for a month. He acted only after E.D. and her mother's meeting with Luna to revisit the flyer issue that had already been addressed. He reasonably viewed this conduct as inconsistent with the forum's student-led requirement and the posting rules.

On this record, McCaffrey's suspension of NSFL's club status was reasonable in light of the forum's purpose and was based on concerns wholly unrelated to E.D.'s viewpoint. The Duells' speech and association claims based on the suspension therefore fail.

Likewise, the First Amendment retaliation claim also fails because McCaffrey acted on viewpoint-neutral, forum-related concerns rather than in response to E.D.'s speech. To prevail, the Duells had to show that E.D.'s protected expression was "a motivating factor" in McCaffrey's decision to suspend NSFL's club status. *Douglas v. Reeves*, 964 F.3d 643, 646 (7th Cir. 2020) (citation omitted). The record does not permit that inference. As explained, McCaffrey approved NSFL knowing its pro-life mission, suspended its status only after learning of conduct he viewed as inconsistent with the student-led requirement, and promptly reinstated the club at the first available opportunity. No reasonable jury could find that E.D.'s protected expression was a motivating factor in his decision.[3]

## II. Equal Access Act Claims

Finally, we address the Duells' claims under the Equal Access Act. The Act prohibits a public secondary school that receives federal funding and maintains a limited open forum from denying "equal access or a fair opportunity to, or discriminat[ing] against, any students who wish to conduct a meeting within [any] limited open forum on the basis of the religious, political, philosophical, or other content of the speech at such meetings." 20 U.S.C. § 4071(a). E.D. advances two theories: first, that the suspension of NSFL's club status violated the Act; and second, that the denial of her flyers

---

[3] The Duells also bring retaliation claims against Superintendent Niedermeyer and Principal McCaffrey in their individual capacities. Those claims also fail because there was no First Amendment retaliation in the first instance. McCaffrey alone made the suspension decision, and Niedermeyer had no role in it so any potential supervisory claim against her falls flat at the start.

constituted a separate violation. Both fail—the former on the merits, and the latter for lack of preservation.

The Act requires proof that the school acted "on the basis of" the content of the speech at the meeting in question. *See Gernetzke*, 274 F.3d at 466. For reasons already discussed ad nauseum, the record forecloses that inference. Principal McCaffrey suspended NSFL's status because he believed the club was run in part by Mrs. Duell in violation of the forum's rules, and because E.D. attempted to circumvent uniform flyer restrictions by seeking approval from another administrator after her proposal had already been rejected, conduct he viewed as insubordinate. His decision was not tied to the club's pro-life mission. The absence of content-based causation defeats the claim against McCaffrey and, by extension, the District. *See id.* at 466–67. It also forecloses the claim against Niedermeyer, Mobley, and Luna, none of whom played any role in the suspension decision. Because McCaffrey's decision did not violate the Act, no other defendant can be liable.

The Duells' alternative theory, that the denial of E.D.'s flyers independently violated the Act was not preserved in the district court. The Southern District of Indiana's local rules require the parties to submit a case management plan identifying "a statement of [the] plaintiff's claims" they intend to prove at trial, including "the legal theories and facts" supporting each claim. S.D. Ind. Uniform Case Management Plan for Civil Cases; *see* S.D. Ind. L.R. 16-1. The Duells' submission defined E.D.'s Equal Access Act claim solely as a denial of the right to "conduct meetings" due to the content of her speech. Nothing in their Local Rule 16 statement (or in their amended

complaint) suggested that the claim also encompassed a right to post flyers under the Act.

The Duells advanced this new theory for the first time in their summary judgment briefing. The district court therefore declined to consider it, finding that it exceeded the scope of the Equal Access Act claim as preserved in the statement of claims and in the pleadings. We review the enforcement of local rules for abuse of discretion, keeping in mind "that district courts may require strict compliance with their local rules." *Hinterberger v. City of Indianapolis*, 966 F.3d 523, 528 (7th Cir. 2020) (collecting cases). We find that the district court acted well within its discretion.

District courts may require parties to define their claims and theories in advance of summary judgment, and they may hold parties to those definitions. *See Elizarri v. Sheriff of Cook Cnty.*, 901 F.3d 787, 790–91 (7th Cir. 2018); *DeliverMed Holdings, LLC v. Schaltenbrand*, 734 F.3d 616, 628–29 (7th Cir. 2013). Several of the Duells' other claims in the same Local Rule 16 statement expressly referenced the posting of flyers, underscoring that they knew how to identify such a theory when they wished to do so. The district court reasonably concluded that the Equal Access Act claim was confined to the suspension of NSFL's status and that the flyer-based theory, raised for the first time at summary judgment, was not properly before the court.

## CONCLUSION

For all the forgoing reasons, we AFFIRM the judgment of the district court.