**No. 24-1608**

## IN THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

E.D., A MINOR, BY HER PARENTS AND NEXT FRIENDS, MICHAEL DUELL AND LISA DUELL; NOBLESVILLE STUDENTS FOR LIFE,

*Plaintiffs-Appellants,*

v.

NOBLESVILLE SCHOOL DISTRICT, ET AL.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division
Case No. 1:21-cv-03075-SEB-TAB
Hon. Judge Sarah Evans Barker

## BRIEF OF *AMICI CURIAE* FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION, TULLY CENTER FOR FREE SPEECH, STUDENT PRESS LAW CENTER, AND FIRST AMENDMENT SCHOLARS IN SUPPORT OF PLAINTIFFS'-APPELLANTS' PETITION FOR REHEARING AND REHEARING *EN BANC*

RONALD G. LONDON
  *Counsel of Record*
WILLIAM CREELEY
JEFFREY M. MURPHY
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE
Suite 340
Washington, DC 20003
(215) 717-3473
ronnie.london@thefire.org
Counsel for *Amici Curiae*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-1608

Short Caption: E.D., a minor, by her parent and next friend, LISA DUELL, et al. v. NOBLESVILLE SCHOOL DISTRICT, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

      ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Foundation for Individual Rights and Expression, Tully Center for Free Speech, Student Press Law Center,

Gregory P. Magarian, Clare R. Norins, Lyrissa Lidsky, Nancy A. Costello, and Victoria Smith Ekstrand, Ph.D.

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Foundation for Individual Rights and Expression

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        None

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Ronald G. London    Date: September 18, 2025

Attorney's Printed Name: Ronald G. London

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ✓    No ☐

Address: 700 Pennsylvania Avenue SE, Suite 340

Washington, DC 20003

Phone Number: (215) 717-3473    Fax Number: N/A

E-Mail Address: ronnie.london@thefire.org

rev. 12/19 AK

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-1608

Short Caption: E.D., a minor, by her parent and next friend, LISA DUELL, et al. v. NOBLESVILLE SCHOOL DISTRICT, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Foundation for Individual Rights and Expression, Tully Center for Free Speech, Student Press Law Center,

Gregory P. Magarian, Clare R. Norins, Lyrissa Lidsky, Nancy A. Costello, and Victoria Smith Ekstrand, Ph.D.

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Foundation for Individual Rights and Expression

(3)     If the party, amicus or intervenor is a corporation:

    i)     Identify all its parent corporations, if any; and
None

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
None

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
N/A

Attorney's Signature: /s/ William Creeley      Date: September 18, 2025

Attorney's Printed Name: William Creeley

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ☐   No ☑

Address: 510 Walnut Street, Suite 900

Philadelphia, PA 19106

Phone Number: (215) 717-3473      Fax Number: N/A

E-Mail Address: will@thefire.org

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-1608

Short Caption: E.D., a minor, by her parent and next friend, LISA DUELL, et al. v. NOBLESVILLE SCHOOL DISTRICT, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

      ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Foundation for Individual Rights and Expression, Tully Center for Free Speech, Student Press Law Center,

Gregory P. Magarian, Clare R. Norins, Lyrissa Lidsky, Nancy A. Costello, and Victoria Smith Ekstrand, Ph.D.

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Foundation for Individual Rights and Expression

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

None

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Jeffrey M. Murphy      Date: September 18, 2025

Attorney's Printed Name: Jeffrey M. Murphy

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐  No ☑

Address: 510 Walnut Street, Suite 900

Philadelphia, PA 19106

Phone Number: (215) 717-3473      Fax Number: N/A

E-Mail Address: jeff.murphy@thefire.org

rev. 12/19 AK

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .........................................................................ii

INTEREST OF *AMICI CURIAE* ............................................................. 1

INTRODUCTION ...................................................................................... 3

DISCUSSION ............................................................................................. 4

CONCLUSION ........................................................................................ 14

# TABLE OF AUTHORITIES

## Cases

*Bowers v. Hardwick,*
  478 U.S. 186 (1986) ................................................................... 7

*Bridges v. California,*
  314 U.S. 252 (1941) ................................................................... 8

*City of Houston v. Hill,*
  482 U.S. 451 (1987) ................................................................... 9

*Hazelwood Sch. Dist. v. Kuhlmeier,*
  484 U.S. 260 (1988) ....................................................... 3, 5, 13

*Houston Cmty. Coll. Sys. v. Wilson,*
  595 U.S. 468 (2022) ................................................................... 9

*Kennedy v. Bremerton Sch. Dist.,*
  597 U.S. 507 (2022) ................................................................... 8

*Kincaid v. Gibson,*
  236 F.3d 342 (6th Cir. 2001) ................................................. 13

*Landmark Communications, Inc. v. Virginia,*
  435 U.S. 829 (1978) ................................................................... 8

*Lawrence v. Texas,*
  539 U.S. 558 (2003) ................................................................... 7

*Lemon v. Kurtzman,*
  403 U.S. 602 (1971) ................................................................... 8

*Matal v. Tam,*
  582 U.S. 218 (2017) ................................................................. 11

*N.Y. Times Co. v. Sullivan,*
  376 U.S. 254 (1964) ................................................................... 9

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.,*
  547 U.S. 47 (2006) ..................................................................... 7

*Shelton v. Tucker*,
  364 U.S. 479 (1960) .................................................................. 9

*Tinker v. Des Moines Indep. Sch. Dist.*,
  393 U.S. 503 (1969) .................................................................. 7

*United States v. Alvarez*,
  567 U.S. 709 (2012) ................................................................ 11

*Walker v. Sons of Confederate Veterans, Inc.*,
  576 U.S. 200 (2015) ................................................................ 11

*Weingarten v. Bd. of Educ.*,
  591 F.Supp.2d 511 (S.D.N.Y. 2008) ....................................... 5

**Other Authorities**

Amanda Harmon Cooley, *Controlling Students and Teachers: The
  Increasing Constriction of Constitutional Rights in Public
  Education*, 66 BAYLOR L. REV. 235 (2014) ............................... 6

Ann M. Gill, *In the Wake of* Fraser *and* Hazelwood, 20 J.L. &
  EDUC. 253 (1991) ..................................................................... 6

ASS'N FOR EDUC. IN JOURN. & MASS COMM., *AEJMC Resolution One
  2013* (2013)............................................................................... 6

Christine Snyder, *Reversing the Tide: Restoring First Amendment
  Ideals in America's Schools Through Legislative Protections for
  Journalism Students and Advisors*, 2014 BYU EDUC. & L.J. 71
  (2014)........................................................................................ 6

Clare R. Norins, Taran Harmon-Walker & Navroz Tharani,
  *Restoring Student Press Freedoms: Why Every State Needs a
  "New Voices" Law*, 32 GEO. MASON UNIV. C.R. L.J. 63 (2021).............. 5

Eric D. Bender, *The Viability of Racist Speech from High Schools
  to Universities: A Welcome Matriculation*, 59 UNIV. CIN. L. REV.
  871 (1991).................................................................................. 6

Frank D. LoMonte, *Censorship Makes the School Look Bad: Why Courts and Educators Must Embrace the "Passionate Conversation,"* 65 WASH. UNIV. J.L. & PUB. POL'Y 91 (2021) ................ 5

Nadine Strossen, *Counterspeech in Response to Changing Notions of Free Speech*, AM. BAR ASS'N HUM. RTS. (Nov. 19, 2018) ................... 11

Roy S. Gutterman, *New Voices, New Rights, New York: A Case Study and a Call for Student Journalist Protections in New York*, 83 ALBANY L. REV. 1115 (2020) ...................................... 5

Sonja R. West, *Student Press Exceptionalism*, 2 EDUC. L. & POL'Y REV. 130 (2015) ....................................................... 5

STUDENT PRESS LAW CTR., *New Voices Timeline* ...................................... 7

William G. Buss, *School Newspapers, Public Forum, and the First Amendment*, 74 IOWA L. REV. 505 (1989) ............................... 6

## INTEREST OF *AMICI CURIAE*[1]

**The Foundation for Individual Rights and Expression (FIRE)** is a nonpartisan nonprofit that defends the rights of all Americans to free speech and free thought—the essential qualities of liberty. Since 1999, FIRE has successfully defended First Amendment rights nationwide through public advocacy, targeted litigation, and *amicus curiae* filings in cases that implicate expressive rights. In lawsuits across the United States, FIRE works to vindicate those rights without regard to speakers' views. FIRE has a keen interest in ensuring the censorship it opposes across the country is not fostered in our public K-12 schools.

**The Tully Center for Free Speech** at Syracuse University's S.I. Newhouse School of Public Communications promotes and supports free speech through research, education and a series of events, including the annual Tully Award for Free Speech.

---

[1] No counsel for a party authored this brief in whole or in part. Further, no person other than *amici*, their counsel, and their members contributed money intended to fund this brief's preparation or submission. *Amici* are concurrently moving for leave to file this brief. *Amici* sought consent of the parties to file the accompanying brief. Plaintiffs-Appellants consented to the filing of the brief; Defendants-Appellees have not yet responded.

**The Student Press Law Center (SPLC)** is a national, non-profit, non-partisan organization established in 1974 that works to promote, support, and defend the press freedom and freedom of information rights of high school and college journalists.

The following *amici* are scholars who write and teach about the First Amendment and thus have an interest in the sound development of doctrine in this area:

**Nancy A. Costello** is Clinical Professor of Law and Director of the First Amendment Law Clinic at Michigan State University College of Law.

**Victoria Smith Ekstrand, Ph.D.**, is Professor at University of North Carolina at Chapel Hill's Hussman School of Journalism and Media.

**Lyrissa Lidsky** is the Raymond & Miriam Ehrlich Chair in U.S. Constitutional Law at the University of Florida Levin College of Law.

**Gregory P. Magarian** is the Thomas and Karole Green Professor of Law at Washington University School of Law.

**Erin Siegal McIntyre** is an Assistant Professor at University of North Carolina at Chapel Hill's Hussman School of Journalism and Media.

**Clare R. Norins** is Clinical Associate Professor and Director of the First Amendment Clinic at the University of Georgia School of Law.

## INTRODUCTION

The panel's choice to root its affirmance in *dicta* from *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 271 (1988), about schools "disassociating" themselves from student speech of which they disapprove, warrants rehearing *en banc*. For 37 years, students in America's public schools have endured a "training wheels" version of free speech due to *Hazelwood*'s holding that time and subsequent events have thoroughly discredited. *Hazelwood*'s nod to schools having authority to censor speech for the sole purpose of distancing themselves from political controversy is both *dicta* and nonsense. It requires indulging two irrational premises that even the Court itself no longer believes: (1) that reasonable audience members cannot distinguish student speech from speech of their schools, and (2) that the interest of a government actor in avoiding perceived entanglement in political controversy trumps citizens'

rights to debate politics. By vacating the panel opinion and rehearing the case *en banc*, this Court can align Seventh Circuit law with the reality that *Hazelwood*'s "disassociation *dicta*" is not binding and should not be followed.

## DISCUSSION

Avoiding damage to the government's reputation is simply not a valid exercise of governmental censorship authority. Indeed, one might convincingly argue the First Amendment exists for the primary purpose of enabling citizens to damage the government's reputation. It is topsy-turvy to suggest the government's "right" to a controversy-free reputation overrides the right to engage in core political and religious speech the Constitution most fiercely protects.

Any notion that the Supreme Court has broadly licensed schools to censor for the sole purpose of avoiding association with controversy misreads both *Hazelwood* and four decades of subsequent caselaw. *Hazelwood* stands for the narrow proposition that school authorities may remove articles from student-produced newspapers if the articles are journalistically deficient or unsuitably mature for a young audience. The only rationales cited by the school in *Hazelwood* to justify its censorship

decision were: (1) an article about teen pregnancy did not sufficiently anonymize interviewees or those they discussed; (2) younger students and their siblings are too immature to encounter discussion of birth control and premarital sex, and (3) an article about divorce criticized a student's absentee father without giving him an opportunity to respond. *Hazelwood*, 484 U.S. at 274–75. Nowhere did the school cite avoiding association with controversy. This "misattribution" rationale was simply a throw-in unnecessary to the decision, classic *dicta* this Court is under no obligation to apply. *See Weingarten v. Bd. of Educ.*, 591 F.Supp.2d 511, 519 (S.D.N.Y. 2008) (recognizing "imprimatur" discussion in *Hazelwood* as "unnecessary to the result").

Commentators have overwhelmingly denounced *Hazelwood* as an outcome-driven kludge lacking doctrinal grounding.[2] Essentially every

---

[2] A very partial sampling of scholarly critiques of *Hazelwood*'s failings includes: Frank D. LoMonte, *Censorship Makes the School Look Bad: Why Courts and Educators Must Embrace the "Passionate Conversation,"* 65 WASH. UNIV. J.L. & PUB. POL'Y 91 (2021); Clare R. Norins, Taran Harmon-Walker & Navroz Tharani, *Restoring Student Press Freedoms: Why Every State Needs a "New Voices" Law*, 32 GEO. MASON UNIV. C.R. L.J. 63 (2021); Roy S. Gutterman, *New Voices, New Rights, New York: A Case Study and a Call for Student Journalist Protections in New York*, 83 ALBANY L. REV. 1115 (2020); Sonja R. West, *Student Press Exceptionalism*, 2 EDUC. L. & POL'Y REV. 130 (2015); Amanda Harmon Cooley, *Controlling Students and Teachers: The Increasing Constriction*

case cited for support in the 5-3 majority opinion is mischaracterized, with some standing for the opposite proposition. Eric D. Bender, *The Viability of Racist Speech from High Schools to Universities: A Welcome Matriculation*, 59 UNIV. CIN. L. REV. 871, 881 n.56 (1991). And the Association for Education in Journalism and Mass Communication ("AEJMC"), the standard-setting body for journalism instruction nationwide, adopted a resolution marking *Hazelwood*'s 25th anniversary that declared:

> [N]o legitimate pedagogical purpose is served by the censorship of student journalism even if it reflects unflatteringly on school policies and programs, candidly discusses sensitive social and political issues, or voices opinions challenging to majority views on matters of public concern. The censorship of such speech is detrimental to effective learning and teaching, and it cannot be justified by reference to "pedagogical concerns."[3]

---

*of Constitutional Rights in Public Education*, 66 BAYLOR L. REV. 235 (2014); Christine Snyder, *Reversing the Tide: Restoring First Amendment Ideals in America's Schools Through Legislative Protections for Journalism Students and Advisors*, 2014 BYU EDUC. & L.J. 71 (2014); Ann M. Gill, *In the Wake of* Fraser *and* Hazelwood, 20 J.L. & EDUC. 253 (1991); William G. Buss, *School Newspapers, Public Forum, and the First Amendment*, 74 IOWA L. REV. 505 (1989).

[3] ASS'N FOR EDUC. IN JOURN. & MASS COMM., *AEJMC Resolution One 2013* (2013), https://www.aejmc.org/about/aejmc-resolutions/aejmc-2013-resolutions/resolution-one-2013.

*Hazelwood* has been so utterly discredited that 18 states have enacted laws specifically to nullify it, recognizing that the authority of *Tinker v. Des Moines Independent School District*, 393 U.S. 503 (1969), suffices to satisfy legitimate concerns for maintaining order.[4] Seldom in modern history has any Supreme Court decision impelled states from coast to coast to enact laws specifically to counteract it.[5]

Time and again since *Hazelwood*, the Supreme Court has admitted reasonable audiences are fully able to distinguish student speech from school messages. As recognized in *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 65 (2006), the Court has "held that high school students can appreciate the difference between speech a

---

[4] "Anti-*Hazelwood*" statutes exist in Arkansas, California, Colorado, Hawaii, Illinois, Iowa, Kansas, Maryland, Massachusetts, Minnesota, Nevada, New Jersey, North Dakota, Oregon, Rhode Island, Vermont, Washington and West Virginia. STUDENT PRESS LAW CTR., *New Voices Timeline*, https://splc.org/1970/01/new-voices-timeline/ (last visited Sept. 17, 2025).

[5] In *Lawrence v. Texas*, 539 U.S. 558 (2003), the Supreme Court afforded great weight to the erosion of state laws criminalizing sodomy in overturning *Bowers v. Hardwick*, 478 U.S. 186 (1986), which had legitimized those laws. At the time of *Bowers*, 25 states made consensual sodomy a crime, and by the time of *Lawrence*, 12 states had repealed their laws. *See Lawrence*, 539 U.S. at 573, reflecting – as with *Hazelwood* – a consensus that the Court's precedent was out of step with reality.

school sponsors and speech the school permits because legally required to do so, pursuant to an equal access policy." And *Hazelwood*'s "attribution" *dicta* plainly cannot survive the Court's more recent and sweeping pronouncement in *Kennedy v. Bremerton School District*, 597 U.S. 507, 534–35 (2022), categorically rejecting the "heckler's veto" that would result from allowing schools to censor speech for fear hearers might misattribute it to the school. *Kennedy*'s repudiation of the Establishment Clause test from *Lemon v. Kurtzman,* 403 U.S. 602 (1971) —which asked whether a reasonable observer could conclude that a school endorsed a speaker's religious message—is the last shovel of dirt interring *Hazelwood*'s antiquated "imprimatur" rationale.

With *Hazelwood* as an outlier, the Supreme Court has otherwise unfailingly recognized the government's reputational interests carry no weight in First Amendment analyses when pitted against a speaker's interest in being heard on matters of public concern. *See Bridges v. California*, 314 U.S. 252, 270 (1941) ("[I]t is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions."); *see also Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 841–42 (1978) ("Our prior cases have firmly

established […] that injury to official reputation is an insufficient reason 'for repressing speech that would otherwise be free.'") (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 272–73 (1964)). Government officials are expected to have thicker skins than ordinary citizens and turn the other cheek to verbal abuse. *See Houston Community College System v. Wilson*, 595 U.S. 468, 478 (2022) (government officials must "shoulder a degree of criticism about their public service from their constituents and their peers" and respond with counterspeech); *City of Houston v. Hill*, 482 U.S. 451, 461 (1987) ("[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers."). Outside of the educational setting—where solicitude for First Amendment values should be at its zenith[6]—nowhere in America is it regarded as tolerable for government authorities to silence people whose speech diminishes the public's opinion of them.

Government control over speakers' messages cannot be made self-validating. Allowing the panel decision to stand would sanction the circular principle that the more the government controls speech, the more

---

[6] *See Shelton v. Tucker*, 364 U.S. 479, 487 (1960) ("The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.").

control the government has. The school itself, in reasoning the panel adopted, notes all the ways the school used resources supporting E.D.'s club, including provision of school meeting space. Yet the school plainly does not regard any of *that* support to convert the students' speech into a school-endorsed message. The school evidently believes reasonable audience members *can* distinguish individual speech from government-endorsed speech—even when speakers meet in school facilities and post notices in school hallways. It is *only* because the school requires initials of a school employee to appear on clubs' flyers that it has any defensible claim E.D.'s speech fell within *Hazelwood*. It is impossible to articulate this "principle"—that a government agency can exert near-total censorship authority over citizens' speech by insisting the speech carry a stamp of government approval—without feeling the chill.

As Justice Alito highlighted with themed license plates, it beggars belief that a reasonable audience member could believe speakers' messages are attributable to the government when they are inconsistent or even directly contradictory. *Walker v. Sons of Confederate Veterans,*

*Inc.*, 576 U.S. 200, 221 (2015) (Alito, J., dissenting).[7] Presumably, a competing student club was free to place an "Abortion-Rights Club meeting" flyer directly beside E.D.'s flyer. What reasonable viewer could believe the government intended to endorse both viewpoints? What "curricular lesson" could a reasonable audience member derive from the existence of these irreconcilable messages?

Like any government agency, a school is always free to engage in counterspeech as a less-restrictive means of avoiding misattribution. *See United States v. Alvarez*, 567 U.S. 709, 727 (2012) ("The remedy for speech that is false is speech that is true. [...] The response to the unreasoned is the rational; to the uninformed, the enlightened; to the straightout lie, the simple truth."); *see also* Nadine Strossen, *Counterspeech in Response to Changing Notions of Free Speech*, Am. Bar Ass'n Hum. Rts. (Nov. 19, 2018),

---

[7] Though stated in a dissent in *Walker*, Justice Alito's reasoning soon commanded a majority in *Matal v. Tam*, 582 U.S. 218, 236 (2017), rejecting the misattribution rationale in the context of a discredited claim that reasonable audience members believe the government is endorsing an ethnic slur by allowing a musician to register a trademark that includes the slur: "[I]t is far-fetched to suggest that the content of a registered mark is government speech. If the federal registration of a trademark makes the mark government speech, the Federal Government is babbling prodigiously and incoherently."

https://www.americanbar.org/groups/crsj/publications/human_rights_m

agazine_home/the-ongoing-challenge-to-define-free-

speech/counterspeech-in-response-to-free-speech ("[T]he constitutionally

permissible response to speech conveying controversial, disfavored views

is 'counterspeech,' not censorship—more speech, not silence."). A simple

counterspeech addition to the bulletin board—"These messages are

posted by student clubs and are not school-endorsed"—would suffice to

remove whatever misattribution concerns might validly lie.

With *Hazelwood* as weak and discredited precedent, courts should

be looking for opportunities to read it as narrowly as possible, not—as

the panel did below—to expand upon it. The factors that convinced the

Court to decide *Hazelwood* in the school district's favor are conspicuously

absent here. Clubs are considered "*extra*curricular," not curricular.

Unlike the *Hazelwood* newspaper, participating in E.D.'s club was not a

graded academic exercise for which students received credit. There is no

indication any school money supported E.D.'s message; the school would

have maintained the message board with or without E.D.'s posting,

unlike the newspaper in *Hazelwood*, which existed for the sole purpose

of disseminating student articles. The Sixth Circuit recognized

*Hazelwood*'s narrowness in *Kincaid v. Gibson*, 236 F.3d 342, 346 (6th Cir. 2001) (*en banc*), in refusing to apply it to an extracurricular publication that university students produced as part of an out-of-class club.

The school was not exercising its "educator" authority here. Defendants did not say "please add more educationally rigorous information to the flyer." Defendant Luna gave the game away by stating the school's motivation was to avoid controversy ("walking on eggshells"). When the school's decision is devoid of curricular basis, *Hazelwood* authority should be at its nadir. After all, the Court stated, to qualify for *Hazelwood* deference, a decision must be justified by "pedagogical" concerns, not reputational ones. 484 U.S. at 273. And there is nothing educational about being censored.

## CONCLUSION

For the aforesaid reasons, the Court should vacate the erroneous panel opinion below and grant *en banc* reconsideration.

Dated: September 18, 2025

/s/ *Ronald G. London*

RONALD G. LONDON
   *Counsel of Record*
WILLIAM CREELEY
JEFFREY M. MURPHY
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE
Suite 340
Washington, DC 20003
(215) 717-3473
ronnie.london@thefire.org

Counsel for *Amici Curiae*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

1.     This document complies with the word limit of Fed. R. App. P. 29(b)(4) because, excluding the parts of the document exempted by the Fed. R. App. P. 32(f), this document contains 2,512 words.

2.     This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) and Circuit Rule 32(b) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

Dated: September 18, 2025          /s/ *Ronald G. London*
                                          RONALD G. LONDON
                                            *Counsel of Record*
                                          FOUNDATION FOR INDIVIDUAL
                                            RIGHTS AND EXPRESSION

## CERTIFICATE OF SERVICE

The undersigned certifies that on September 18, 2025, an electronic copy of the Brief of *Amici Curiae* Foundation for Individual Rights and Expression was filed with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the CM/ECF system. The undersigned also certifies all parties in this case are represented by counsel who are registered CM/ECF users and that service of the brief will be accomplished by the CM/ECF system.

Dated: September 18, 2025      /s/ *Ronald G. London*

Ronald G. London
   *Counsel of Record*
Foundation for Individual
   Rights and Expression